**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| JENNIFER CAEDRAN SULLIVAN, an individual person, | |
| *Plaintiff*, | |
| *v.* | |
| UNIFIED SCHOOL DISTRICT 512, JOHNSON COUNTY, STATE OF KANSAS (the "Shawnee Mission School District"); UNIFIED SCHOOL DISTRICT 512, JOHNSON COUNTY, STATE OF KANSAS 2023 BOARD OF EDUCATION MEMBERS—Mary Sinclair, President, Jessica Hembree, Vice President, Jamie Borgman, April Boyd-Noronha, Sara Goodburn, Heather Ousley, Brad Stratton, and—in their official and individual capacities (the "2023 Shawnee Mission School Board"); UNIFIED SCHOOL DISTRICT 512, JOHNSON COUNTY, STATE OF KANSAS 2024 BOARD OF EDUCATION MEMBERS—Mary Sinclair, President, April Boyd-Noronha, Vice President, Jamie Borgman, Mario Garcia, Jessica Hembree, Heather Ousley, and David Westbrook—in their official and individual capacities (the "2024 Shawnee Mission School Board"); MICHELLE HUBBARD, Superintendent, JOE GILHAUS, Deputy Superintendent, RACHEL ENGLAND, Compliance Coordinator, MICHAEL SCHUMACHER, Superintendent/Associate Superintendent, JEREMY HIGGINS, Director of Secondary Human Resources, and DAVID EWERS, Principal—in their official and individual capacities, | Case No: **JURY TRIAL DEMANDED** |
| *Defendants.* | |

<u>**VERIFIED COMPLAINT**</u>

COMES NOW Plaintiff Jennifer Caedran Sullivan, who goes by and is known as Caedran Sullivan ("Caedran" or "Ms. Sullivan"), by and through below-signed counsel, and for her Verified Complaint and her causes of action against Defendants, hereby states as follows:

1

## I. INTRODUCTION

1.      This is a case about the government controlling speech and abridging free-speech rights through retaliation and intimidation. It is about the government compelling speech to fit its orthodoxy and punishing speech that does not fit its narrative.

2.      In this case, a government entity has punished and continues to punish both speech that is not acceptable to the government under its new "transgender" orthodoxy and speech opposing the government's unlawful, racist conduct.

3.      The punishment of speech that does not fit the government's new "trans" narrative constitutes a violation of citizens' constitutional rights under the U.S. Constitution's First Amendment and under the Kansas Constitution's Bill of Rights.

4.      The punishment of speech that opposes government employer unlawful conduct is a violation of the First Amendment, the Kansas Constitution, and a violation of federal civil rights law protecting government employees' right to oppose the government's racist conduct in the workplace.

5.      Forcing people to say things they don't believe and that go against their religious beliefs is also a violation of the Kansas Preservation of Religious Freedom Act.

6.      All of the Defendants are either government entities or government officials acting under color of state law.

7.      At a time when our freedoms are under attack through baseless arguments that the First Amendment does not protect "misinformation," "hate-speech," or speech that does not fit a particular narrative, this case is even more important because it is about the government punishing those who will not disseminate the government's *opinion* on so-

called "gender-ideology" that treads on religious freedom, and it is about the government punishing those who dare speak up in opposition to the government's anti-white ideology that is just as racist as anti-black ideology, or any other race-based ideology.

8.     Specifically, Defendants are violating a public school teacher's rights by forcing her to say things which violate her religious, moral, and personal beliefs by requiring her use words endorsing and supporting the fiction that boys can become girls and girls can become boys, or that one can disavow his or her sex because one feels like it. In doing so, the government is violating the teacher's rights of conscience and the government is also punishing her for speaking up about the government's imposition of racist, anti-white ideology prevalent in the government's mandatory DEI training.

9.     The teacher, Ms. Sullivan, is a long-time Advanced Placement (AP) English teacher with an impeccable record at Shawnee Mission North High School. She dared speak up in opposition to the Shawnee Mission School District's mandatory, anti-white, anti-American, anti-Christian, politically-divisive DEI training sessions while also suggesting more balanced, non-racist viewpoints for the training.

10.     After she spoke up and then put her opposition to the racist DEI sessions in writing, Defendants utilized the power and force of the government to retaliate against Ms. Sullivan, attempted to silence her, and attempted to compel her to say things she does not believe – things which violate her religious and moral beliefs and her conscience. Things which also go against her extensive educational training (including without limitation English usage and grammar rules).

11.     Race and color discrimination and harassment are wrong and unlawful

whether they are perpetrated in the private sector or by the government.

12.     Race and color discrimination and harassment are wrong and unlawful whether they are committed against a member of a minority race or against a member of the majority.

13.     Race and color discrimination and harassment are wrong and unlawful even when, or especially when, they are perpetrated under the rubric of Diversity, Equity, and Inclusion ("DEI") by the people entrusted with the education of our youth.

14.     In 2021, after Ms. Sullivan spoke up and then put in writing her opposition to the racist, anti-white, anti-American, politically-charged DEI training sessions that she and other teachers are required to attend and are expected to incorporate into classroom lessons, Defendants targeted Ms. Sullivan for retaliation.

15.     Defendants then retaliated against Ms. Sullivan in numerous material ways under the pretext of discipline for allegedly referring to a female student: "by his legal name and using incorrect pronouns on one or a couple occasions during the school year."

16.     Defendants disciplined and continue to discipline Ms. Sullivan despite telling her she would not be disciplined in connection with the government's "investigation" of an alleged written complaint of "gender identity discrimination."

17.     Defendants never produced the alleged complaint.

18.     Defendants placed a written reprimand in Ms. Sullivan's permanent file (affecting her ability to be promoted or hired), fabricated a reason to require training, monitored her team meetings, made her workplace hostile, and stripped her of her AP classes (a demotion reassignment with significantly different responsibilities, necessitating

her to design and implement a whole new curriculum for a lower grade level).

19.     Ms. Sullivan tries not to use pronouns for any students, but during the second "investigation," specifically during Defendants' double-team interrogation of Ms. Sullivan, she informed Defendants that she tries to call students by whatever name they want to be called (because names do not necessarily express a student's sex like pronouns do).

20.     Defendants disciplined and continue to discipline Ms. Sullivan even after Defendants could not find any evidence of discrimination, and after a finding that the alleged pronoun use was: "inadvertent and not purposeful."

21.     On information and belief, no other teachers at the school were disciplined for similar use of pronouns that coincide with a student's sex.

22.     It is understandable when someone refers to female students with feminine pronouns, even if they prefer masculine pronouns, and when someone refers to male students with masculine pronouns, even if they prefer feminine pronouns.

23.     After two "investigations" finding no support for its allegation of discrimination, no support for intentional use of *any* pronouns, and no violation of any policy, Defendants quickly created a new "trans" policy, not published with its other policies—intentionally not calling it a 'policy.'

24.     The Defendants' new "trans" policy expressly states, on one hand, "The SMSD Board of Education has not adopted a transgender-specific policy. The current practice in SMSD is for administration to evaluate requests for accommodations on a case-by-case basis, and to develop an individual plan for each student."

25.    On the other hand, the Defendants' new policy, written in the form of frequently asked questions (FAQs), prohibits (in every case) the use of actual pronouns coinciding with a student's sex if the student requests other pronouns,[1] and requires the use of preferred pronouns.

26.    Although Defendants' "investigation" was not proper, as required by the teachers' contract terms, Defendants threatened Ms. Sullivan with further discipline, including termination, if she does not parrot their new gender ideology by abandoning her religious beliefs, abandoning her conscience, and abandoning centuries-long-established English usage rules for pronouns.

27.    By requiring Ms. Sullivan to use pronouns that do not coincide with a student's sex (whenever requested), Defendants are forcing Ms. Sullivan, against her will and against her religious beliefs and conscience, to participate in so-called "gender transitioning" experiments at school, requiring her to endorse the fiction that boys can become girls and girls can become boys if they choose, or the fiction that a boy or girl can disavow his or her sex by "identifying" as something else.

28.    Defendants are demanding that Ms. Sullivan participate by using masculine pronouns for females and feminine pronouns for males when requested, requiring her to affirm the fiction that students can change sexes or genders, despite Ms. Sullivan's sincerely-held religious beliefs and moral beliefs against doing so.

---

[1] "Q. Can we call a student by their preferred name and/or pronouns?
A. Yes. All students have the right to be addressed by the name and pronouns that correspond to the gender identity they assert at school. School staff and peers are expected to respect a student's name and pronouns once they have been made aware."

29.     Defendants are also demanding that Ms. Sullivan participate in students' experiments by using any of the myriad trendy pronouns students may choose (on any given day) which diverge from the student's sex (*e.g.*, (f)ee/ (f)eer/ (f)eer/(f)eers/ (f)eerself; e/ ey/ em/ eir/ eirs/ eirself; per/ per/ pers/ pers/ perself; they/ them/ their/ theirs/ themself; ve/ ver/ vis/ vis/ verself; xe/ xem/ xyr/ xyrs/ xemself; ze/ zie/ hir/ hir/ hirs/ hirself), despite Ms. Sullivan's conscience and her religious and moral beliefs against doing so.[2] Some "gender-identity" proponents claim at least 72 genders other than masculine or feminine genders.[3]

30.     There is no compelling or legitimate reason for the government to force Ms. Sullivan or other teachers to participate in students' experiments with divergent pronouns or genders.

31.     Defendants are also demanding that Ms. Sullivan implicate herself by lying to parents to hide from parents when their child is experimenting at school with different pronouns or genders. Defendants require Ms. Sullivan to hide this critical information from parents despite Ms. Sullivan's religious and moral beliefs against lying, and despite the Kansas Attorney General's express warning that the Shawnee Mission School District's policy demanding teachers to hide the critical information from parents likely violates the law.[4] Ex. 1 at 1.

32.     There is no compelling or legitimate reason for the government to force Ms. Sullivan or other teachers to lie to parents by hiding from parents when their child is

---

[2] University of Wisconsin at Milwaukee list of gender pronouns https://uwm.edu/lgbtrc/support/gender-pronouns/
[3] https://www.medicinenet.com/what_are_the_72_other_genders/article.htm
[4] https://www.ag.ks.gov/Home/Components/News/News/40/

experimenting at school with different pronouns or genders.

33.     Defendants' actions are violating this Court's precedent. *See Ricard v. USD 475 Geary County, Kansas School Board*, No. 5:22-cv-04015-HLT-GEB, 2022 WL 1471372, at *8-9, 13 (D. Kan. May 9, 2022) ("the Court finds Plaintiff has demonstrated continued application of the Communication with Parents Policy to her burdens her religious exercise . . . It is difficult to envision why a school would even claim—much less how a school could establish—a generalized interest in withholding or concealing from the parents of minor children, information fundamental to a child's identity, personhood, and mental and emotional well-being such as their preferred name and pronouns").

34.     Defendants' are violating Ms. Sullivan's constitutional rights to freedom of speech and the free exercise of her religion, practices prohibited by 42 U.S.C. § 1983, the Kansas Constitution, and the Kansas Preservation of Religious Freedom Act.

35.     Defendants are violating Ms. Sullivan's rights under the unconstitutional conditions doctrine, and through content viewpoint discrimination.

36.     Defendants are violating Title VII of the Civil Rights Act of 1964 which protects against retaliation for opposing harassment on the basis of race and/or color, including without limitation ethnic slurs, and offensive or derogatory comments, or other verbal conduct based on an individual's race/color; a practice prohibited in employment by 42 U.S.C. § 2000e, *et seq*.

37.     After Defendants punished Ms. Sullivan for opposing Defendants' racist DEI programing and after Defendants punished Ms. Sullivan for not endorsing their new "trans" policy (because she did not and will not affirm the fiction that boys can become girls and

girls can become boys, or that one can disavow his or her sex), Ms. Sullivan wrote two op-ed articles in an online newspaper as an individual citizen warning the public of the indoctrination and the ideology in the District; things that no one else was willing to risk warning parents about for fear of government retribution.[5]

38.     In further retaliation, this time for Ms. Sullivan speaking freely in public on matters of public importance, and as additional retaliation for resisting the Defendants' racist DEI training and resisting the government's policy requiring her to endorse and affirm the government's ideology that boys can become girls and girls can become boys or that students can disavow their sex, Defendants singled-out Ms. Sullivan by sending District personnel to monitor each of Ms. Sullivan's weekly team meetings for the entire 2023-24 school year and then punished Ms. Sullivan by demoting and reassigning her.

39.     Defendants' actions violate not only Ms. Sullivan's First Amendment rights to free exercise of religion and free speech but also the Kansas Constitution's rights to religious liberty, rights of conscience, and rights to freely speak, write or publish their sentiments, as guaranteed by the Kansas Constitution's Bill of Rights, §§ 7 and 11.

## II. THE PARTIES

### A. PLAINTIFF

40.     Caedran Sullivan is an exemplary, long-term English teacher at Shawnee Mission North High School (the "School"), within Kansas Unified School District 512, Johnson county, state of Kansas  (the "Shawnee Mission School District," "SMSD," "USD

---

[5] https://readlion.com/kansas-public-school-teacher-yes-your-children-are-being-indoctrinated/
https://readlion.com/kansas-public-school-teacher-stands-by-criticism-amid-attacks-and-national-attention-i-will-not-be-deterred/

512," or the "District") where she has taught students since 2007, including without limitation Advanced Placement ("AP") and Honors English classes. Ms. Sullivan also served as the International Baccalaureate Extended Essay Supervisor; coached softball, swimming, and track; and is the faculty advisor for the Literary Magazine.

41.     Ms. Sullivan has Bachelors degrees in Psychology and Secondary Education/English and a Masters degree in English.

42.     Although she feels her job is threatened and her workplace has become increasingly hostile, Ms. Sullivan simply wants to teach kids—the career she has invested many years in, and for which she has trained long and hard, at significant expense.

43.     Ms. Sullivan is still employed in the District despite the Defendants' repeated attempts to ostracize her and despite Defendants adversely altering the terms of her employment.

44.     Ms. Sullivan resides and works in Kansas.

## B. DEFENDANTS

45.     The Shawnee Mission School District is a public corporation governmental body governed by its board, under K.S.A. 72-1131. The board is responsible for the general operation, management, and control of the school system. In governing the District, the board acts in a policy-making capacity and exercises executive, legislative, and/or judicial authority. The board delegates administrative authority to the superintendent or other employees as specified, but retains the power to alter or veto the acts of any or all employees. All defendants in this action acting in their official capacities acted under color of law, including without limitation the law of Kansas.

46.     Defendants Mary Sinclair, Jessica Hembree, Jamie Borgman, April Boyd-Noronha, Sara Goodburn, Heather Ousley, and Brad Stratton (the "2023 School Board Defendants") were members of the Board of Education of Kansas USD 512, Shawnee Mission Public Schools, which constituted the governing body of the District in 2023.

47.     Defendants Mary Sinclair, President, April Boyd-Noronha, Vice President, Jamie Borgman, Mario Garcia, Jessica Hembree, Heather Ousley, and David Westbrook (the "2024 School Board Defendants") are members of the Board of Education of Kansas USD 512, Shawnee Mission Public Schools, which constitutes the governing body of the District in 2024 (the 2023 School Board Defendants or the 2024 School Board Defendants, collectively and generally the "Board Defendants"). Through its members, the Board Defendants, the Board of Education is responsible for, among other things, the adoption and authorization of policies that govern teacher conduct and expression in the District, including the policies challenged herein.

48.     As members of the School Board, the Board Defendants exercise final policymaking authority for policies that govern the District, including the policies governing faculty members, including teachers.

49.     The Board Defendants are responsible for the enactment, amendment, and repeal of District policies, including those challenged herein.

50.     As elected members of the School Board, the Board Defendants possess the authority to change and enforce the policies challenged herein.

51.     The Board Defendants have not modified the policies governing teachers challenged herein to comply with constitutional mandates.

52.     Each of the Board Defendants acquiesces in, sanctions, approves, and supports the actions of the other Defendants in enforcing the policies and procedures governing faculty members, including without limitation the policies and procedures used against Ms. Sullivan and challenged herein.

53.     None of the Board Defendants have instructed District personnel, including the other Defendants, to change or alter the policies and practices challenged herein or to change the way those policies are applied to faculty members, including Ms. Sullivan.

54.     Board Defendants are aware of the actions authorized by and occurring under the policies and actions challenged by Ms. Sullivan and have not instructed District personnel, including the other Defendants, to change or alter either the policies or the actions taken pursuant to those policies.

55.     Defendant Michelle Hubbard ("Hubbard") was the Superintendent of the District, and served in that role until after the 2023-2024 school year.

56.     As Superintendent, Defendant Hubbard was the chief executive, educational, and administrative officer of the District.

57.     Defendant Hubbard's authority and powers included oversight and control of the District and other government Defendants.

58.     Defendant Hubbard's duties included, among others, authorizing, executing, enforcing, and implementing the policies governing faculty members in the District and overseeing the operation and management of the District.

59.     As Superintendent, Defendant Hubbard directly oversaw Defendant Gilhaus, Defendant Schumacher, Defendant England, Defendant Higgins, and Defendant Ewers.

60.     Defendant Gilhaus, Defendant Schumacher, Defendant England, and Defendant Higgins were involved in and failed to process or participate in Ms. Sullivan's appeal/grievance in relation to the second "investigation" (more fully described hereinafter).

61.     As Superintendent, Defendant Hubbard had the responsibility to implement final policymaking authority concerning faculty members in the District, to the extent not retained by the Board Defendants. The Board Defendants retained authority to make and enforce policies for the District, to the extent not abdicated to the Administration.

62.     As Superintendent, Defendant Hubbard possessed the authority and responsibility for governing, overseeing, and disciplining faculty members in the District, as well as the grievance process terms set forth in the teacher contract incorporating the terms of the Professional Negotiated Agreement, or PNA (defined hereinafter).

63.     As Superintendent, Defendant Hubbard was aware of the actions alleged herein and the actions authorized by and occurring under the policies challenged by Ms. Sullivan and did not instruct District personnel, including without limitation the other Defendants, to change or alter either the policies or the actions taken against Ms. Sullivan pursuant to those policies.

64.     As Superintendent, Defendant Hubbard had the authority to review, approve, or reject the decisions of other District officials, including without limitation the other non-Board Defendants, regarding the policies and actions challenged herein.

65.     Defendant Hubbard authorized, approved, and implemented the policies that are challenged herein and that are being used to restrict Ms. Sullivan's protected expression

and exercise and to control and compel her expression against her will.

66.    Defendant Hubbard confirmed, sanctioned, approved, and ratified District officials' creation and application of the policies and sanctioned, approved, and ratified the actions applied to Ms. Sullivan in a discriminatory and retaliatory fashion, as challenged herein.

67.    Defendant David Ewers ("Ewers") is the Principal of the School.

68.    Defendant Ewers possessed and possesses the authority and responsibility for governing and regulating faculty at the School.

69.    Defendant Ewers' duties include overseeing the various departments at the School, including the English/Language Arts department.

70.    Defendant Ewers's duties include supervising Ms. Sullivan.

71.    Defendants Hubbard and Ewers each possessed or possess the authority to enforce the District policies challenged herein and to recommend changes to them.

72.    In executing their respective responsibilities, Defendant Hubbard, independently and in consultation with other Defendants, enforced the policies challenged herein and endorsed the actions against Ms. Sullivan challenged herein.

73.    Defendant Hubbard had the authority under the policies and actions challenged herein to investigate, recommend disciplinary actions, and impose disciplinary actions on faculty in the District, and Defendant Ewers has the authority under the policies and actions challenged herein to investigate, recommend disciplinary actions, and impose disciplinary actions on faculty in the School.

74.    Defendants Hubbard and Ewers, independently and in consultation with each

other, were responsible for creating and enforcing the policies challenged herein and applying them to Ms. Sullivan and others.

75.    Defendants Hubbard and Ewers failed to recommend any changes to the policies or actions challenged herein, or to how those policies are enforced, to comply with constitutional mandates, even after given the opportunity to do so by counsel.

76.    Defendant Hubbard failed to stop District officials, including the other Defendants, from applying the policies challenged herein to faculty, including Ms. Sullivan.

77.    The Board Defendants failed to stop District officials, including without limitation other defendants Hubbard, Gilhaus, Schumacher, England, Higgins, and Ewers from applying against Ms. Sullivan the policies and actions challenged herein.

78.    The Board Defendants failed to stop District officials, including without limitation other Defendants Hubbard, Gilhaus, Schumacher, England, Higgins, and Ewers from retaliating against Ms. Sullivan.

79.    Each and every Defendant is sued in his or her official capacity and are sued in their individual capacities as well.

80.    Because the school- or building-level administration defendants acted on behalf of and as agents of and for the District-level administration defendants and the District-level defendants acted on behalf of and as agents of and for the Board Defendants, the term "Defendants" refers to the most expansive set of defendants as is applicable from the context within the timeframe alleged (2023 or 2024).

### III. JURISDICTION AND VENUE

81.    This civil rights action raises federal questions under the United States Constitution, particularly the First Amendment, and the Civil Rights Act of 1964, 42 U.S.C. § 1983, and 42 U.S.C. § 2000e.

82.    This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

83.    This Court has authority to award: the requested damages pursuant to 28 U.S.C. § 1343; declaratory relief pursuant to 28 U.S.C. §§ 2201–02; the requested injunctive relief pursuant to 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; and costs and attorney's fees under 42 U.S.C. § 1988 and K.S.A. 60–5303(b)(6).

84.    This Court has supplemental jurisdiction over the state law claims made herein pursuant to 28 U.S.C. § 1367.

85.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendants reside or did reside in this district and all of the acts described in this Verified Complaint occurred in this district.

86.    On or about October 3, 2023, Ms. Sullivan filed with the EEOC a timely charge against the Defendants for discrimination and retaliation. A copy of Ms. Sullivan's charge is attached. Ex. 2.

87.    On or about August 1, the EEOC posted a notice of right to sue for Ms. Sullivan.  A copy of the right to sue notice is attached. Ex. 3.

88.    This action has been filed with this Court within 90 days of Ms. Sullivan's receipt of the right to sue notice of from the EEOC. Ms. Sullivan has fully complied with all administrative prerequisites before filing her Title VII claims in this action.

## IV. SPECIFIC FACTUAL ALLEGATIONS

**A.**      **Ms. Sullivan opposed the Defendants' racist DEI programing.**

89.      After enduring numerous anti-white DEI training sessions she was required to attend, Ms. Sullivan opposed the government's anti-white racist, anti-American, and politically-divisive DEI programing.

90.      After the government's DEI programing became even more racist and one-sided, Ms. Sullivan wrote a letter to the DEI coordinators opposing the racist and divisive curriculum and suggesting more balanced training, which letter Ms. Sullivan provided to her principal, Defendant Ewers (the "Opposition Letter"). Ex. 4.

91.      When Ms. Sullivan provided the Opposition Letter to Defendant Ewers, she asked if she could be excused from the racist DEI training. Defendant Ewers denied Ms. Sullivan's request to be excused.

92.      The Opposition Letter was not part of Ms. Sullivan's job duties. Rather, it stated her opinions as a private citizen.

93.      In the Opposition Letter, Ms. Sullivan opposed acts and practices occurring in the school system as a citizen. Ms. Sullivan's Opposition to Racist DEI implicated her interest as a citizen on matters of public concern because she took issue with unsustainability within the building, alienation of staff, public attacks on social media and internet discussion boards, how the racist DEI curriculum was not being released to the public, was contributing to lower academic performance in the District, was contributing to divisiveness among staff, was contributing to teacher shortages, and was indoctrinating students through a one-sided political agenda without balance.

94.    Ms. Sullivan's Opposition to the racist DEI was not part of her responsibilities as a teacher.

95.    In drafting the Opposition Letter, Ms. Sullivan expressed her personal views on racial and educational issues of public concern.

96.    In her Opposition Letter, Ms. Sullivan took issue with the Government's DEI Programing (defined in great detail hereinafter).

97.    Ms. Sullivan respectfully opposed: "BLM workshops & lectures with blatant propaganda videos . . . a liberal standpoint about white privilege, systemic racism, white supremacy, anti-capitalism, anti-conservatism, decolonizing our classrooms, how to be an antiracist, white fragility, critical race theory, 1619 curriculum, daily microaggressions . . . White shaming discourse and a preoccupation with language depicting white people as the oppressor vs the oppressed . . . Field trips focusing on systemic racism . . ." Ex. 4 at 1.

98.    In the Opposition Letter, Ms. Sullivan quoted author Arthur Brooks in suggesting, "Our willingness to listen to and respectfully engage those with whom we disagree (especially about matters of profound importance) contributes vitally to the maintenance of a milieu in which people feel free to speak their minds, consider unpopular positions, and explore lines of argument that may undercut established ways of thinking. Such an ethos protects us against dogmatism and groupthink, both of which are toxic to the health of academic communities and to the functioning of democracies . . . Good leaders should get out of their ideological bubbles and interact with those in other positions along the spectrum of personal morality in America . . . We need to find our common ground and bridge our differences with respect . . ." Ex. 4 at 2.

99.    In the Opposition Letter, Ms. Sullivan wrote, "We should not be exploiting identity politics in our Deep Equity meetings, or with our students at the school. Doing so neglects the opportunity to bring people together. We should be trying to break down division, not create it. We are not a 'one-party' entity." Ms. Sullivan also opposed the Government's DEI Programing because of its "presumed superior intellectual or political status and view of leftist ideology," and because the "curriculum centered around a Progressive Liberal point of view." Ex. 4 at 2.

100.    In the Opposition Letter, Ms. Sullivan suggests the District "move away from the disdain shown to more independent and conservative views." Ex. 4 at 2.

101.    In the Opposition Letter, Ms. Sullivan again quotes Brooks in stating, "We should reject rhetoric that suggests contempt for the other, and 'should celebrate our ideological diversity. Good leaders should get out of their ideological bubbles and interact with those in other positions along the spectrum of personal morality in America' . . . We need to find our common ground and bridge our differences with respect," and she notes, "The issues we discuss in Deep Equity are politically charged topics." Ex. 4 at 2.

102.    On information and belief, the fact of the Opposition Letter, and its contents or a summary, were shared amongst Defendants and angered some or all of them.

103.    After the Opposition Letter, Defendants set about to silence, discipline, and punish, or "cancel" Ms. Sullivan because of and as retaliation for her beliefs, her legally-protected opposition to the government's race and color discrimination, for her free exercise of speech objecting to the government Defendants' lack of diversity of thought, and for Ms. Sullivan not endorsing and affirming Defendants' new "trans" ideology.

19

**B.      Ms. Sullivan's beliefs.**

104.     Ms. Sullivan cares a great deal about each and every one of her students and she believes it is incumbent upon her as a teacher to be kind, compassionate, and loving as she endeavors to provide the best possible education, irrespective of the students' race, gender, or other immutable characteristic, and regardless of the students' religion, orientation, identity, or other preferences; which is something she strives to do every day, every year, for every student.

105.     Ms. Sullivan believes anti-white racism is just as wrong as anti-black racism or racism of any kind against any race.

106.     Ms. Sullivan holds absolutely no animus toward students or anyone else struggling with gender dysphoria or the recent narratives around so-called "gender ideology," including so-called social or medical "transitioning," or "trans" students. But Ms. Sullivan refuses to deceive students, and she endeavors to not tell them things that are false or harmful.

107.     Ms. Sullivan also does not want to and will not lie to parents. But she feels threatened by Defendants if she does not follow District policy or custom to hide information about students from their parents.

108.     Ms. Sullivan believes gender dysphoria and "transgenderism" can be considered a "serious emotional disturbance" (formerly called gender identity disorder) and therefore can classify a student suffering from gender dysphoria or transgenderism as a "child with a disability," under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.* ("IDEA"), requiring informed, written consent from parents before

providing evaluation, an Individualized Education Program ("IEP"), or special services.

109.    Ms. Sullivan believes the requirement to refer to students by pronouns that do not coincide with the student's sex can be considered part of an IEP and/or special services.

110.    Ms. Sullivan believes the Defendants' requirement that teachers refer to students by pronouns that do not coincide with the student's sex, or a name that diverges from the student's legal name or nickname, requires informed, written consent from parents under the IDEA.

111.    Defendants requiring teachers to refer to a student by pronouns that do not coincide with the student's sex, without an IEP and without written consent from the student's parent(s), is requiring teachers to violate IDEA federal law.

112.    Ms. Sullivan does not want to and will not violate the IDEA or other federal law. But she feels threatened by Defendants if she does not follow District policy or directive.

113.    Ms. Sullivan is a woman of faith who strives to live out her faith daily.

114.    Because of her Judeo-Christian values and her faith, Ms. Sullivan has sincerely-held beliefs that govern her views about human nature, marriage, gender, sex, sexuality, morality, and social issues.

115.    Ms. Sullivan's faith informs her convictions concerning human nature, the purpose and meaning of life, and ethical and moral standards that should govern human conduct.

116.    Ms. Sullivan's faith teaches essentially the same thing that modern science

teaches, as summarized in a formal scientific statement of the Endocrine Society: that humans like "most vertebrates and all mammals have 2 distinct sexes."[6] Ex. 5 at 3.

117.    The traditional Christian and biblical understanding of human nature includes the belief that human beings are created as either male or female and that their sex cannot be changed, regardless of an individual person's feelings or preferences. Ms. Sullivan shares those beliefs.

118.    As part of her sincerely-held religious beliefs, Ms. Sullivan believes that lying is wrong.

119.    Ms. Sullivan does not want to be compelled to lie to parents or say things that are not true, to anyone.

120.    Ms. Sullivan believes that persons born with XY chromosomes are males, and persons born with XX chromosomes are females.

121.    As part of her sincerely-held religious beliefs and moral beliefs, Ms. Sullivan believes that no humans are "born in the wrong body."

122.    As part of her sincerely-held religious beliefs and her academic training, including without limitation several degrees, Ms. Sullivan believes that there are two sexes.

123.    As part of her sincerely-held religious beliefs, Ms. Sullivan believes that one cannot change his or her gender or sex, or "transition" from one sex to another, or one gender to another.

124.    As part of her sincerely-held religious beliefs, Ms. Sullivan believes the idea

---

[6] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8348944/

that males can become females and females can become males is false.

125.   As part of her sincerely-held religious beliefs and her academic training, which includes a degree in psychology, Ms. Sullivan believes that the idea that one can change genders or sexes, or "transition" from one to another is false and harmful to children.

126.   As part of her sincerely-held religious beliefs, Ms. Sullivan believes it is wrong to lie by encouraging or affirming falsehoods or things she does not believe.

127.   Ms. Sullivan believes it is inappropriate and potentially harmful to children for her to participate in a student's experimentation based on the student's belief that he or she can change sexes or genders—before, during, or after puberty, or from day-to-day.

128.   Ms. Sullivan believes it is wrong to compel her and other teachers to say things that they believe are false and that violate her and their sincerely-held religious beliefs.

129.   Ms. Sullivan believes it is wrong to compel her and other teachers to participate in a student's experimentation based on the student's belief that he or she can change sexes or genders—before, during, or after puberty, or from day-to-day—by choosing to change identities.

130.   Ms. Sullivan, who has a Master's Degree in English, believes that the proper use of English language requires masculine pronouns for males and feminine pronouns for females and that these long-established rules reflect the biological reality of human nature.

131.   Using masculine pronouns for males and feminine pronouns for females are long-established rules of English usage, designed to accurately describe human nature.

132.    Masculine pronouns for males and feminine pronouns for females are correct rules of English usage.

133.    Ms. Sullivan believes it is not discrimination to use masculine pronouns for males and feminine pronouns for females.

134.    Ms. Sullivan believes it is not "misgendering" to use masculine pronouns for males and feminine pronouns for females but she sincerely tries not to use pronouns when referring to students.

135.    It is not "misgendering" to use masculine pronouns for males and feminine pronouns for females.

136.    Ms. Sullivan does not want to participate in children experimenting with changing sexes or genders or making potentially irreversible and life-changing decisions that they may regret later.

137.    Ms. Sullivan believes that, because of the difficulty of assessing matters of so-called "gender identity" and the long-term irreversible consequences of certain treatments of and for transgender-identifying people, including without limitation puberty blockers, cross-sex hormone replacement therapy, and so-called sex-reassignment surgery, children should not be encouraged to experiment with or undertake social or medical "transition" because of their inability to assess long-term consequences.

138.    Ms. Sullivan believes that parents are responsible for helping children understand factors surrounding so-called gender identity.

139.    Ms. Sullivan believes that parents have a fundamental right to control the upbringing and education of their children.

140.    Ms. Sullivan believes that any so-called gender-identity education policy must account for the fundamental right of parents to control the upbringing and education of their children.

141.    Ms. Sullivan believes that any gender-identity education policy that does not account for parents' fundamental right to control the upbringing and education of their children does a disservice to both children and their parents.

142.    Ms. Sullivan believes educators have free speech and free exercise of religion rights and rights of conscience that Defendants have violated with their New Trans Orthodoxy (defined hereinafter) and with their punishment of Ms. Sullivan.

143.    Ms. Sullivan believes that all education policy must protect educators' fundamental freedoms.

144.    Ms. Sullivan believes that if she and other teachers refer to a student by pronouns other than masculine pronouns for males and feminine pronouns for females, it affirms the fiction that boys can become girls and girls can become boys, or that one can disavow or change his or her sex or gender.

**C.      First "investigation": false, year-old allegations, bad faith exclusion of counsel, and unique "expectations" for Ms. Sullivan.**

145.    Because of her beliefs and because she opposed the government's racist DEI programing, Defendants retaliated against Ms. Sullivan on January 20, 2023 through an alleged "investigation" into false, year-old allegations, by stating ominously in an email that Ms. Sullivan could bring representation to a meeting with the principal and associate-principal for allegations they would not disclose. Defendants' actions were intended to

intimidate Ms. Sullivan.

146.   Defendant Ewers' January 20, 2023 email stated in part: "I have had some information brought to my attention and I need to discuss it with you." The email provided no detail. Ex. 6.

147.   Before the Opposition Letter, Defendant Ewers would typically come to Ms. Sullivan's room if he had something to talk with her about (usually during her planning period or after school).

148.   Defendant Ewers' January 20, 2023 email also connoted urgency to meet that day ("I need to meet with you today either during your plan 7th period or immediately after school."). Ex. 6.

149.   Defendant Ewers could have gone to Ms. Sullivan's classroom to talk with her like he did in the past, but chose instead to send an email.

150.   When Ms. Sullivan did not see the email sent on a Friday, Defendant Ewers sent another email, *on a Sunday* in the late afternoon, January 22, 2023, stating, "I am reaching out to confirm that you have read the email below." Ex. 6.

151.   Ms. Sullivan saw the email on Monday, January 23, 2023 and followed-up right away, "No, I am just seeing this email today. I am scared about the contents of your email and my heart dropped. I will be available today during my lunch (3rd lunch) and after school (7th block)." Ex. 6.

152.   When Defendant Ewers' email was received it prompted fears in Ms. Sullivan that her employment could be in jeopardy. However, there was no time to secure representation before the meeting.

153.    At the January 23, 2023 meeting called by the government, Defendant Ewers made allegations that Ms. Sullivan referred to some students by their "dead name and non-preferred pronouns" in class.

154.    At the same meeting, Defendant Ewers made other antagonistic allegations which Ms. Sullivan categorically denied (without limitation, falsely claiming she used the N-word in class and falsely claiming she said putting one's phone away can cure depression).

155.    However, Defendants provided no substance for any of the allegations; no names of students, no classes, and no dates. Just vague, ambiguous, generic accusations.

156.    Defendants had no policy, practice, or expectations regarding the names or pronouns teachers must use to refer to students.

157.    But Defendants stated that in "moving forward" (from January 23, 2023): "It is an expectation that students who have indicated a preferred name and pronoun will be referred to by those preferences." Ex. 7.

158.    Ms. Sullivan did not recall referring to any student with a pronoun or by any name that was not the student's preferred name.

159.    Two days later, on January 25, 2023, as instructed, Ms. Sullivan responded to the vague accusations. In her email response, Ms. Sullivan requested additional information relative to the accusations in order to be able to fully respond for a follow-up meeting the government insisted on. Ex. 8.

160.    Defendant Ewers alleged that the conduct occurred the previous year but did not provide any more detail or information Ms. Sullivan requested.

161.    Defendants instead required Ms. Sullivan to attend another meeting regarding the vague accusations.

162.    Ms. Sullivan again requested the basis for the accusations and meeting:

I am happy to meet with you, but because our exchanges have ended with "you are more than welcome to bring representation to the meeting," that makes it seem as though this is a formal process and I would like a few questions answered before the meeting in order to best be prepared.
  1. Has there been a formal complaint made?
  2. If there has been a formal complaint made, who is the Human Resources Director or Human Resources Coordinator or designee who will be the designated investigator?
  3. If there has been a formal complaint made, I would like to see all supporting documents pertaining to the complaint (redacted if necessary).
  4. If there hasn't been a formal complaint made, what is the stated purpose of the meeting from your position?
Thank you for your time,
Caedran

Ex. 8.

163.    Defendant Ewers, on January 26, 2023, informed Ms. Sullivan: (i) there was no formal complaint, (ii) the alleged student statements could not be shared with Ms. Sullivan, (iii) she could bring representation, and (iv) the follow-up investigation meeting was not optional.

164.    When Ms. Sullivan attempted to schedule the follow-up investigation meeting with legal representation, Defendants backpedaled and said they meant NEA union representation or another teacher. Ex. 9.

165.    But Ms. Sullivan is not a union member, and Ms. Sullivan does not know

any teachers who are licensed to practice law in Kansas.[7]

166.   Defendant Ewers then stated that District policy held that Ms. Sullivan could not be represented by a lawyer at the investigation meeting. Ex. 6.

167.   That statement was false. Ms. Sullivan could have been represented by legal counsel. Ex. 9.

168.   However, if Ms. Sullivan was represented by legal counsel, then Defendants would want their legal counsel present. Ex. 9.

169.   Defendants misrepresented to Ms. Sullivan that she could not have legal counsel present for the follow-up investigation meeting February 1, 2023 (an investigation that could affect her employment).

170.   Ms. Sullivan responded also in a writing provided to Defendant Ewers, and no cause for discipline of Ms. Sullivan was found through the "investigation" at either the January 23, 2023 meeting or the February 1, 2023 meeting. Ex. 9, 10.

171.   In connection with the first "investigation," Defendants communicated to Ms. Sullivan for the first time on January 23rd, 2023, an "expectation that students who have indicated a preferred name and pronoun will be referred to by those preferences," on a piece of paper Defendant Ewers handed to Ms. Sullivan. Ex. 7.

172.   On information and belief, Defendants did not communicate this "expectation" to any other teachers, before, at the same time, or within a week of communicating it to Ms. Sullivan.

---

[7] It is believed that representing someone at an investigation that could have an effect on that person's employment would be the unauthorized practice of law if the one representing the other person is not a licensed attorney at law.

173.   Defendants later conceded: "district administration will review current practice/procedure for how preferred names of students are communicated to teachers and steps will be taken to ensure that both classroom teachers and substitute teachers are aware of transgender students' preferred names."

**D.      The sham second "investigation" for alleged gender identity discrimination.**

174.   On February 14, 2023, Defendants notified Ms. Sullivan of another "investigation," this time a formal investigation into an alleged "recently filed" complaint of "gender identity discrimination" against Ms. Sullivan. Ex. 11.

175.   Defendants knew of Ms. Sullivan's beliefs in her Opposition Letter, and so, when the first "investigation" meetings, January 23, 2023 and February 1, 2023, failed to produce any cause for discipline, Defendants, on information and belief, manufactured or solicited a complaint of "incorrect" pronoun use, alleging Ms. Sullivan referred to a female student with feminine pronouns.

176.   Defendants never produced the alleged complaint (the "Phantom Complaint").

177.   Ms. Sullivan's teacher contract with the District includes the following terms regarding complaints:

> The parties agree that complaints are likely to arise from time to time with reference to Professional Employees and, in order to resolve such complaints, the following criteria shall apply:
> 1. After appropriate investigation, the administrator shall decide whether the complaint merits further attention.
> 2. Where it is appropriate to do so, the complaint will be presented to the Professional Employee for resolution. Promptness in resolving the complaint is important and the Professional Employee and the administrator shall do their best to keep the other informed of progress toward resolution. The

Professional Employee shall have an opportunity to answer the complaint and such response may be communicated to the complainant.

3. No complaint and/or related documents will be placed in the Professional Employee's file unless the complaint has led to an investigation.

4. An anonymous communication may be used as the basis for an investigation but no anonymous communication from a parent, student or other person shall be placed in a Professional Employee's file folder.

Ex. 12 at 8.

178.    The "administrator" is not defined.

179.    The administrator did not conduct an appropriate investigation.

180.    The Phantom Complaint was not presented to the Professional Employee, Ms. Sullivan, for resolution.

181.    The administrator did not do their best to keep Ms. Sullivan informed of progress toward resolution and Ms. Sullivan did not have an opportunity to answer the complaint because she was not presented with the alleged complaint.

182.    Neither the District nor the School had a policy regarding pronoun use.

183.    The alleged "incorrect" pronoun use allegedly occurred the prior year, before Defendants expressed the "expectation" that "students who have indicated a preferred name and pronoun will be referred to by those preferences." But the government would not produce the alleged Policy AC Complaint, and would not state the alleged date of the alleged "incorrect pronouns" use.

184.    At the time of the alleged "incorrect" pronoun use, Defendants had never expressed an expectation that feminine pronouns are "incorrect" pronouns for females who prefer masculine pronouns.

185.    The student who Defendants allege made the Phantom Complaint was the

female student who Ms. Sullivan had to repeatedly discipline for open and repeated willful defiance of classroom cell phone policy—a policy the principal, Defendant Ewers, instructed teachers to rigorously enforce.

186.   The student who Defendants claim made the Phantom Complaint was a female student who was removed from Ms. Sullivan's class, ostensibly at the student's request after being disciplined several times for violating the cell phone policy and defying Ms. Sullivan.

187.   The disciplined student did not deny that she openly violated the cell phone policy in class.

188.   Defendants required Ms. Sullivan to participate in the "investigation" for the alleged claim of "gender identity discrimination" by the disciplined, removed student.

189.   Defendants did not allege any different outcomes for, or different treatment of, the alleged student complainant.

190.   The so-called "investigation" was a sham.

191.   Defendants subjected Ms. Sullivan to an intense interrogation by two government officials, Defendants Higgins and England, at the District Headquarters where both government actors alternately grilled Ms. Sullivan without providing her any advance knowledge of the alleged accusations.

192.   Defendants Higgins and England peppered Ms. Sullivan with multiple inappropriate questions and posed hypotheticals such as, "What would you do if a student informed you that you were using the wrong pronouns to refer to them?" even after Ms. Sullivan said that did not occur and she did not have a "policy" so she would have evaluate

each situation, case-by-case.

193.    Ms. Sullivan recognized her career and livelihood being threatened and had to engage legal counsel to protect her rights during the interrogation. But Defendants Higgins and England insisted on Ms. Sullivan answering over counsel's objections.

194.    The government Defendants refused to produce the Phantom Complaint or its alleged contents, before, during, or after the interrogation. Ex. 13.

195.    Even when requested by counsel, Defendants refused to produce the alleged complaint or disclose the alleged contents, claiming that: (i) protecting "confidentiality of the investigation to the greatest extent possible," (ii) compliance with FERPA, (iii) protecting the integrity of interviews, and (iv) preventing "retaliation toward the complainant" as the reasons for refusing to produce the alleged complaint or disclose its alleged contents. Ex. 14.

196.    All four stated reasons for refusing to produce the Phantom Complaint were exposed as specious and spurious when Defendants Higgins and England stated the name of the alleged complainant in the interrogation and read aloud four "claims" that allegedly came from the Phantom Complaint. Ex. 15 (secure audio links).

197.    Nevertheless, Defendants still refused to produce the Phantom Complaint to Ms. Sullivan or counsel after the interrogation where the Phantom Complaint was allegedly read aloud.

198.    FERPA (the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g; 34 CFR Part 99) is federal law that protects the privacy of student education records, not complaints against teachers filed by students.

199.    Defendants provided no time, date, or place of the alleged conduct, nor the specific phrasing or context of the alleged conduct (conduct which Ms. Sullivan disputed).

200.    Even if the female student who wants to be considered a male knew to file a complaint under the School Board's Policy AC for "discrimination," there were no allegations of different treatment or different outcomes to suggest any discrimination.

201.    On information and belief, if the aforementioned female student who wants to be considered a male filed a complaint against Ms. Sullivan, it was provoked by one or more of the Defendants who suggested or elicited a complaint under the School Board's Policy AC.

202.    The PNA's terms are incorporated in Ms. Sullivan's teacher contract, as they are in all District teacher contracts. Ex. 12 at 4.

203.     Defendants breached the PNA's incorporated terms of Ms. Sullivan's contract by failing to provide an appropriate investigation of a Phantom Complaint under Article V § J(1). Ex. 12 at 9.

204.    Defendants failed to provide an appropriate investigation of a Phantom Complaint, without limitation, in the following ways, as raised by Ms. Sullivan in her appeal/grievance:

      a.    "procedural irregularity that affected the determination" (Policy AC; Grievance Process § 4)

        (1) The Investigator or Compliance Coordinator fabricated a "violation" of a policy that does not exist - the determination cited disputed conduct that is not prohibited by Policy AC (or any other SMSD Board policy);

(2) The student complaint allegedly contained four allegations of discrimination after the student was disciplined by the teacher but the Compliance Coordinator refused to produce the complaint or its contents so that the Respondent could respond - either before or after the interrogation;

(3) In the March 3, 2023 interrogation of Ms. Sullivan, both Defendant Higgins and Defendant England questioned Ms. Sullivan and made allegations,  in contravention of Policy AC § 3 ("The designated investigator will interview the complainant, witnesses, and the respondent ...");

(4) The grievance process did not begin with the requisite Policy AC presumption that Ms. Sullivan did not engage in any prohibited conduct;

(5) Although the complaint had nothing to do with race, Ms. Sullivan was questioned about unsubstantiated, vague allegations of allegedly "racist" materials in her classroom (without disclosing an allegedly "racist" book title and without providing a photograph or even description of any allegedly "racist" flag);

(6) Defendants made unsubstantiated, vague allegations of "racist" conduct unrelated to the allegation of gender identity discrimination but did not make a determination to clear Ms. Sullivan's name or her permanent file;

(7) Statements of counsel  were imputed to Ms. Sullivan without any authority (or logic) for doing so;

(8) Defendant Higgins did not "create a report that summarizes the relevant evidence," in contravention of Policy AC § 3;

(9) the determination did not identify any time, place, or context for

the alleged "violation" of a policy that does not exist - the determination obliquely states "on one or a couple occasions during the school year," hardly enough to overcome the presumption that the Respondent did not engage in any prohibited conduct, a procedural requirement under the grievance process;

(10) the "investigation" and the interrogation were allegedly not conducted under the PNA but were also allegedly conducted under the PNA's grievance process that Defendants later refused to participate in; and

(11) the "investigation" and the interrogation were held under the false pretense that no discipline would occur as a result.

b.     "conflict of interest or bias on behalf [sic] of the Compliance Coordinator or investigator." (Policy AC; Grievance Process § 4)

(1) By definition, the General Counsel cannot serve without conflicting interests in the two roles as: (A) lawyer advocate for the District participating in and grilling Ms. Sullivan in the deposition-styled "interview;" and (B) unbiased Compliance Coordinator for the grievance process;

(2) The Compliance Coordinator demonstrated bias when she questioned Ms. Sullivan in the interrogation and would not answer Ms. Sullivan's written questions before the interrogation nor provide the alleged complaint or its contents before the interrogation.

(3)     The Compliance Coordinator demonstrated conflict of interest and bias when she falsely claimed in the interrogation  that she did not represent either party in the investigation.

36

(4)    The Compliance Coordinator demonstrated conflict of interest and bias when she falsely stated that FERPA prevented the SMSD from producing the alleged complaint.

(5) On information and belief, the Compliance Coordinator or others at the District fabricated or elicited a complaint from a student and/or parent(s) in attempt to target Ms. Sullivan.

Ex. 16

205.    Through the sham second "investigation," Defendants were and still are retaliating against Ms. Sullivan, the one teacher who was willing to speak up against the government's indoctrination that is the Government's DEI Programing (more fully described herein) that the government refuses to release to the public.

206.  Defendants were and still are trying to control the speech of Ms. Sullivan (and others) through the Defendants' New Trans Orthodoxy (defined herein) partially released after the sham second "investigation."

207.    The School Board's Policy AC, under which Defendants alleged Ms. Sullivan discriminated on the basis of "gender identity," states: "In determining whether prohibited conduct occurred, an objective evaluation of all relevant evidence will be made and the following will be considered: the surrounding circumstances; the nature of the conduct; the relationships between the parties involved; past incidents; and the context in which the alleged incidents occurred. Investigations begin with presumptions that the respondent did not engage in any prohibited conduct, and that the complainant is credible." Ex. 17 at 6.

208.   The surrounding circumstances from the Phantom Complaint included without limitation the student's uncontroverted repeated open defiance of the policy against cell phone use in class and the need for Ms. Sullivan to repeatedly discipline her.

209.   If a written complaint does exist, it does not require a doctorate degree for an administrator to figure out that the student would likely retaliate against Ms. Sullivan in whatever way she could.

210.   Defendants did not have to investigate the highly suspect claims of the Phantom Complaint, if a complaint was actually filed.

211.   Ms. Sullivan was not afforded the presumption that she did not discriminate against the student; especially because no different treatment or outcomes were alleged and because using a pronoun coinciding with someone's sex is not discriminatory.

212.   On information and belief, the Phantom Complaint does not exist because it has never been produced to Ms. Sullivan, her counsel, or to the EEOC in redacted form.

213.   Also, there is reason to believe the Phantom Complaint does not exist (or the government does not want it to be seen) because the government Defendants allegedly read its accusations during the interrogation of Ms. Sullivan, so there is no legitimate reason for not producing it.

214.   The Phantom Complaint, if one actually exists, on information and belief, was prepared by the government Defendants (in the effort to target Ms. Sullivan in retaliation for her opposition to the Government's DEI Program and political indoctrination).

215.   The refusal to produce—to the person being "investigated"—the alleged

basis for the "investigation," even after the government Defendants allegedly read its accusations during the interrogation of that person, strongly suggests that there was no Phantom Complaint or that it was fabricated or generated by the government and the government now wants it hidden.

**E.     Inconsistent standards.**

216.    When referring to another student who preferred pronouns divergent from that student's sex, at least two other staff members repeatedly used what Defendants call "incorrect pronouns" but the staff members (who did not oppose the Government's DEI Programing) was not investigated or otherwise retaliated against by the government.

217.    To wit: on January 11, 2024, the School social worker sent an email to at least ten District teachers and administrators instructing them to use female pronouns for a male student who requested "she/her" pronouns. However, the School social worker repeatedly referred to the student with "they" pronouns and in response, the associate principal referred to the student with "his/him" pronouns. The School social worker and the associate principal (neither of whom opposed the government's DEI Programing) were not subjected to a government "investigation" or punishment for "incorrect pronouns." Ex. 18.

**F.     Tainted by conflict of interest.**

218.    The government's "Compliance Coordinator" claimed to be a disinterested party for the "investigation" but she served as the government's lawyer in the "investigation" and was one of the two government officials who grilled Ms. Sullivan in the government's recorded interrogation. The government had another administrator, John

McKinney, who served as co-Compliance Coordinator with Ms. England, but Defendants chose to use their general counsel instead.

219.    The Compliance Coordinator's conflict of interest tainted the government's "investigation" in a way that could not be waived. As a result, the government's "investigation" was not proper.

220.    The "investigation" was a sham, at best. Ms. Sullivan was singled out by the government and targeted for her opposition to the Government's DEI Programming and her religious beliefs.

221.    Ms. Sullivan also requested an outside investigator under the government Defendants' Policy AC, which states: "In the event that any person involved in an investigation has a concern that the designated investigator, decision-maker, or appeal officer may have a bias or conflict of interest, or for any other reason, the Compliance Coordinator will evaluate the situation and determine in their sole discretion whether to designate a different internal investigator, decision-maker, or appeal officer. In their sole discretion, the Compliance Coordinator may choose to retain an outside investigator, decision-maker, or appeal officer." As a result of the government Defendants' failure to resolve an unwaivable conflict of interest of the Compliance Coordinator, among many other factors, the government's "investigation" was not proper.

222.    The second "investigation" (at least) was itself retaliation for Ms. Sullivan's opposition to Defendants DEI Programing and for Ms. Sullivan's exercising her protected Free Speech and Free Exercise rights if she did, in fact, use a pronoun accidentally.

**G.      Frivolous allegations of racism.**

223.    During the sham second "investigation," before getting Ms. Sullivan's side, the government, through Defendant Higgins, disclosed *to students* the alleged conduct that Defendants would not disclose to Ms. Sullivan before the government's interrogation.

224.    Defendant Higgins conceded as much in the interrogation. *See* Ex. 15 (secure audio links to which Defendants will need to provide access).

225.    As part of the sham second "investigation," the government, through Defendant Higgins, also discussed with students racism allegations unrelated to alleged gender discrimination, namely wholly unsupported, frivolous allegations that Ms. Sullivan had "racist" books and a "racist" flag in her classroom (the "Frivolous Racist Allegations"). Ex. 15 (secure audio links).

226.    Defendants did not and could not state, identify, or produce any evidence of a single racist book in Ms. Sullivan's library or classroom. *Id*.

227.    Defendants did not or could not identify, describe, or produce any evidence of a racist flag in Ms. Sullivan classroom. *Id*.

228.    When the government introduced and/or disseminated to students the Frivolous Racist Allegations in the alleged gender identity "investigation," Defendants engaged in rumor mill propaganda to retaliate against Ms. Sullivan, which a reasonable person could perceive as threats to control his or her speech.

229.    In the sham second "investigation," when Defendants raised, and discussed with students, baseless allegations of racism-unrelated in any way to the alleged "gender identity discrimination" Defendants retaliated against Ms. Sullivan for opposing the government's racist DEI, which a reasonable person could perceive as threats to control

his or her speech.

230.    During the interrogation, the government, through Defendant Higgins, again raised the Frivolous Racist Allegations as a veiled threat to Ms. Sullivan. *Id.*

231.    By introducing and/or disseminating the Frivolous Racist Allegations against Ms. Sullivan without any connection to any allegation of "gender-identity discrimination," Defendants retaliated against Ms. Sullivan and attempted to control her speech.

232.    By introducing and/or disseminating the Frivolous Racist Allegations against Ms. Sullivan, Defendants attempted to intimidate Ms. Sullivan into silence about Defendants' racist, radical DEI Programing and intimidate her into parroting the government's ideology, the New Trans Orthodoxy (defined hereinafter) which violates Ms. Sullivan's rights.

233.    The "investigation" itself cost Ms. Sullivan time and money, and it caused her a great deal of stress and reputational damage. The "investigation" was a material adverse employment action without just cause.

**H.      Discipline for conduct that did not violate any policy.**

234.    Prior to the interrogation at the outset of the "investigation," Defendants assured Ms. Sullivan that no discipline would result from the "investigation." Ex. 13.

235.    Defendants' second "investigation," like the first, did not uncover any discrimination by Ms. Sullivan.

236.    Regarding the female student's alleged Policy AC complaint, the investigator determined: "a preponderance of the evidence did not show that Policy AC was violated by [Ms. Sullivan], or that [Ms. Sullivan] treated the [female student] differently or

negatively because of or based on his gender identity or the fact that he is transgender." Ex. 19.

237.    Furthermore: "the investigator determined that the evidence did not show discrimination based on gender identity . . ." Ex. 19.

238.    The most Defendants could come up with was: Ms. Sullivan "referred to the [female student] by his legal name and using incorrect pronouns on one or a couple occasions during the school year, and that the evidence indicated that this conduct was inadvertent and not purposeful." Ex. 19.

239.    Defendants, nevertheless, disciplined Ms. Sullivan as a result of the "investigation," with: (i) a conference, (ii) a written reprimand  in Ms. Sullivan's permanent employment file, and (iii) required training for made-up reasons. Ex. 20.

240.    The Board Defendants' Policy AC itself states: "Employees who violate this policy will be subject to discipline, which may include a conference, written reprimand, required training or other measure . . . ." Ex. 17 at 6.

241.    On one hand, Defendants disciplined Ms. Sullivan in connection with the determination from the "investigation" of the Policy AC. Ex. 19.

242.    On another hand, Defendants stated Ms. Sullivan could not appeal the "investigation" because she "does not seek to appeal the determination on the Policy AC complaint." Ex. 21.

243.    On yet another hand, Defendants stated that the "corrective action" was non-grievable because it was discipline under the PNA Article V § K(4). Ex. 21; Ex. 12 at 14.

244.    And on still another hand, Defendants stated "If you have any further

questions about the Policy AC grievance process, you may direct them to me or to the Compliance Coordinators." Ex. 13.

245.   At the time of the alleged conduct, referring to a female student by using feminine pronouns was not a violation of any published or unpublished District or School policy or rule.

246.   Defendants' discipline of Ms. Sullivan was a material adverse employment action without just cause.

247.   Defendants also disciplined Ms. Sullivan by the other Material Adverse Employment Actions (defined hereinafter), including without limitation demoting and reassigning Ms. Sullivan.

248.   Defendants threatened further discipline, including termination, if Ms. Sullivan uses "incorrect" pronouns in the future.

249.   The allegation of, the discipline for, and the threatened discipline for "incorrect" pronoun use compels Ms. Sullivan to engage in speech that goes against her sincerely-held religious, moral, and personal beliefs, as well as centuries of English language usage rules that establish masculine pronouns for males and feminine pronouns for females.

250.   When Defendants required Ms. Sullivan to attend a conference, placed a written reprimand in her permanent employment file, and required her to undergo "corrective action" training, Defendants retaliated against Ms. Sullivan for her opposition to the government's Racist DEI Programing.

251.   When Defendants disciplined Ms. Sullivan after telling her she would not be

disciplined, Defendants retaliated against Ms. Sullivan for opposing the government's Racist DEI Programing, which a reasonable person could perceive as threats to control his or her speech.

252.   When Defendants disciplined Ms. Sullivan for disputed, vague alleged conduct that was, at worst, inadvertent, and did not violate any policy, rule, or District expectation, Defendants retaliated against Ms. Sullivan for opposing the government's Racist DEI Programing, which a reasonable person could perceive as threats to control his or her speech.

253.   When Defendants disciplined Ms. Sullivan for what their own "investigation" determined to be inadvertent, unintentional conduct, Defendants did so in retaliation for opposing the government's Racist DEI Programing, which a reasonable person could perceive as threats to control his or her speech.

## I.      The government's new transgender orthodoxy.

254.   In addition to the new "trans" pronouns and names expectation[8] expressed to Ms. Sullivan January 23, 2023, Defendants, at a mandatory PD session on or about April 10, 2023, stated their policy prohibiting teachers from disclosing to a student's parents when a student requests pronouns that are divergent from the sex of the student and preventing teachers from disclosing to a student's parents when a student requests to be called a name that might suggest a divergent gender (the "Communication with Parents Policy").

---

[8] "moving forward … expectation that students who have indicated a preferred name and pronoun will be referred to by those preferences."

255.    Shortly after the second "investigation," the Frivolous Racist Allegations, and the March 31, 2023 discipline of Ms. Sullivan for conduct that did not violate any policy, or rule, Defendants, on April 12, 2023, created and implemented new transgender practices and FAQ (the "Trans Practices"). Ex. 22.

256.    The new Trans Practices incorporates the "expectation" expressed to Ms. Sullivan on January 23, 2023 and requires teachers and others to adopt language and speech that express Defendants' view of pronoun use and gender.

257.    By requiring Ms. Sullivan to use pronouns that do not coincide with a student's sex (whenever requested), Defendants are forcing Ms. Sullivan (and others) to endorse Defendants' view that boys can become girls and girls can become boys, or that one can disavow his or her sex, if they so choose—while prohibiting Ms. Sullivan from using language or speech that reflects a contrary view.

258.    The expectation moving forward from January 23, 2023, the Communication with Parents Policy, and the Trans Practices (collectively, the "New Trans Orthodoxy") insists: "All students have the right to be addressed by the name and pronouns that correspond to the gender identity they assert at school."

259.    The New Trans Orthodoxy requires teachers "to respect a student's name and pronouns once they have been made aware."

260.    The New Trans Orthodoxy provides at least three conflicting practices such as:

(1)  "Q. Can we change the student's gender marker in Skyward?

A. No. Students/Families with questions about the gender reflected in Skyward

should contact their building administration.

Q. Can we change a student's name in Canvas?

A. Yes. Students can change their name in Canvas under Settings under "Display Name."

(2) the Communication with Parents Policy requires hiding from parents the students' experimentation with divergent genders at school—while everyone at school knows—but the Trans Practices requires parent involvement and consent before publishing the divergent name or pronoun in the yearbook or school paper; and

(3) the Trans Practices states on one hand: "School staff and peers are expected to respect a student's name and pronouns once they have been made aware," while on the other hand stating: "The current practice in SMSD is for administration to evaluate requests for accommodations on a case-by-case basis, and to develop an individual plan for each student." ((1)-(3), collectively, the "Conflicting Practices").

261.   The New Trans Orthodoxy does not address situations such as: (1) so-called "gender-fluid" students who change their "preferred gender" from day-to-day, as some students in Ms. Sullivan's classes have; or (2) what names or pronouns to use in parent-teacher conferences at school when a student who prefers divergent pronouns or a different name is present with a parent or parents who has/have not been informed of the divergent pronouns preference or different name use at school (the "Unaddressed Trans Situations").

262.   Shawnee Mission School District Board policies are published and made public at https://go.boarddocs.com/ks/smsd/Board.nsf/public# ("Board Docs").

263.   The Communication with Parents Policy and the Trans Practices are not

47

published Board policy on Board Docs. However, Defendants still require Ms. Sullivan to follow them.

264.   The New Trans Orthodoxy requires teachers to support Defendants' new ideology and requires teachers to participate in students' experimentation with gender identities divergent from the student's sex, by using whatever pronouns or names with which a student wants to experiment.

265.   Defendants have not used the media outlet on the District's payroll—the Shawnee Mission Post/the Johnson County Post—to publicize their New Trans Orthodoxy, like they have for other issues. Ex. 23.

266.   Part of the New Trans Orthodoxy, specifically the Communication with Parents Policy, has been determined by the Kansas Attorney General to be unlawful and the AG's Office has warned Defendants about its implementtion. Ex. 1.

267.   Prior to Defendants disciplining Ms. Sullivan in March 2023 for alleged conduct that did not violate any District or School policy, or rule, the District or the School had no formal or published policy regarding the use of "preferred pronouns" that do not coincide with a student's sex.

268.   Prior to Defendants disciplining Ms. Sullivan in March 2023 for alleged conduct that did not violate any District or School policy, or rule, the District or the School had no rule(s) regarding the use of "preferred pronouns" that do not coincide with a student's sex or the use of "preferred names" that do not match a student's legal name or the name entered in Skyward, the District's official student database.

269.   Prior to Defendants disciplining Ms. Sullivan in March 2023 for alleged

conduct that did not violate any District or School policy, or rule, the District or the School had no formal or published policy regarding communicating to parents their child's use of "preferred names" that do not match the student's sex or communicating to parents their child's use of "preferred names" that do not coincide with the student's legal name or name in the Skyward database.

270.    Defendants' New Trans Orthodoxy is the government's attempt to control Ms. Sullivan's speech (and the speech of others) by requiring words and language that affirm and endorse the government's view on matters of public importance while simultaneously preventing words and language that do not align with the government's view.

**J.      The government policies' effects on Ms. Sullivan.**

271.    Ms. Sullivan's desire to remain silent at school by refraining from participating in students' experimenting with divergent genders or so-called "transitioning" implicates her interest as a citizen because doing so violates her conscience and the sincerely-held beliefs that she maintains as a private citizen.

272.    Ms. Sullivan's desire to refrain from using incorrect pronouns (feminine pronouns for males and masculine pronouns for females) implicates her interest in protecting her reputation as an English teacher because doing so would affect her employability outside the Shawnee Mission School District.

273.    Ms. Sullivan's desire to remain silent by refraining from participating in students' experimenting with divergent genders or "transitioning" implicates her interest as a citizen because no amount of private speech on her own time can counteract the harm

that she would cause to her own conscience, to her students, or her reputation by participating in students' experiments with divergent genders or so-called "transitioning."

274.   Ms. Sullivan had and has no valid official duty to participate in students' experimenting with divergent genders or "transitioning."

275.   Defendants' policy and practices relating to Ms. Sullivan's forced participation in students' experimenting with divergent genders or "transitioning" is not a valid curricular requirement.

276.   Ms. Sullivan wishes to remain silent at school on a matter of public concern because the issues of human identity, sex, gender, and mental health raised by experimenting with divergent genders or "transitioning" (and communicated by words within so-called "social transition") are hotly contested in society, politics, and academia, both in Kansas and throughout the world.

277.   Ms. Sullivan has spoken and wishes to speak outside of school on the same issues of public concern without having her message undermined by participating in experimenting with divergent genders or "transitioning" at school in contradiction to her sincerely-held religious and moral beliefs and her beliefs of conscience.

278.   Ms. Sullivan's desire to remain silent implicates this matter of public concern because using pronouns to affirm and participate in experimenting with divergent genders or "transitioning" asserts a specific, identifiable position on this matter—that a person's subjective identity (and not the person's sex) determines whether the person is male or female.

279.   Ms. Sullivan, a parent of two, has a strong interest as a citizen in speaking

(and refraining from speaking to the contrary at school) on this issue consistent with her conscience because it is among the sensitive political topics that occupy the highest rung of constitutional protection, requiring an even stronger showing by the government to outweigh her interest.

280.    But the government has no interest at all that justifies its New Trans Orthodoxy.

281.    Because Ms. Sullivan's strong interest in refraining from speaking on a matter of public concern outweighs any of Defendants' interests in forcing her to participate in students' experimenting with divergent genders or "transitioning," she engaged in constitutionally protected activity.

## K.    Ms. Sullivan publicly opposed the government's racist DEI, the government's New Trans Orthodoxy, and the government's refusal to disclose its indoctrination.

282.    After her Opposition Letter was met with hostility and Ms. Sullivan was singled out for punishment, Ms. Sullivan on April 21, 2023, published an op-ed article online in *The Lion,* dealing with matters of importance to the public, namely that the children in the District are being indoctrinated with anti-white bias and so-called "woke" political ideology, and in doing so the District is causing a toxic environment, teacher shortage, and a focus away from academics through its divisive policies, which policies also include promoting so-called "gender transitioning" experiments at school without telling parents[9] (the "Op-Ed"). Ex. 24.

283.    The Op-Ed opposed the District's anti-white racist DEI curriculum and

---

[9] https://readlion.com/kansas-public-school-teacher-yes-your-children-are-being-indoctrinated/

programing (described hereinafter), exposing it to the public and also opposing the important public issues of divisiveness, political indoctrination, hiding "trans" policies from parents, teacher discontent, and lack of focus on academics in the District.

284.  In response to distortions and outright lies after her Op-Ed, Ms. Sullivan felt obliged to publish a follow-up article to set the record straight on matters of real importance to the public (the "Follow-up Op-Ed").[10] Ex. 25.

285.  Ms. Sullivan's Op-Ed and Follow-up Op-Ed (collectively, the "Exposé Articles") received significant national and local media attention.[11]

---

[10] https://heartlandernews.com/2023/05/08/kansas-public-school-teacher-stands-by-criticism-amid-attacks-and-national-attention-i-will-not-be-deterred/

[11] https://readlion.com/records-request-backs-up-kansas-teachers-complaints-about-dei/

https://readlion.com/what-are-they-teaching-these-kids-kansas-city-area-students-call-for-teachers-head-for-speaking-out-about-racist-divisive-curriculum/

https://readlion.com/local-reporting-on-teachers-whistleblowing-reveals-bias/ (https://www.kansascity.com/news/local/education/article275267616.html)

https://heartlandernews.com/2024/04/26/johnson-county-schools-used-to-take-in-education-refugees-now-may-be-creating-them/

https://fox4kc.com/news/kansas-news/shawnee-mission-teacher-alleges-district-forces-woke-curriculum/

https://www.dailymail.co.uk/news/article-12072827/Furious-students-protest-Kansas-high-school-teacher-Caedran-Sullivan.html

https://sentinelksmo.org/shawnee-mission-teacher-shines-light-on-divisive-diversity-training/

https://www.foxnews.com/video/6327332169112

https://www.foxnews.com/video/6327313271112

https://www.foxbusiness.com/video/6326691017112

https://www.theblaze.com/news/high-school-teacher-slams-dei-training-as-white-shaming-claims-students-run-the-school-now-students-want-her-punished

https://www.kkhasissues.com/e/sm-teacher-drops-bomb-on-district-wh-blames-gunnot-illegal-alien-killer-mahomes-hits-red-carpet-small-biz-hurt-by-draft-nhl-team-for-americans-only/

https://www.kkhasissues.com/e/jackson-mahomes-charged-courageous-teacher-joins-kkhi/

286.    The Exposé Articles, dealing with matters of significant public concern, were not part of Ms. Sullivan's job duties, rather the Exposé Articles were written by Ms. Sullivan as a private citizen.

287.    Defendants had no legitimate compelling interest in preventing the dissemination of the issues in Ms. Sullivan's Exposé Articles.

**L. The government's required racist DEI programing that Ms. Sullivan opposed.**

288.    In 2019, the Shawnee Mission School District implemented a multi-year program for training teachers in Diversity, Equity, and Inclusion.

289.    The Shawnee Mission School District calls its brand of DEI "Diversity, Equity, Inclusion, and Belonging" or "DEIB."

290.    For their DEI/DEIB training sessions, called "Deep Equity" training, the Defendants incorporate curriculum in the form of a training manual and training videos (the "DEI Curriculum") plus slide presentations and live trainers to espouse Defendants' ideology that Defendants will not release to the public.

291.    Defendants required, and still require, Ms. Sullivan and other teachers to attend the Deep Equity training sessions by referring to them as "professional development" days accounted for in the terms of the teachers' contract.

292.    Defendants required and still require teachers in the District, including Ms.

---

https://www.kkhasissues.com/e/chiefs-kicker-stuns-graduation-bob-huggins-in-big-trouble-smn-teacher-fires-back/

https://www.youtube.com/watch?v=-0NSxc88jKw

https://kansasreflector.com/2023/07/27/kansas-school-system-fights-indoctrination-rumors-continues-dei-training/

Sullivan, to participate in these Deep Equity training sessions that incorporate the DEI Curriculum, and other training the government calls professional development or "PD" (collectively, the "Government's DEI Programing" or "DEI Programing").

293.    Defendants refuse to publicly release their DEI Curriculum that is part of the Government's DEI Programing.[12]

294.    Defendants' DEI Curriculum is radical, racist, and, if released to the public, would expose Defendants' ideological political agenda.

295.    The following excepts are substantial, but not comprehensive, examples of the government's anti-white, race-based DEI Curriculum that Ms. Sullivan and other teachers were and are subjected to. They are important to provide a small bit of insight into the depth and breadth of race-based indoctrination.

296.    Defendants' DEI Curriculum promotes a radical, anti-white ideology, blaming so-called "injustice" on the white majority and American society, stating: "When we acknowledge who is caught in the achievement gap—the same racial, cultural, and economic groups that have been marginalized by the larger dynamics of dominance in our society—it becomes clear that 'education for all' and 'justice for all' are synonymous goals. The work of transforming public education in the service of equity, inclusion, and excellence for all of our children, is social justice work. It cannot be successfully carried without the transformation of all other social, political, and economic systems." Ex. 26 at 336.

---

[12] Ms. Sullivan received a copy from a third party.

297.   Defendants' DEI Curriculum asserts blanket, blatantly racist ideology: Whites "view the world through a single lens that is always right and always white." Ex. 26 at 314.

298.   Defendants' DEI Curriculum vilifies whites, stating: "Put differently, how do white Americans learn to be positive participants in a richly pluralistic nation? . . . Most of our work in race relations and multicultural education in the United States has emphasized—and appropriately so—the particular cultural experiences and perspectives of black, Asian, Hispanic, and American Indian groups. These are the people who have been marginalized to varying degrees by the repeated assertion of dominance by Americans of European ancestry. As the population of the United States shifts to embrace ever larger numbers of previously marginalized groups, there is an emerging need to take a closer look at the changing role of white Americans." Ex. 26 at 300.

299.   Defendants' DEI Curriculum faults whites for lack of excellence and "equity" in public education, stating: "Since 90% of our nation's teachers are white, the business of achieving greater equity and excellence in public education is in large part of a process of transforming the beliefs and behaviors of white educators." Ex. 26 at 330.

300.   Defendants' DEI Curriculum proclaims: Whites "are collectively bound and unavoidably complicit in the arrangements of dominance that have systematically favored [the white] racial group over others." Ex. 26 at 313.

301.   Defendants' DEI Curriculum asserts that conservatives are white supremacists: "White supremacist hate groups represent one particularly hostile form of fundamentalist white identity, but there is also the Tea Party version that masks its racism

with the guise of patriotism." It continues by saying: "They self-righteously flaunt the flag and the constitution under the banner of 'I want my country back,' which more accurately translates as 'I want to keep the White House white.'" Ex. 26 at 314.

302.    Defendants' DEI Curriculum makes blanket racist statements painting white Americans as deniers of history, afraid of and hostile to diversity, stating: "The most prevalent strategy that white Americans adopt to deal with the grim realities of history is denial . . . another response is hostility, a reaction to cultural differences that we have seen resurfacing more blatantly in recent years . . . Whatever the reason, hostility related to racial and cultural difference has always been a part of American life . . . Underlying both the denial and the hostility is a deep fear of diversity. This fear is obvious in the Neanderthal violence and activism of white supremacist groups. Because of their personal and economic insecurities, they seek to destroy that which is not like them." Ex. 26 at 304.

303.    Defendants' DEI Curriculum advocates divisive race-based ideology that portrays all whites as oppressors, stating: "Even though we are undeniably connected by history and ethnicity with a long legacy of oppression, this identification with the oppressor is not our only means of defining ourselves. We can choose now to contribute to the making of a new kind of nation. Young white students need to see that they, too, can be full participants in the building of a multicultural America." Ex. 26 at 310. It continues, saying: "It's in a sense going in and looking at who I really am, say, for me as a white person, what does it really mean to be white in a country that has such a difficult history around race and my group has been the dominant oppressive group in many ways. Ex. 27 at Phase 2. And it adds: "As we become aware of the realities of the past and the present—of the heavy

56

weight of oppression and racism that continues to drag our nation down—it is natural for many of us of European background to feel a collective sense of complicity, shame, or guilt. On a rational level, of course, we can say that we didn't contribute to the pain. We weren't there. We would never do such things to anyone. Yet, on an emotional level, there is a sense that we were involved somehow. And our membership in the dominant culture keeps us connected to the wrongs, because we continue to reap the benefits of past oppression." Ex. 26 at 305.

304.   Defendants' DEI Curriculum espouses: "Too many segments of our white American population remain committed to their position of dominance; they are willing to defend it and legitimize it." Ex. 26 at 300.

305.   Defendants' DEI Curriculum uses "social dominance" as a euphemism for white people, stating: "At some point in your work with Social Dominance, it is recommended that you focus specifically on issues of race and white privilege. This is important precisely because such a large percentage of teachers are white. Your facilitation team should talk about when might be the best time to initiate this activity and how you want to structure the small groups for discussion. For diverse faculties, it is best to have a mix of white people and people of color in each of your small groups." Ex. 27 at Phase 3.

306.   Defendants' DEI Curriculum promotes a white power-struggle, stating: "Taken as a whole, these realities strongly suggest that the peaceful transition to a new kind of America, in which no ethnic or cultural group is in a dominant position, will require considerable change in education and deep psychological shifts for many white Americans. Attempting to effect these changes is part of the work of multicultural education, and that

challenge leads us to a central question; What must take place in the minds and hearts of white Americans to convince them that now is the time to begin their journey from dominance to diversity?" Ex. 26 at 300.

307.    Defendants' DEI Curriculum preaches anti-white rhetoric: "School reform can be understood as a movement from social dominance to social justice, as a process of undoing those educational systems that have favored only the few and replacing them with institutional practices that will more effectively serve the many." Ex. 26 at 335.

308.    Defendants' DEI Curriculum promotes a power-struggle in education ideology: "Part of this need is generated by the growing evidence that many white Americans may not be comfortable with the transition from their dominant status." Ex. 26 at 300. It adds: "A clear understanding of social dominance is the essential backdrop for our efforts to create effective schools that serve all students." Ex. 26 at 325.

309.    Defendants' DEI Curriculum promotes revolutionary ideology through a book entitled *Reading, Writing, and Rising Up, Writing About Social Justice Issues in the Classroom.* Ex. 27 at Phase 2.

310.    Defendants' DEI Curriculum is based on Marxist ideology, stating: "the good of the many over what I call 'the greed of the few.' Social justice is really about that." Ex. 27 at Phase 3.

311.    Defendants' DEI Curriculum espouses ideology antithetical to educating all children the same, stating:  "Teaching . . . is actually redistributing privilege in the service of social justice." Ex. 27 at Phase 3.

312.    Defendants' DEI Curriculum argues the majority is "indecent" and "unfair"

so education must be utilized for all Americans to stop separating through intentional forces of unfairness, stating: "If we are to move from social dominance to simple decency as a pluralistic nation, then public education must offer a broad and inclusive doorway to success. It is the responsibility of all Americans to champion our youth, especially those who have been most debilitated by the forces of unfairness, which for far too long have separated far too many from the full fruits of citizenship" Ex. 26 at 326.

313.    Defendants' DEI Curriculum teaches that good whites should inject Defendants' one-sided ideology into the classroom, stating: "Transformationist Whites have acquired a paradoxical identity, which allows us to acknowledge our inevitable privilege and racism while at the same time actively working to dismantle our legacy of dominance. Transformationist white teachers know it is our place and our responsibility to engage issues of race and social justice in the classroom. We become allies and advocates for our students and colleagues of color and anti-racist change agents among our white colleagues." Ex. 26 at 314.

314.    Defendants' DEI Curriculum attacks whites through the euphemistic "certain groups" and by making unfounded assumptions, stating: "So systems of privilege and preference are reinforced by power, favoring certain groups over others. The question we want to think about, particularly as we get into phase 4, and looking at the classroom, is to what extent our schools, your school, my school, to what extent our schools and our classrooms have systems of privilege and preference reinforced by power, favoring certain groups over others, and if so, who is favored, why, and what is my stake in that, as a teacher, as an educator, who am I contributing to those systems or to breaking them down." Ex. 27

at Phase 3.

315.    Defendants' DEI Curriculum lectures that disparate educational and success outcomes are necessarily a result of social and cultural factors controlled by whites, stating: "The achievement gap cannot be understood without honestly confronting issues of social dominance. The process of schooling is neither power-neutral nor culture-neutral." Ex. 26 at 317.

316.    Defendants' DEI Curriculum blames whites for poor education, stating: "The legacy of privilege refers to those advantages that flow to some and not to others, based solely on our membership in the dominant group . . . 'good schools' have in many people's minds become synonymous with "White schools." Ex. 26 at 319.

317.    Defendants' DEI Curriculum blames unequal achievement on white "privilege," "power," and "dominance, stating: "Schooling, like all other social institutions, functions as a system of privilege and preference, reinforced by power, favoring certain groups over others. This is the sad asymmetry of social dominance: the victors of history disproportionately thrive while the descendants of the vanquished inordinately struggle just to survive. Such inequities are perpetuated through three highly interrelated and mutually reinforcing dynamics of dominance: the assumption of rightness, the luxury of ignorance, and the legacy of privilege." Ex. 26 at 317-18.

318.    Defendants' DEI Curriculum blames white racism, classism, and American society for lesser outcomes for certain groups, stating: "When we look at school outcome data, the history of racism, classism, and exclusion in the United States stares us in the face. Systems of privilege and preference often create enclaves of exclusivity in schools,

in which certain demographic groups are served well while others languish in failure or mediocrity . . . In phase three, educators directly confront the current and historical inequities that affect education." Ex. 26 at 290.

319.   Defendants' DEI Curriculum assumes all whites are racist and often destructively so, stating: "The sad lesson of this work is that even if no one in the school is being overtly racist toward students of color, the strong presence of the threat is still internalized and often destructive." Ex. 26 at 323.

320.   Defendants' DEI Curriculum inculcates with anti-white, anti-American ideology, stating: "The data of inequities in our schools are our history as a nation staring us in the face. The system of social dominance and privilege that was established by the founding fathers, and perpetuated over the centuries, is still living with us in our classrooms. Although it is a harsh reality to acknowledge, the success of wealthy white men in our country, and the marginalization of other groups, is intimately connected to the racism, sexism, genocide, and land theft that were integral to the founding of this nation" Ex. 27 at Phase 3.

321.   Defendants' DEI Curriculum adds anti-Christian elements as well, stating: "because, my background is very fundamentalist kind of Christian Evangelical religion that I grew up with in my life that certainly had some of those narrow attitudes." Ex. 27 at Phase 5. It adds: "The Celts became the victims of the imperialistic expansion of Roman Christianity. Their culture was overwhelmed by the twofold aggression of the Roman army and the church. Consequently, much of their history is lost to us today." Ex. 26 at 309.

322.   Defendants' DEI Curriculum includes repeated white-shaming, stating:

"How do white people deal with their own whiteness?" Ex. 27 at Phase 3.6; "How do I live with this? How can I incorporate into my own sense of being an American the knowledge that my family's survival and eventual success on this continent were built on the removal and near extermination of an entire race of people?" Ex. 26 at 302; and "At one point in her interviews with her students, she said, "What's the issue here?" She was talking to 3 or 4 young, latina girls, and they said, 'It's just that you're so white.' and it shocked her because she had never, again, interrogated her whiteness. She didn't see how these girls were seeing her as a white girl. She looked at the lens of race, and then she continued to work on her relationship with the counseling and coaching of her Latino friend . . . at the end of the year, it was a lot better . . . 'You're not so white anymore.'" Ex. 27 at Phase 2; and "Together they are experiencing a collective meltdown over the realities of race and their own whiteness. One faculty member remarks, "I feel so helpless. What am I supposed to do as a white teacher?" Ex. 26 at 313.

323.    Defendants' DEI Curriculum concedes that it makes children feel ashamed to be white, stating: "One of my students actually, in my 8th grade classroom, when I was teaching some of my early work in this area, teaching black, Asian, Latino, Native American perspectives on U.S. History in 8th grade U.S. Social Studies, U.S. History, Social Studies, one of my white students, after reading a while, came to me and said, 'Mr. Howard, I feel like ripping my white skin off.' Ex. 27 at Phase 3.7.

324.    Defendants' DEI Curriculum pushes white-saviorism, stating: "We cannot as a nation close the achievement gap until a critical mass of conscious White Americans begin to accept poor children, urban children, and children of color as our own children,"

Ex. 26 at 326; "When White teachers, policy leaders, parents, and scholars join with families and communities of color and claim with a united voice that "all the children are our children," perhaps then we shall see the type of investment in quality education that our children deserve—the type of investment middle and upper class Americans presently demand for their children." Ex. 26 at 326.

325.    Defendants' DEI Curriculum promotes indoctrination of students from a very young age for the Defendants' ideological purposes, stating: "Getting student voices into the process, where your elementary, middle, and high school, how do we invite youth voice, student voice, and how do we empower in a sense that voice and have that voice be heard by faculty and staff, and really utilizing student voice as the key component of our school improvement process." Ex. 27 at Phase 5; "And to teach kids how to provide that leadership and give them the same words that you gave adults in the professional development that we went through, give the kids those words to say. This is what social justice is, this is what White Privilege looks like, and what did I do about it and how do I help this building and these kids to get to a better place?" Ex. 27 at Phase 5.

326.    Defendants' DEI Curriculum promotes pitting children against adults to overcome resistance, stating: "And another way of working with resistance, because we talk a lot about resistance, adult resistance to this work, one of the best strategies both for prevention and dealing with resistance, is engaging youth voices. Now what that district is doing is using these Youth Voices videos in all their buildings, you know, Pre-K through 12 and adult education, to help bring everybody on board with the conversation." Ex. 27 at Phase 5.

327.   Defendants' DEI Curriculum uses other psychological tactics to overcome resistance, stating: "Dealing with Resistance is a conversation you will inevitably need to have and probably revisit several times in the course of the overall professional development process. Even though most of the activities and discussion in Phase 1–4 are specifically structured to prevent or minimize the impact of resistant behaviors, resistance will inevitably occur. Complex personal, professional, and political dynamics underlie such resistance and non-engagement, and it will be important for your leadership to approach these issues sensitively and strategically, always focusing on the positive growth of the critical mass of  your people, while not being derailed by the cynics, resistors, or naysayers." Ex. 27 at Phase 5); "Direct Confrontation: Occasionally, a person or group becomes so negative that you need to confront the behavior directly during the session or perhaps privately afterward. This is necessary to demonstrate to the other participants that you value their feelings and commitment and will not allow one or two people to destroy the experience for others. Regrouping: In the case of negative groups of participants, people who seem to reinforce each other's resistance or negativity, use small-group activities that separate these people. Plan ahead for the next activity, and organize the groups so these clusters of negativity are neutralized." Ex. 26 at 257.

328.   Defendants' DEI Curriculum embraces and promotes Critical Race Theory, stating: "Integrating CRT into your school improvement process. Once your faculty has become familiar with the Seven Principles and the Peer Observation process, you can move toward systemic integration of CRT into your school change efforts. This is best achieved by building CRT language and the Seven Principles into any Look-For or Walkthrough

instrument your school district is currently using. You can also build CRT outcomes into your teacher evaluation process. This is where the work becomes real, when it becomes part of business-as-usual for your school and part of the DNA of your school district." Ex. 27 at Phase 4.

329.    Defendants' DEI Curriculum promotes Black Lives Matter in the classroom; in one session, titled "Black Lives Matter in the Classroom," staff were shown BLM propaganda videos indoctrinating why it was necessary to bring BLM materials into the classroom and teachers were taken to the BLM website to demonstrate how to access resources from that website to bring them into classrooms to use with students.

330.    Black Lives Matter founders openly advocated for abolition of police, jails, prisons, and the court system, and implemented Critical Race Theory in schools across the United States.

331.    Defendants, in concert with others, downplayed the influence of Critical Race Theory in the District.

332.    On information and belief, Defendants paid entities and individuals to spread narratives downplaying the influence of Critical Race Theory in the District.

333.    Defendants paid media entities to spread narratives praising the District. Ex. 23.

334.    On information and belief, Defendants paid individuals to praise the District.

335.    Defendants' DEI Curriculum instructs on overcoming "resistance" by intimidation, stating: "If you have a group of people who have been resistant to the work you have done so far, make sure to call on them." Ex. 26 at 78.

336.   Defendants knew Ms. Sullivan opposed the Government's DEI Curriculum, the Government's DEI Programing and "Deep Equity" sessions as more fully stated in this section, paragraphs 288-336.

**M.      Retaliation and controlled speech.**

337.   The targeting and intimidation of Ms. Sullivan comprise an ongoing pattern of escalating retaliation and material adverse employment actions.

338.   Soon after Ms. Sullivan delivered the Opposition Letter, Defendant administrators started ignoring (shunning) Ms. Sullivan and alienating her in the workplace.

339.   Defendant Ewers, however, would keep tabs on Ms. Sullivan by periodically coming to her classroom after the Opposition Letter.

340.   After the Opposition Letter, when Ms. Sullivan was struggling with a student openly defying the cell phone policy in her classroom starting in 2022, Ms. Sullivan received no support from Defendant Ewers, though Defendant Ewers had instructed Ms. Sullivan and all teachers to more rigorously enforce classroom cell phone policy.

341.   Prior to the Opposition Letter, Defendant Ewers had never before shown lack of support for handling students' behavior problems.

342.   After the Opposition Letter, Defendants retaliated and continue to retaliate against Ms. Sullivan by disciplining and punishing her without cause.

343.   As part of the government's retaliation against Ms. Sullivan for the Opposition Letter and for not remaining silent about the Government's DEI Programing, Defendants attempted to and continue to attempt to control Ms. Sullivan's speech by

imposing restrictions on her speech and by requiring her to endorse the government's new gender ideology.

344. After the Opposition Letter, Defendants plotted to attack and alienate or pressure Ms. Sullivan into quitting, and began looking for ways to discipline, punish, or terminate Ms. Sullivan.

345. Ms. Sullivan, however, is an exemplary teacher with many years of excellent teacher-student relationships and no prior discipline or negative incidents in her permanent file. So the government Defendants had to bide their time and keep looking.

346. Defendants' continuing pattern of escalating retaliation and controlled speech go hand-in-hand. That is, Defendants retaliated by attempting to control Ms. Sullivan's speech by requiring her to say things that go against her religious, moral, and personal beliefs and violate her rights. And Defendants attempted to get Ms. Sullivan to say things that support, affirm, and endorse Defendants' New Trans Orthodoxy by retaliating against her, attacking her in ways Defendants believed they could get away with.

347. After Defendants could not come up with any plausible reason to discipline or punish Ms. Sullivan through the January 23, 2023 investigation meeting, through the February 1, 2023 follow-up investigation meeting, through the second "investigation," or through the blindsiding, double-team interrogation as part of the second "investigation," Defendants disciplined Ms. Sullivan anyway for a policy that did not exist.

348. Shortly thereafter, Defendants made up and instituted the New Trans Orthodoxy to cover their tracks after retaliating against Ms. Sullivan, and also to control her speech.

**(i)    The government refused to process Ms. Sullivan's appeal of the second "investigation" in breach of its own teacher contract terms.**

349.    After she was wrongfully disciplined, Ms. Sullivan followed the appeal and grievance procedure under the collective bargaining agreement negotiated by the NEA with the District, applicable to and covering Ms. Sullivan's employment (the "Professional Negotiated Agreement" or "PNA"). Ex. 12.

350.    Ms. Sullivan's grievance asserted that the "investigation" was not appropriate on numerous grounds, including without limitation the grounds in paragraph 204 herein. Ex. 16.

351.    Ms. Sullivan timely filed her appeal/grievance at every stage of the process as outlined in the Policy AC and PNA. Ex. 28.

352.    Defendants refused to participate in the grievance process. Ex. 21.

353.    Defendants refused to follow the District's own contract language in the PNA when Defendants refused to participate in the grievance process.

354.    Defendants refused to participate in arbitration with a third party arbitrator as part of the grievance process, again breaching the District's own contract, which provides attorney's fees for the prevailing party. Ex. 12 at 23, ¶ j.

355.    The Defendants waived the PNA contractual remedy when the District refused to participate in arbitration as part of the grievance process.

356.    When the Defendants refused to process Ms. Sullivan's grievance, arguing inconsistently that it was not grievable, the Defendants retaliated against Ms. Sullivan, as their Material Adverse Employment Actions (defined hereinafter).

357.    When the Defendants refused to process Ms. Sullivan's grievance, the Defendants refused to let a third party outside neutral hear and determine the case in attempt to continue to control Ms. Sullivan's speech by not letting the third party mediator determine Defendants' actions were unreasonable.

**(ii)      Defendants promoted/allowed a walk-out protest against Ms. Sullivan.**

358.    After the Exposé Articles, Defendants allowed a small student protest against Ms. Sullivan at a time when the students were supposed to be in class.

359.    Defendants did not call the students back to class and Defendants did not discipline any of the students who skipped classes to protest Ms. Sullivan.

360.    Ironically, the small student walk-out claimed Ms. Sullivan is "rascist" [sic] and "homophobic," "Rasicm" [sic] is taught, and suggested that the School was somehow "unsafe." Ex. 29.

361.    The students' claims do not logically follow from Ms. Sullivan's Exposé Articles or any of Ms. Sullivan's conduct.

362.    Accordingly, and because no students were disciplined, docked, or reprimanded for skipping school to attend the protest, on information and belief, Defendants organized, promoted, or condoned the protest against Ms. Sullivan at a time when the students were scheduled to be in class.

363.    On information and belief, the walk-out students who protested Ms. Sullivan developed their belief that she was somehow racist or homophobic when Defendants' introduced and/or perpetuated the Frivolous Racist Allegations in the sham second "investigation."

364.    When Defendants organized, promoted, or allowed a protest against Ms. Sullivan at a time when the students were scheduled to be in class, Defendants retaliated against Ms. Sullivan and further attempted to control her speech, as part of Defendant's Material Adverse Employment Actions (defined hereinafter).

**(iii)   Ms. Sullivan was monitored at School by District personnel.**

365.    Defendants began monitoring Ms. Sullivan in her workplace after she publicly expressed government opposition in the media through the Exposé Articles.

366.    Monitoring citizens at home and in the workplace after they express opposition to government activity has been part of strong-arm tactics employed by fascist political regimes throughout history.

367.    After the Exposé Articles, Defendants assigned District-level monitors to sit in on and monitor Ms. Sullivan's weekly meetings with her grade-level English teacher colleagues, known as 'ELA 3 PLC,' for the entirety of the following school year.

368.    On information and belief, no other PLC group meetings at the School, or in the District, were monitored by Defendants at the time Ms. Sullivan was monitored in her PLC group.

369.    On information and belief, no other PLC group meetings at the School or in the District were *ever* monitored by District-level monitors before Ms. Sullivan's ELA 3 PLC was monitored by Defendants, nor since.

370.    Defendants monitored Ms. Sullivan after her protected, Free-Speech exposure of and opposition to Defendants' racist, political indoctrination as retaliation for and as further attempt to control Ms. Sullivan's speech.

**(iv)    Ms. Sullivan was demoted, reassigned, and stripped of her AP classes.**

371.    Ms. Sullivan is a highly-qualified English teacher who has taught college-level Advanced Placement English classes for many years.

372.    AP classes are rewarding for teachers who get to work with students who put in extra effort and who have advanced abilities.

373.    AP classes are highly sought after assignments for teachers who are qualified to teach them (not all teachers are).

374.    Teaching AP classes reflects well on a teacher's career and provides upward mobility in position and compensation within a district and without.

375.    After Ms. Sullivan's protected, Free-Speech exposure and opposition to the government's racist, political indoctrination, and after Ms. Sullivan filed a charge with the EEOC, Defendants, through Ewers, took away Ms. Sullivan's AP classes after the 2023-2024 school year.

376.    Ms. Sullivan is still fully qualified to teach AP classes.

377.    When Defendants took away Ms. Sullivan's AP classes, they did so without just cause.

378.    When Defendants stripped Ms. Sullivan of her AP classes, they did so as retaliation for her opposition to the Government's DEI Programing, for not parroting the government's New Trans Orthodoxy, for the Exposé Articles, and for filing an EEOC charge, which might deter a reasonable person from filing and is a violation of Title VII.

**(v)    Defendants refused to participate in the EEOC investigation.**

379.    The aforementioned instances and this instance of retaliation (collectively,

those in § M (i-v)) and attempts to control and compel Ms. Sullivan's speech as alleged herein were actions perpetrated by Defendants that materially affected her employment in adverse ways (collectively, "Material Adverse Employment Actions").

380.    Because Defendants were retaliating and discriminating against Ms. Sullivan for her constitutionally and statutorily protected speech, Ms. Sullivan filed a charge with the United States Equal Employment Opportunity Commission (the "EEOC") on October 3, 2023, seeking an investigation into the government's unlawful actions.

381.    Ms. Sullivan timely responded to all the EEOC's requests for information.

382.    After Ms. Sullivan provided evidence to the EEOC, the EEOC requested additional information from Defendants by May 3, 2024. Ex. 30.

383.    Defendants refused to provide the requested information to the EEOC.

384.    Defendants failed to refute Ms. Sullivan's evidence supplied to the EEOC and refused to provide evidence to support Ms. Sullivan's claims; evidence which Ms. Sullivan has been unable to obtain on her own.

385.    Additionally, when the EEOC offered to attempt to mediate this dispute through the EEOC's no-cost early Alternate Dispute Resolution program, Ms. Sullivan agreed to participate.

386.    Defendants, however, refused to participate in mediation through the EEOC's no-cost early Alternate Dispute Resolution program.

387.    When Defendants refused to participate in the EEOC investigation, Defendants retaliated against Ms. Sullivan by stonewalling; a tactic for overcoming "resistance" as promoted through the government's DEI Programing. Ex. 26 at 327.

## V. STATEMENTS OF LAW

388.   The United States Constitution guarantees freedom of thought and expression that includes a freedom to differ. "But freedom to differ is not limited only to things that do not matter much. That would be a mere shadow of freedom. The test of its substance is the right to differ as to things that touch the heart of the existing order." W. Va. Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943). There are perhaps no questions that "touch the heart of the existing order" more than those concerning the nature of human existence itself.

389.   The Constitution protects this freedom to differ, in part, by prohibiting the government from adopting and enforcing a set of approved views (its own orthodoxy) on these matters of human existence in America's public schools-which American school-aged children are compelled to attend (unless their parents pay for more costly alternatives). "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Id*.

390.   Defendants have intentionally abandoned this guiding light and adopted one particular view on this subject-that a person's subjective identity determines whether a person is male or female, not a person's sex-and the government is imposing that view not only on its public school teachers but on the students. Defendants have expressed this view through their own speech and through required training inculcating their view and indoctrinating students through psychological tactics designed to, in the government

Defendants' DEI Programing's own words, overcome "resistance." Ex. 26 at 257.

391.    The First Amendment of the Constitution of the United States of America, applied to state governments through the Fourteenth Amendment, includes "the right to speak freely, and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (citing Board of Education v. Barnette, 319 U.S. 624, 633-34 (1943)).

392.    The Kansas Constitution provides: "Religious liberty. The right to worship God according to the dictates of conscience shall never be infringed . . . nor shall any control of or interference with the rights of conscience be permitted . . ." KAN. CONST. BILL OF RIGHTS § 7.

393.  The Kansas Constitution provides: "[A]ll persons may freely speak, write or publish their sentiments on all subjects . . ." KAN. CONST. BILL OF RIGHTS § 11.

394.    Section 7 of the Kansas Constitution Bill of Rights provides greater protections concerning the free exercise of religious beliefs than does the First Amendment to the United States Constitution. To determine whether government action violates an individual's right to the free exercise of religious beliefs under the Kansas Constitution, a court must determine: (1) whether the individual's religious beliefs are sincerely held; (2) whether the state action burdens the individual's free exercise of religious beliefs; (3) whether the state interest is overriding or compelling; and (4) whether the State uses the least restrictive means of achieving its interest. The individual bears the burden of proof to show that the first two steps have been satisfied, and then the burden shifts to the State to prove that the last two steps are met. *Stinemetz v. Kan. Health Policy Auth.*, 45 Kan. App. 2d 818, Syl. ¶¶ 6,7 (2011) (citing *Roman Catholic Archdiocese of Kan. City v. City of*

*Mission Woods*, 337 F. Supp. 3d 1122 (D. Kan. 2018)).

## VI. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violation of Plaintiff's First Amendment Right to Freedom of Speech
### Compelled Speech
### (42 U.S.C. § 1983)

395.    Ms. Sullivan repeats and realleges each of the allegations in paragraphs 1-394 of this Complaint.

396.    The U.S. Constitution protects Ms. Sullivan's right to speak and to refrain from speaking.

397.    Compelled speech imposes additional harm, and so requires an even more urgent justification.

398.    The government must withstand "exacting scrutiny" in order to furnish the more urgent justification for compelled speech, which requires a showing that compelling Ms. Sullivan to speak furthers a compelling interest that could not be secured by significantly less restrictive means.

399.    Defendants' New Trans Orthodoxy compels Ms. Sullivan to speak in ways that violate her religious, moral, and personal beliefs.

400.    Defendants have attempted and are attempting to control and compel Ms. Sullivan's speech in ways that violate her religious, moral, and personal beliefs through the actions contested herein.

401.    Defendants could have used less restrictive means, including without limitation altering class schedules, allowing no pronouns for all students, and not

punishing, disciplining, or threatening termination for inadvertent use of pronouns.

402.    Defendants have no overriding or compelling interest in forcing Ms. Sullivan to participate in students' experimenting with genders divergent from their sex, and Defendants did not or do not use the least restrictive means for doing so.

403.    Defendants have no overriding or compelling interest in forcing Ms. Sullivan to participate in students' experimenting with attempting to become another sex, and Defendants did not or do not use the least restrictive means for doing so.

404.    Defendants have no overriding or compelling interest in forcing Ms. Sullivan to participate in students' experimenting with social "transitioning," and Defendants did not or do not use the least restrictive means for doing so.

405.    Defendants have no overriding or compelling interest in forcing Ms. Sullivan to lie to students by affirming the fiction that boys can become girls and girls can become boys or that one can disavow his or her sex, and Defendants did not or do not use the least restrictive means for doing so.

406.    Defendants have no overriding or compelling interest in forcing Ms. Sullivan to use feminine pronouns for males and masculine pronouns for females or other trendy pronouns when students choose pronouns divergent from their sex.

407.    Defendants have no overriding or compelling interest in forcing Ms. Sullivan to implicate herself by lying to parents in hiding that their child is experimenting with other genders or "transitioning" at school, and Defendants did not or do not use the least restrictive means for doing so.

408.    Defendants undermine any compelling interest in forcing Ms. Sullivan's

speech when they failed to create or communicate their New Trans Orthodoxy until after the alleged, disputed conduct for which they disciplined and punished Ms. Sullivan.

409.   Defendants undermine any compelling interest in forcing Ms. Sullivan's speech by their Conflicting Practices and the Unaddressed Trans Situations in their New Trans Orthodoxy.

410.   Defendants undermine any compelling interest in forcing Ms. Sullivan's speech when they concede there is no "transgender-specific policy" and the "practice in the SMSD is for administration to evaluate requests for accommodations on a case-by-case basis."

411.   Defendants undermine any compelling interest in forcing Ms. Sullivan's speech when they failed to publish their New Trans Orthodoxy as a Board Policy along with their other Board policies on BoardDocs.

412.   Because Defendants took Material Adverse Employment Actions against Ms. Sullivan, and the other actions challenged herein, for not speaking in ways that adhere to the government's New Trans Orthodoxy, Defendants fail exacting scrutiny and have violated Ms. Sullivan's right to be free from compelled speech.

413.   Because Defendants' New Trans Orthodoxy does not further any compelling interest and Defendants do not use the least restrictive means, Defendants fail exacting scrutiny and have violated Ms. Sullivan's right to be free from compelled speech.

414.   By punishing and threatening to punish Ms. Sullivan for refusing to communicate a government-mandated ideological message regarding so-called "gender identity," Defendants have attempted and are attempting to compel Ms. Sullivan's speech,

in violation of her rights under the First Amendment.

415.   Defendants' policies and actions and their enforcement of those policies and their other actions challenged herein compel Ms. Sullivan to communicate messages about gender identity that she does not hold, that she does not wish to communicate, and that conflict with (and violate) her religious, moral, personal, and professional beliefs.

416.   Defendants' policies and actions and their enforcement of those policies and their other actions violate Ms. Sullivan's right to free speech as guaranteed by the First Amendment to the United States Constitution.

## SECOND CAUSE OF ACTION
**Violation of Plaintiff's Kansas Constitutional Rights to Religious Liberty and Liberty of Press and Speech**
**(Kansas Constitution Bill of Rights §§ 7, 11)**

417.   Ms. Sullivan repeats and realleges each of the allegations in paragraphs 1-416 of this Complaint.

418.   The Kansas Constitution states in relevant part: "Religious liberty. The right to worship God according to the dictates of conscience shall never be infringed; nor shall any person be compelled to attend or support any form of worship; nor shall any control of or interference with the rights of conscience be permitted." KAN. CONST. BILL OF RIGHTS § 7.

419.   The Kansas Constitution also states in relevant part: "Liberty of press and speech; . . . all persons may freely speak, write or publish their sentiments on all subjects, being responsible for the abuse of such rights . . ." KAN. CONST. BILL OF RIGHTS § 11.

420.   The Kansas Constitution's Bill of Rights protects Ms. Sullivan's right to

speak and to refrain from speaking.

421. Defendants' New Trans Orthodoxy substantially burdens Ms. Sullivan's sincerely held religious beliefs and rights of conscience, and her ability to freely speak, write or publish their sentiments on all subjects.

422. Compelled speech imposes additional harm, and so requires an even more urgent justification.

423. The government must withstand "exacting scrutiny" in order to furnish the more urgent justification for compelled speech, which requires a showing that compelling Ms. Sullivan to speak furthers a compelling interest that could not be secured by significantly less restrictive means.

424. By forcing Ms. Sullivan to use pronouns that are divergent from the students' sex, Defendants' New Trans Orthodoxy compels Ms. Sullivan to speak in ways that violate her religious, moral, and personal beliefs by requiring her to participate in students' experimenting with attempting to become another sex or "social transitioning," and requiring her to lie to students by affirming the fiction that boys can become girls and girls can become boys or that one can disavow his or her sex.

425. Defendants' New Trans Orthodoxy also compels Ms. Sullivan to make material misrepresentations of omission to students' parents by not informing parents of their child's request for pronouns that diverge from the child's sex or their child's request for a name that is divergent from the child's legal name or name by which he or she is enrolled in the official Skyward database.

426. Defendants' New Trans Orthodoxy compelling Ms. Sullivan to make those

material misrepresentations of omission violates Ms. Sullivan's religious, moral, and personal beliefs, and beliefs of conscience, against lying.

427.    Defendants have attempted and are attempting to control and compel Ms. Sullivan's speech—through the New Trans Orthodoxy, threats of discipline including termination, the Material Adverse Employment Actions and other actions challenged herein—in ways that violate her religious, moral, and personal beliefs as well as her rights of conscience.

428.    Defendants could have used less restrictive means, including without limitation altering class schedules, allowing no pronouns for all students, and not punishing, disciplining, or threatening termination for inadvertent use of pronouns.

429.    Defendants have no overriding or compelling interest in forcing Ms. Sullivan to participate in students' experimenting with divergent genders, and Defendants did not or do not use the least restrictive means for doing so.

430.    Defendants have no overriding or compelling interest in forcing Ms. Sullivan to participate in students' experimenting with attempting to become another sex by forcing her to use pronouns, and Defendants did not or do not use the least restrictive means for doing so.

431.    Defendants have no overriding or compelling interest in forcing Ms. Sullivan to participate in students' experimenting with social "transitioning," and Defendants did not or do not use the least restrictive means for doing so.

432.    Defendants have no overriding or compelling interest in forcing Ms. Sullivan to lie to students by affirming the fiction that boys can become girls and girls can become

boys or that one can disavow his or her sex, and Defendants did not or do not use the least restrictive means for doing so.

433.    Defendants have no overriding or compelling interest in forcing Ms. Sullivan to use feminine pronouns for males and masculine pronouns for females or other trendy pronouns when students choose divergent pronouns.

434.    Defendants have no overriding or compelling interest in forcing Ms. Sullivan to implicate herself by lying to parents in hiding that their child is experimenting with other genders or "transitioning" at school, and Defendants did not or do not use the least restrictive means for doing so.

435.    Defendants undermine any compelling interest in forcing Ms. Sullivan's speech when they failed to create or communicate their New Trans Orthodoxy until after the alleged, disputed conduct for which they disciplined and punished Ms. Sullivan.

436.    Defendants undermine any compelling interest in forcing Ms. Sullivan's speech by their Conflicting Practices and the Unaddressed Trans Situations in their New Trans Orthodoxy.

437.    Defendants undermine any compelling interest in forcing Ms. Sullivan's speech when they concede there is no "transgender-specific policy" and the "practice in SMSD is for administration to evaluate requests for accommodations on a case-by-case basis."

438.    Defendants undermine any compelling interest in forcing Ms. Sullivan's speech when they failed to publish their New Trans Orthodoxy as a Board Policy along with their other Board policies on BoardDocs.

439. Because Defendants took Material Adverse Employment Actions against Ms. Sullivan, and other actions challenged herein, for not speaking in ways that adhere to the government's New Trans Orthodoxy, Defendants fail exacting scrutiny and have violated Ms. Sullivan's right to be free from compelled speech.

440. Because Defendants' New Trans Orthodoxy does not further any compelling interest and Defendants do not use the least restrictive means, Defendants fail exacting scrutiny and have violated Ms. Sullivan's right to be free from compelled speech and violated Ms. Sullivan's rights to religious liberty and rights of conscience.

441. By punishing and threatening to punish Ms. Sullivan for refusing to communicate a government-mandated ideological message regarding gender identity, Defendants have attempted and are attempting to compel Ms. Sullivan's speech, in violation of her rights under the Kansas Constitution.

442. Defendants' policies and their enforcement of those policies compel Ms. Sullivan to communicate messages about gender identity that she does not hold, that she does not wish to communicate, and that conflict with (and violate) her religious, personal, and moral beliefs, in violation of the Kansas Constitution.

443. Defendants' discipline and punishment, together with the other Material Adverse Employment Actions and actions challenged herein, burden Ms. Sullivan's guaranteed rights to free exercise of religion and rights of conscience, in violation of the Kansas Constitution's prevention of infringement on religious liberty.

444. Defendants New Trans Orthodoxy, Defendants' discipline and punishment, together with the other Material Adverse Employment Actions and the other actions

challenged herein also interfere with Ms. Sullivan's rights of conscience, in violation of the Kansas Constitution's prohibition against "any control of or interference with the rights of conscience" because Ms. Sullivan believes it is wrong and harmful to lie and endorse, affirm, or promote the fiction that boys can become girls and girls can become boys or that one can disavow his or her sex, by participating in her students' so-called social "transition."

445.   Defendants have violated and are violating Ms. Sullivan's right to free exercise of religion under the Kansas Constitution Bill of Rights § 7.

446.   Ms. Sullivan's religious convictions and right of conscience against lying against and endorsing, affirming, or promoting the fiction that boys can become girls and girls can become boys or that one can disavow his or her sex, by participating in students' so-called "transition" are beliefs with which she seeks to live in accordance are sincerely-held beliefs.

447.   Defendants have substantially burdened, interfered with, and are attempting to burden and interfere with Ms. Sullivan's right to engage freely in her religious practices by controlling her speech through the government's New Trans Orthodoxy which forces her, through participation in students' experimentation with divergent genders, to express views on gender identity that conflict with her religious beliefs and that force her to violate her conscience and religious convictions by not only expressing Defendants' preferred views on so-called gender identity but also participating in so-called social "transition" experiments.

448.   Under the Kansas Constitution, government policies that substantially

burden, interfere with, or control a person's exercise of a sincerely held religious belief or rights of conscience are unconstitutional unless they are narrowly tailored to achieve a compelling government interest.

449.   Defendants have no legitimate (and therefore no compelling) interest in forcing Ms. Sullivan to participate in gender experiments by using pronouns inconsistent with a student's sex.

450.   Defendants' requiring Ms. Sullivan to participate in students' social transition or participate in gender experiments by using pronouns inconsistent with a student's sex is not narrowly tailored to achieve any legitimate (let alone compelling) interest.

451.   Defendants' requirement that Ms. Sullivan  participate in so-called "social transition" and their enforcement of that requirement violates Ms. Sullivan's right to free exercise of religion and free speech as guaranteed by the Bill of Rights of the Kansas Constitution § 7 and § 11.

### THIRD CAUSE OF ACTION
### Retaliation for Exercising Religious Liberty, Rights of Conscience, and Liberty of Speech
### (Kansas Constitution Bill of Rights § 7, 11)

452.   Ms. Sullivan repeats and realleges each of the allegations in paragraphs 1-451 of this Complaint.

453.   Defendants disciplined and punished Ms. Sullivan for inadvertently "using incorrect pronouns on one or a couple occasions during the school year," when Defendants: (a) carried out the sham second "investigation" (with its inconsistent standards and tainted

by conflict of interest); (b) made Frivolous Racism Allegations against her; (c) disciplined her with "a conference, written reprimand, required training or other measure" for alleged, disputed conduct that did not violate any policy; (d) imposed the government's New Trans Orthodoxy; (d) refused to proceed with the contractually-required appeal/grievance process, including without limitation arbitration; (e) promoted or allowed a protest of Ms. Sullivan at school during class time; (f) monitored all of Ms. Sullivan's team meetings and amplified her in-class monitoring more than other teachers; (g) demoted, reassigned, and stripped Ms. Sullivan of her AP classes; and (h) refused to participate in the EEOC investigation.

454.   When Defendants disciplined and punished Ms. Sullivan for inadvertently "using incorrect pronouns on one or a couple occasions during the school year," Defendants retaliated against Ms. Sullivan for exercising her religious liberty as protected under the Kansas Constitution Bill of Rights.

455.   Defendants disciplined and punished Ms. Sullivan for the Exposé Articles when Defendants: (a) promoted or allowed a protest of Ms. Sullivan during class time; (b) monitored all of Ms. Sullivan's team meetings and amplified her in-class monitoring unlike other teachers; (c) demoted, reassigned, and stripped Ms. Sullivan of her AP classes; and (d) refused to participate in the EEOC investigation.

456.   When Defendants disciplined and punished Ms. Sullivan for the Exposé Articles, Defendants retaliated against Ms. Sullivan for exercising her liberty of press and speech as protected under the Kansas Constitution Bill of Rights.

457.   When Ms. Sullivan opposed Defendants' DEI Programing, without

limitation through her Opposition Letter, her actions were protected under the Kansas Constitution's guarantee that all persons may freely speak, write, or publish their sentiments on all subjects.

458.    When Defendants: (a) carried out the sham second "investigation" (with its inconsistent standards and tainted by conflict of interest); (b) made Frivolous Racism Allegations against her; (c) imposed a conference, a written reprimand in Ms. Sullivan's permanent employment file, and required unwarranted training for alleged, disputed conduct that did not violate any policy; (d) imposed the government's New Trans Orthodoxy; (d) refused to proceed with the contractually-required appeal/grievance process, including without limitation arbitration; (e) promoted or allowed a protest of Ms. Sullivan at school during class time; (f) monitored all of Ms. Sullivan's team meetings and amplified her in-class monitoring more than other teachers; (g) demoted, reassigned, and stripped Ms. Sullivan of her AP classes; and (h) refused to participate in the EEOC investigation, Defendants retaliated against Ms. Sullivan for freely speaking, writing, or publishing her sentiments on all subjects.

459.    Defendants' actions are in violation of the Kansas Constitution Bill of Rights § 11.

460.    Defendants' discipline and punishment of Ms. Sullivan and Defendants' Material Adverse Employment Actions and other actions challenged herein were retaliation in violation of the Kansas Constitution Bill of Rights for her exercising her rights to religious liberty and her rights to liberty of press and speech.

## FOURTH CAUSE OF ACTION

### Violation of the Kansas Preservation of Religious Freedom Act
### (K.S.A. 60-5302 et seq.)

461.    Ms. Sullivan repeats and realleges each of the allegations in paragraphs 1-460 of this Complaint.

462.    Defendants and Defendants' actions challenged herein are covered under the Kansas Preservation of Religious Freedom Act, K.S.A. 60–5302 et seq. (the "Act"), as Persons and as Government actors as defined in K.S.A. 60–5302(f) and K.S.A. 60–5302(e), respectively.

463.    The Act applies to all policies, procedures, expectations, discipline, punishment, actions, and inactions challenged herein, including without limitation the New Trans Orthodoxy, as set forth in K.S.A. 60–5305(b).

464.    Defendants' discipline and punishment of Ms. Sullivan, Defendants' New Trans Orthodoxy, and the other actions challenged herein substantially burden Ms. Sullivan's civil right to exercise of religion as defined in K.S.A. 60–5302(a) and K.S.A. 60–5302(c).

465.    Defendants have no compelling government interest in burdening Ms. Sullivan's rights under the Act, as defined in K.S.A. 60–5302(b) and K.S.A. 60–5304.

466.    Defendants have not, and cannot demonstrate by clear and convincing evidence that they have applied their burden to Ms. Sullivan through the least restrictive means. *See* K.S.A. 60–5303(a).

467.    Under the Act, Ms. Sullivan is entitled to injunctive relief; protective orders; declaratory relief; actual damages; and costs and attorney fees determined by the court, as

set forth in K.S.A. 60–5303(b).

## FIFTH CAUSE OF ACTION
### Retaliation for Opposition to Government's Racist DEI Programing
### Violation of First Amendment Free Speech Rights
### (42 U.S.C. § 1983)

468.    Ms. Sullivan repeats and realleges each of the allegations in paragraphs 1-467 of this Complaint.

469.    When Ms. Sullivan opposed the government's required anti-white, white-shaming, white-savior, offensive DEI Programing and racist "Deep Equity" curriculum, through her Opposition Letter, her opposition was protected under the First Amendment of the U.S. Constitution.

470.    Defendants' discipline, threats of further discipline including termination, punishment, their Material Adverse Employment Actions, and other actions challenged herein constitute a series and pattern of continuing retaliation.

471.    Defendants' discipline, threats of further discipline including termination, punishment, their Material Adverse Employment Actions and other actions challenged herein were motivated in material part by Ms. Sullivan's Opposition Letter, her Exposé Articles, and her other exercise of rights under the First Amendment, including without limitation her refusal to affirm or endorse the government's New Trans Orthodoxy.

472.    The U.S. Constitution protects Ms. Sullivan's right to speak as a citizen on matters of public concern and her right not to speak.

473.    Defendants violated Ms. Sullivan's First Amendment rights when they retaliated against her.

## SIXTH CAUSE OF ACTION
### Retaliation for Opposition to Racist DEI Required Training
### (Title VII; 42 U.S.C. §2000e, et seq.)

474.    Ms. Sullivan repeats and realleges each of the allegations in paragraphs 1-473 of this Complaint.

475.    Ms. Sullivan was subjected to race-based slurs, insults, and harassment, including without limitation those in the Government's DEI Programing.

476.    Offensive, racist comments made during employee training are considered racial harassment and are prohibited under Title VII of the Civil Rights Act.

477.    Ms. Sullivan opposed the government Defendants' required anti-white, white-shaming, white-savior, offensive  DEI Programing and racist "Deep Equity" curriculum, through her Opposition Letter and her Op-Ed and Follow-up Op-Ed (collectively, her "Opposition to Racist DEI").

478.    Ms. Sullivan's Opposition to Racist DEI is protected activity under Title VII of the Civil Rights Act.

479.    When Defendants took materially adverse employment actions against Ms. Sullivan, including without limitation the Material Adverse Employment Actions and other actions challenged herein, Defendants engaged in a series and pattern of continuing retaliation motivated by Ms. Sullivan's opposition to the government's Racist DEI Programing.

480.    Ms. Sullivan's Opposition to Racist DEI implicated her interest as a citizen on matters of public concern because she took issue with unsustainability within the building, alienation of staff, public attacks on social media and internet discussion boards,

how the racist DEI curriculum was not being released to the public, was contributing to lower academic performance in the District, was contributing to divisiveness among staff, was contributing to teacher shortages, and was indoctrinating students through a one-sided political agenda without balance.

481.    Ms. Sullivan's opposition to the government's Racist DEI, through the Opposition Letter and her Exposé Articles was not part of her responsibilities as a teacher.

482.    Defendants' Material Adverse Employment Actions and other actions against Ms. Sullivan challenged herein were motivated by Ms. Sullivan's opposition to Defendants' Racist DEI in the District.

483.    Ms. Sullivan's opposition to Defendants' Racist DEI in the District is a protected activity under Title VII.

484.    When Defendants' took the Material Adverse Employment Actions and other actions against Ms. Sullivan challenged herein, Defendants violated Title VII of the Civil Rights Act of 1964.

## SEVENTH CAUSE OF ACTION
### Violation of Plaintiff's First Amendment Right to Freedom of Speech
### Content & Viewpoint Discrimination
### (42 U.S.C. § 1983)

485.    Ms. Sullivan repeats and realleges each of the allegations in paragraphs 1-484 of this Complaint.

486.    Defendants subjected Ms. Sullivan to discipline and threaten to do so again in the future due to the content and viewpoint of Ms. Sullivan's speech.

487.    Defendants' policies challenged herein require officials to evaluate the

content and viewpoint of faculty expression to determine whether it constitutes discrimination or harassment and whether it creates a hostile environment.

488.   Defendants considered the content and viewpoint of Ms. Sullivan's expression when they decided to enforce their policies against her and they threaten to do so again if she continues to express her views.

489.   Defendants' policies challenged herein confer unbridled discretion upon District officials to discriminate based on content or viewpoint.

490.   Defendants exercised this unbridled discretion when they punished Ms. Sullivan for expressing her views regarding gender identity.

491.   Defendants' policies challenged herein and their enforcement of those policies are unconstitutionally overbroad because they restrict a significant amount of constitutionally protected speech.

492.   The overbreadth of Defendants' policies challenged herein chills the speech of Ms. Sullivan, who seeks to engage in protected expression in her interactions with students at school and in the classroom.

493.   Ms. Sullivan's expression regarding so-called "gender identity" is protected by the First Amendment.

494.   Through the Material Adverse Employment Actions and other actions challenged herein, for allegedly violating Defendants' policies challenged herein, Defendants have punished Ms. Sullivan for engaging in expression the First Amendment protects.

495.   Defendants' policies challenged herein and their enforcement of those

policies violate Ms. Sullivan's right to free speech as guaranteed by the First Amendment to the United States Constitution.

496.    Because Defendants condition Ms. Sullivan's continued employment on her parroting their political ideology through words that affirm that boys can become girls and girls can become boys, which violates Ms. Sullivan's religious, moral, and scientific beliefs, as well as infringes on her conscience, Defendants are engaging in content and viewpoint discrimination in violation of 42 U.S.C. § 1983.

**EIGHTH CAUSE OF ACTION**
**Violation of Plaintiff's Right to be Free from Unconstitutional Conditions**
**(42 U.S.C. § 1983)**

497.    Ms. Sullivan repeats and realleges each of the allegations in paragraphs 1-496 of this Complaint.

498.    Defendants' policies and related practices burden several of Ms. Sullivan's constitutional rights, including her rights under the First Amendment (e.g., freedom of speech, freedom from retaliation, free exercise of religion), and the unconstitutional conditions doctrine.

499.    By conditioning Ms. Sullivan's status as a teacher in good standing with the District (and ultimately her employment with the District) on her willingness to surrender various constitutional rights, Defendants have imposed and are imposing an unconstitutional condition on her in violation of her First Amendment rights.

500.    Defendants' policies and their enforcement of those policies impose an unconstitutional condition upon teachers' rights to free speech and their receipt of state benefits (*e.g.*, avoiding disciplinary actions up to and including termination, remaining a

teacher at a public school).

501.    Defendants' policies and their enforcement of those policies require teachers to surrender their constitutionally protected rights to freedom of speech, free exercise of religion, due process, and equal protection to avoid disciplinary actions up to and including termination.

502.    Defendants enforced their policies against Ms. Sullivan, making it clear that she can only avoid further disciplinary action if she surrenders her constitutionally protected rights to freedom of speech, free exercise of religion, and rights of conscience.

503.    Defendants' policies and their enforcement of those policies violate Ms. Sullivan's right to be free from unconstitutional conditions.

504.    By placing a written reprimand in her personnel file for allegedly violating their District policies, Defendants have punished Ms. Sullivan for engaging in expression the First Amendment protects.

## NINTH CAUSE OF ACTION
### Breach of Contract

505.    Ms. Sullivan repeats and realleges each of the allegations in paragraphs 1-504 of this Complaint.

506.    Under Kansas law, the Professional Negotiated Agreement in its various iterations (the "PNA") covered Ms. Sullivan's employment for the 2022–2023 school year, the 2023–2024 school year, and covers Ms. Sullivan's employment through the present 2024–2025 school year, as enforceable contract terms between Ms. Sullivan and the District.

507.   Ms. Sullivan's contract incorporates the terms of PNA by specific reference to same.

508.   Ms. Sullivan, at all times relevant to this Complaint, was employed under contract with the District which incorporates the PNA terms for each relevant school year.

509.   Throughout her career at the District, Ms. Sullivan has substantially performed her duties under the contract with the District and the terms of the PNA and has not materially breached her contract or the PNA.

510.   Defendants breached the PNA incorporated terms by subjecting Ms. Sullivan to a sham second "investigation" based on multiple false pretenses, procedural irregularities, and conflicts of interest.

511.   Defendants breached their agreement with Ms. Sullivan by promising no discipline as a result of the "investigation" and then subjecting Ms. Sullivan to discipline.

512.   Defendants breached the PNA incorporated terms by refusing to participate in the grievance process under the contract, including without limitation binding arbitration.

513. Ms. Sullivan's classroom library contains books she has obtained for students to read, a number of which are by black authors, addressing questions dealing with critical issues included within the content and objectives of the subject matter taught, the scope and sequence of the subject matter, considering grade placement, maturity and level of comprehension of her students, and consistent with the defined and outlined curricular programs approved by the Board of Education.

514.   Defendants breached the PNA incorporated contract terms by refusing Ms.

Sullivan academic freedom.

515.    Defendants breached the PNA incorporated terms by subjecting Ms. Sullivan to disciplinary action under the District policies for expression that is protected by the First Amendment.

516.    The incorporated PNA terms state, in part: "The parties hereto agree that, in the exercise of their rights, privileges, duties and responsibilities, the provisions of this Agreement shall be applied without regard to an individual's race, creed, religion, color, national origin, ancestry, age, sex, sexual orientation, gender identity, disability, genetic information, marital status, political affiliation, membership and participation in professional association activities or any statutorily prohibitive basis, except as provided by law.

517.    Defendants breached the PNA incorporated terms by discriminating against Ms. Sullivan based on her political affiliation.

518.    Defendants breached the PNA incorporated terms by discriminating against Ms. Sullivan because she is not a member of the teacher's union.

519.    Defendants have no legal excuse for the breaches of the PNA incorporated terms.

520.    Defendants made threats against and intimidated Ms. Sullivan in attempt to suppress her academic freedom.

521.    Academic Freedom is defined in the PNA as: "Academic freedom is the right of the Professional Employee and the learner to explore, present and discuss divergent points of view in the quest for knowledge and truth. Since only those who are free to learn

can learn to be free and because the freedom to learn is dependent upon the freedom to teach, academic freedom shall be guaranteed to Professional Employees. A classroom atmosphere shall be encouraged which permits students and Professional Employees to study questions dealing with critical issues, included within the scope and sequence of the subject matter, the grade placement, maturity and level of comprehension of the students involved. Such questions and issues shall be consistent with the defined and outlined curricular programs approved by the Board of Education." Ex. 12 at 49, Art. XII § H(1).

## VI. IMPACT AND DAMAGES

522.   Ms. Sullivan was targeted by Defendants and eventually disciplined under the pretext of referring to a female student "by his legal name and using incorrect pronouns on one or a couple occasions during the school year," after Defendants assured Ms. Sullivan no discipline would occur.

523.   This Orwellian scenario never should have occurred.

524.   Defendants' "investigation" itself was intimidating, expensive, antagonistic, and resulted in the "investigator" spreading aspersions about Ms. Sullivan through "interviewing" students. Defendants' "investigation" was itself retaliation and the subsequent inappropriate discipline and other actions of Defendants detailed above were both retaliatory and intended to further control Ms. Sullivan's speech.

525.   Ms. Sullivan's career has been irreparably damaged by Defendants' wrongful acts as stated herein. Ms. Sullivan is owed damages to compensate for the damage caused by Defendants.

526.   Ms. Sullivan has suffered emotional distress and mental anguish as a direct

and proximate result of Defendants actions set forth herein.

527.    Ms. Sullivan has incurred sizeable legal expenses by way of attorney's fees to not only protect her rights throughout the improper "investigation," Defendants' interrogation, the grievance process afterward, and the EEOC administrative procedure Defendants essentially ignored, but also for the preparation of this action in the face of unconstitutional infringement on Ms. Sullivan's First Amendment rights by a large governmental entity with essentially unlimited resources.

528.    Those attorney's fees will undoubtedly increase as Defendants attempt to avoid liability for their actions and attempt to avoid the Court's injunctive relief powers, declaratory relief powers, and its powers award damages.

529.    Ms. Sullivan is also damaged by the record of discipline in her permanent file.

530.    Additional damage arises now that the government Defendants inappropriately disciplined Ms. Sullivan. Unless Defendants rescind the inappropriate discipline, Plaintiff will have to answer in the affirmative every time she is asked if she has been disciplined in her professional role. One such obligation occurred in completing Plaintiff's application for her 2024 teaching license with the Kansas Department of Education, which asks for and requires certified copies of the disciplinary documents as follows:

5. Have you had a teacher's or school administrator's certificate or license denied, suspended, revoked or been the subject of other disciplinary action in any state?

◉Yes

You have selected "yes" to professional conduct question #5. Please read and verify the below statement.

☑ By checking this box, I understand I must mail a certified copy of documents regarding the official action taken to KSDE to complete my application.
Mail to: TLA, 900 SW Jackson St., Suite 106, Topeka, KS 66612.

6. Have you ever been disbarred or had a professional license or state issued certificate denied, revoked or been the subject of any other disciplinary action in any state?

◉Yes

You have selected "yes" to professional conduct question #6. Please read and verify the below statement.

☑ By checking this box, I understand I must mail a certified copy of documents regarding the official action taken to KSDE to complete my application.
Mail to: TLA, 900 SW Jackson St., Suite 106, Topeka, KS 66612.

531.    Defendants' inappropriate discipline, if not rescinded, will require Ms. Sullivan to incur additional time and expense in obtaining sufficiently redacted certified copies to comply with confidentiality laws, ensuring the legal sufficiency of the redactions through her legal counsel, and mailing the certified copies.

532.    Defendants' inappropriate discipline, if not rescinded, will subject Ms. Sullivan to discipline up to and including termination for failing to disclose discipline or failing to maintain confidentiality.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants and provide Plaintiff with the following relief:

A.      A declaratory judgment that the government Defendants' New Trans

Orthodoxy violates Ms. Sullivan's rights under the First Amendment as applied;

B.      A declaratory judgment that Defendants' New Trans Orthodoxy compelling teachers to affirm students' or others' "gender identity" that is inconsistent with his or her sex, and to affirm the fiction that boys can become girls and girls can become boys, violates Ms. Sullivan's rights under the First Amendment facially;

C.      A preliminary and permanent injunction prohibiting Defendants, their agents, officials, employees, and any other persons acting on their behalf from requiring Ms. Sullivan (and other faculty) to hide from parents the fact that the parents' minor child has requested to be addressed as a name different than the official name in Skyward or by pronouns that do not match the minor child's sex.

D.      A preliminary and permanent injunction prohibiting Defendants, their agents, officials, employees, and any other persons acting on their behalf from compelling Plaintiff to refer to students with pronouns that do not match the student's sex.

E.      A preliminary and permanent injunction prohibiting Defendants, their agents, officials, employees, and any other persons acting on their behalf from compelling Plaintiff to engage in speech that supports the government Defendants' New Trans Orthodoxy principles that conflict with Plaintiff's sincerely-held religious beliefs, moral beliefs, and conscience.

F.      A preliminary and permanent injunction requiring Defendants, their agents, officials, employees, and any other persons acting on their behalf to identify and produce the "racist" materials allegedly in Plaintiff's classroom.

G.      A preliminary and permanent injunction requiring Defendants, their agents,

officials, employees, and any other persons acting on their behalf to produce Plaintiff's permanent employment file and require Defendants to halt any further dissemination or suggestion that Ms. Sullivan had any racist materials in her classroom and include a finding in her permanent file that a preponderance of the evidence did not show Ms. Sullivan had racist materials in her classroom, or that Ms. Sullivan treated anyone differently or negatively because of or based on race.

H.     A preliminary and permanent injunction ordering Defendants, their agents, officials, servants, employees, and any other persons acting on their behalf to retract and purge Ms. Sullivan's personnel file, and any District or School record, of any reference to the punishment or discipline they imposed on Ms. Sullivan for expressing her views regarding gender identity, including without limitation the Phantom Complaint of gender identity discrimination, the alleged "investigation," and the written reprimand in the form of the March 31, 2023 Summary of Conference, and all related documentation upholding or referencing those decisions, such that no discipline occurred;

I.     Nominal, compensatory, and punitive damages from the Defendants violations of Title VII for discrimination, retaliation, and hostile work environment.

J.     Nominal, compensatory, and punitive damages from the Defendants for the violation of Ms. Sullivan's First Amendment rights under the U.S. Constitution, her rights under the Kansas Constitution's Bill of Rights, §§ 7, 11, and under the Kansas Preservation of Religious Freedom Act, and for violation of her contractual rights;

K.     Plaintiff's reasonable attorneys' fees and other expenses and disbursements incurred to bring this action and to protect her rights during the interrogation threatening

her career and livelihood, and for the ensuing appeal process.

L.      Plaintiff's reasonable attorneys' fees, costs, and other costs and disbursements in this action pursuant to 42 U.S.C. § 1988 and K.S.A. 60–5303(b)(6); and

M.      All other further relief to which Plaintiff may be entitled.

Respectfully submitted,

**EDMUNDS LAW OFFICE, LLC**

*/s/ Fritz Edmunds*
FRITZ EDMUNDS (KS Bar # 16829)
11715 W. 101st Street
Overland Park, Kansas 66214
(913) 669-3000
fritz@edmundslaw.com
ATTORNEY FOR PLAINTIFF

## DEMAND FOR TRIAL BY JURY
## AND DESIGNATION OF TRIAL LOCATION

Plaintiff demands a trial by jury for all issues so triable herein and respectfully requests all hearings and trial proceedings occur in Kansas City, Kansas.

*/s/ Fritz Edmunds*
FRITZ EDMUNDS (KS Bar # 16829)
Attorney for Plaintiff

## DECLARATION UNDER PENALTY OF PERJURY

I, JENNIFER CAEDRAN SULLIVAN, a citizen of the United States and a resident of the State of Kansas, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing, that the foregoing is true and correct to the best of my knowledge (except as to statements made on information and belief, and those I believe to be true and correct), and that the foregoing statements that pertain to me are based on my personal knowledge.

Executed this 10/26 day of October 2024, at Prairie Village, Kansas.

*J. Caedran Sullivan*

JENNIFER CAEDRAN SULLIVAN

State of **Kansas**
County of **Johnson**

Signed or attested before me on 10/26/24 (date)
Jennifer Caedran [name(s) of person(s)]
Sullivan

MATTHEW STEINBOCK
Notary Public-State of Kansas
My Appt. Expires 2/27/2026