**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

JENNIFER CAEDRAN SULLIVAN,

*Plaintiff*

v.

UNIFIED SCHOOL DISTRICT 512, *et al.*,

*Defendants*.

Case No: 2:24-cv-02491-DDT-BGS

**<u>PLAINTIFF'S SUGGESTIONS IN OPPOSITION TO
DEFENDANT USD 512'S MOTION TO DISMISS</u>**

i

**Table of Contents**

INTRODUCTION ................................................................................................... 5

ARGUMENT .......................................................................................................... 7

I.    The District's motion should be denied because Ms. Sullivan pleads plausible constitutional claims. ............................................................................ 7

    A.    Ms. Sullivan plausibly pleads that the District can be held accountable for the constitutional violations she experienced and the injuries she sustained. ....................................................................................... 7

    B.    The District's motion should be denied because Ms. Sullivan pleads plausible First Amendment retaliation claims. .......................................... 9

        1.    Affirming and endorsing the District's new "trans" orthodoxy is not part of Ms. Sullivan's official duties as a teacher. ..................... 9

            a.    *Garcetti* does not apply to compelled speech. .................. 11

            b.    Not all speech in the course of Ms. Sullivan's role as a teacher is part of her official duties. ................................. 11

            c.    Promoting the District's orthodoxy is not a valid official duty for teachers. .............................................................. 11

            d.    Academic-freedom also prevents the District from requiring, as an 'official duty,' speech that goes against her training and longstanding rules of English usage. ....... 12

        2.    Ms. Sullivan's speech unquestionably deals with matters of public concern. ..................................................................................... 13

        3.    The District offers no valid interest served by its new "trans" orthodoxy sufficient to outweigh Ms. Sullivan's free speech rights. ..................................................................................... 14

            a.    The District's motion offers no interest. .......................... 15

            b.    The District would need to satisfy heightened scrutiny.... 15

             c.    The District's desire for Ms. Sullivan to affirm its new "trans" orthodoxy does not outweigh her free-speech rights. .............................................................................. 16

        4.    The District does not deny that Ms. Sullivan's free-speech was a motivating factor in the District's adverse employment actions. . 17

5. The District does not argue it would have reached the same decisions in the absence of Ms. Sullivan's protected speech......... 17

C. The District's motion should be denied because Ms. Sullivan plausibly pleads claims for other First Amendment violations. ............................... 18

II. The District's motion should be denied because Ms. Sullivan pleads plausible Title VII retaliation and hostile environment claims. .......................................... 18

A. Ms. Sullivan pleads plausible Title VII retaliation claims........................ 18

1. Ms. Sullivan engaged in protected opposition to discrimination.. 19

2. Opposing race-based workplace discrimination is a protected activity..................................................................................... 21

3. The District's motion also fails because its authority is unavailing................................................................................... 21

4. Abundant authority supports Ms. Sullivan's Title VII claims...... 22

B. The District apparently concedes that Ms. Sullivan pleads a hostile environment. ....................................................................................... 22

III. The District's motion fails because Ms. Sullivan amply pleads injury-in-fact to establish standing and facts to support causation. ................................................ 23

A. Arguing the merits, without accepting well-pleaded facts, is inappropriate and ineffectual in a motion to dismiss. ................................................... 23

B. The District ignores Ms. Sullivan's First Amendment rights and again misstates her claims. ............................................................................. 24

C. Ms. Sullivan pleads numerous injuries that amply establish standing. .... 24

1. Ms. Sullivan pleads six categories of constitutionally protected speech for which she sustained injury, satisfying Article III standing..................................................................................... 24

2. Ms. Sullivan pleads numerous other injuries that satisfy Article III standing..................................................................................... 25

3. The District misconstrues Ms. Sullivan's requested relief. .......... 27

4. Ms. Sullivan established standing because she pleads both constitutionally-protected activity and the District's actions that would chill the speech of a person of ordinary firmness. ............. 27

D. The District waives any causation argument but its motion should be denied because Ms. Sullivan nevertheless amply pleads but-for causation. .............................................................................. 28

1. Ms. Sullivan pleads direct evidence of but-for causation. ............ 28

2. Ms. Sullivan also pleads indirect evidence of but-for causation. . 29

3. Ms. Sullivan amply pleads causation for her First Amendment retaliation claim. ......................................................................... 30

IV. The District's motion should be denied because Ms. Sullivan pleads plausible claims under Kansas law.......................................................................... 30

A. Ms. Sullivan need not provide the District notice of her claims but did anyway. .................................................................................................. 30

1. Kansas state law requiring notice for Kansas claims waiving sovereign immunity under the KTCA does not apply to claims under federal law.......................................................................... 30

2. The KTCA notice is not required for claims brought under other Kansas statutory schemes establishing liability for state actors. .. 31

3. The District nevertheless had substantive notice of Ms. Sullivan's claims. ....................................................................................... 32

4. The District has actual notice of Ms. Sullivan's claims............... 32

5. The Kansas Tort Claims Act notice also does not apply to contract claims. ....................................................................................... 33

A. Ms. Sullivan pleads plausible claims under the Kansas Constitution....... 33

B. Ms. Sullivan pleads plausible contract claims. ........................................ 34

V. The District's motion should be denied because Ms. Sullivan seeks punitive damages against the individual co-defendants and not against USD 512. ........... 35

VI. The District's request for attorney's fees should be denied................................. 36

Conclusion ...................................................................................................................... 36

**INTRODUCTION**

Like their other two motions to dismiss, the Defendants' motion to dismiss the Unified School District 512 (the "District") (ECF 39, 40) fails as a matter of law. This brief demonstrates why.

Defendants seek to compel Ms. Sullivan's speech in ways that violate her core beliefs. So at issue in this action is the extent of teachers' constitutional rights to freedom of speech. As the Supreme Court held more than fifty years ago, "It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). But Ms. Sullivan's speech is not just being stifled. The government is forcing her, an English teacher, to participate in students' experimentation with different genders, pronouns, and so-called "transitioning," by compelling her to use words that affirm its new "trans" orthodoxy through a requirement that Ms. Sullivan use pronouns that violate her sincerely-held religious beliefs and other deeply-held beliefs against lying to students and parents, plus her beliefs and training regarding English usage rules. The government violates Ms. Sullivan's core beliefs because the "preferred pronouns" she is being compelled to use do not coincide with the students' sex.

When speech is compelled, not just silenced, "additional damage is done. In that situation, individuals are coerced into betraying their convictions; forcing individuals to endorse ideas they find objectionable is always demeaning, commanding 'involuntary affirmation' of objected-to beliefs would require 'even more immediate and urgent grounds' than demanding silence." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018) (citing *Bd. of Educ. v. Barnette*, 319 U.S. 624, 633 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein … Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command")). Just as forcing teachers to affirm their support of the president or the flag would be unconstitutional, forcing teachers to affirm their support of the idea

that one can change genders is also unconstitutional. *Id.*

Defendants also seek to force Ms. Sullivan to deceive parents by both limiting and compelling her speech. As part of the District's new "trans" orthodoxy, the government not only requires teachers to use preferred names and pronouns but is also prohibiting teachers, when communicating with parents, from letting the parents know their child is "transitioning" at school and from using the preferred name or preferred pronouns their child has chosen to go by at school, requiring instead the use of the student's legal name and sex-consistent pronouns. (ECF 44 ¶ 255.) The District's practice of requiring teachers to hide the truth from parents has been condemned by this district court, *see Ricard v. USD 475 Geary Cnty.*, 13, 2022 WL 1471372 *8 (D. Kan. May 9, 2022) ("It is difficult to envision why a school would even claim—much less how a school could establish—a generalized interest in withholding or concealing from the parents of minor children, information fundamental to a child's identity, personhood, and mental and emotional well-being such as their preferred name and pronouns").

Not only does the government's new "trans" policy require Ms. Sullivan to violate her sincerely-held religious beliefs and her core personal beliefs against lying and deceiving parents and students, but the District's policy would also require Ms. Sullivan to violate the Individuals with Disabilities Education Act (IDEA) (ECF 44 ¶¶ 109-13) because students suffering from gender dysphoria (formerly, gender identity disorder) or from "transgenderism" fit the IDEA's definition of a "serious emotional disturbance." *See Chiles v. Salazar*, 116 F.4th 1178, 1226 (10th Cir. 2024) ("Many young people have suffered severe emotional distress as they struggle with resolving their sexual orientation or gender identity"); *Fowler v. Stitt*, 104 F.4th 770, 776 (10th Cir. 2024) (accepting as true plaintiff's pleading that "[i]f left untreated, gender dysphoria may result in serious consequences including depression, self-harm, and even suicide"). Because a student with a serious emotional disturbance qualifies as a "child with a disability," the IDEA requires informed, written consent from parents before educators provide evaluation, an IEP, or special services. 20 U.S.C. § 1400, *et seq*.

Defendants are also retaliating against Ms. Sullivan for opposing workplace racial

discrimination. So additionally at issue in this action is whether a government employer can lawfully punish a teacher for opposing the government's appallingly numerous race-based discriminatory insults, stereotypes, and slurs embraced and propagated under the guise of Diversity, Equity, and Inclusion mandatory training sessions to be incorporated into lessons in the classroom. (ECF 44 ¶¶ 289-337.) When Ms. Sullivan opposed the government's race-based discriminatory DEI, she was targeted by the District and retaliated against in an escalating, and still ongoing, pattern of adverse employment actions resulting in not only a District-level monitor sitting-in on all Ms. Sullivan's school's team meetings with other teachers, but also in Ms. Sullivan's demotion, reassignment, and material change in job duties, plus threats of termination among other punishments. (ECF 44 ¶¶ 527, *e.g.*, ¶¶ 338-49.)

## ARGUMENT

"Granting [a] motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Duron v. Cams*, 238 F.3d 1268, 1270 (10th Cir. 2001) (citation omitted). Under the *Twombly/Iqbal* standard, to survive a motion to dismiss the complaint must "allege sufficient facts to state a claim for relief plausible on its face." *Lucas v. Turn Key Health Clinics, LLC,* 58 F.4th 1127, 1136 (10th Cir. 2023) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Bell ML Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (factual allegations must be enough to raise a right to relief above the speculative level). Ms. Sullivan's Complaint does.

In considering a motion to dismiss, courts must "accept a complaint's well-pleaded allegations as true, viewing all reasonable inferences in favor of the nonmoving party, and liberally construe the pleadings" in the plaintiff's favor. *Id.* at 1136. Ms. Sullivan's Complaint easily overcomes the District's motion to dismiss.

I.    **The District's motion should be denied because Ms. Sullivan pleads plausible constitutional claims.**

    **A. Ms. Sullivan plausibly pleads that the District can be held accountable for the constitutional violations she experienced and the injuries she sustained.**

In attempting to distance itself from its own policy and actions, the District misapprehends

7

the law. The District asserts: "The Tenth Circuit has held that, in Kansas, the final policymaker for a school district is the board of education and that authority cannot be delegated." (ECF 40 at 5 n.19 (emphasis in the District's brief)). But the case the District cited expressly holds the opposite: "*However, final decisionmaking authority may be delegated*." *Ware v. Unified School Dist. No. 492*, 902 F.2d 815, 817 (10th Cir. 1990) (*emphasis* added). *Ware* cites *St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988), which notes that § 1983 authorizes suit "for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels," and *Ware* clarifies that "delegation arises when a subordinate's decision … manifests a custom or usage of which the entity must have been aware." *Ware*, at 818.

Here, for her continuing First Amendment injury, Ms. Sullivan pleads: "The board delegates administrative authority to the superintendent or other employees as specified, but retains the power to alter or veto the acts of any or all employees"[1] and she pleads: "Board Defendants are aware of the actions authorized by and occurring under the policies and actions challenged by Ms. Sullivan and have not instructed District personnel, including the other Defendants, to change or alter either the policies or the actions taken pursuant to those policies." (ECF 44 ¶¶ 45, 54.) Although municipalities are not liable under *respondeat superior* for First Amendment injuries, the 'deliberate indifference' standard may be used to determine the "direct causal link" between the alleged constitutional deprivation and the board's actions or inaction, which is a question for the jury. *Ware,* at 817 (citing *Canton v. Harris*, 489 U.S. 378, 379 (1989)).

After Ms. Sullivan was disciplined for using so-called "incorrect pronouns" matching the student's sex—which was not a violation of any policy at the time—the Defendants quickly and quietly promulgated a policy that violates the First Amendment by compelling speech to affirm the government's new "trans" orthodoxy. (ECF 44 ¶¶ 255, 265.) *See Janus,* 138 S. Ct. at 2463.

---

[1] Shawnee Mission School District Board Policy CF "delegates to the superintendent all administrative duties. The board reserves the ultimate decision in all matters concerning appointing and terminating employees, policy or expenditures of funds, and it will normally proceed in those areas only after receiving the superintendent's recommendations." https://shorturl.at/pTdLY

The District's policy was implemented either under the authority of the School Board or under the authority of the Superintendent or other employees who had been delegated the School Board's administrative authority. (ECF 44 ¶¶ 255-59.) The Court may take judicial notice that the District specifically states that its transgender policies are "administrative." Winter 2024 SMSD Strategic Plan Update at 10, https://shorturl.at/WKEYh (stating "SMSD continues to hone district-wide administrative guidelines related to inclusive practices and procedures for transgender students."). Discovery will determine whether the School Board created or approved the First Amendment-offending policy or whether it delegated its rulemaking authority. Either way, the "trans" policy unlawfully compelling speech is a written policy, that is still in place and of which the District cannot reasonably claim it had no knowledge or opportunity to undo. The District (and its co-defendants) can be held accountable by the Court, despite the District's misunderstanding the law.

## B. The District's motion should be denied because Ms. Sullivan pleads plausible First Amendment retaliation claims.

The Tenth Circuit applies the *Garcetti-Pickering* test to First Amendment retaliation claims by public employees, which examines: "(1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct." *Singh v. Cordle*, 936 F.3d 1022, 1034 (10th Cir. 2019) (citing *Helget v. City of Hays, Kansas*, 844 F.3d 1216, 1221 (10th Cir. 2017)). The first three factors "are ordinarily matters of law for a court to decide, and the final two steps are ordinarily questions of fact." *Id*. All five weigh in Ms. Sullivan's favor.

### 1. Affirming and endorsing the District's new "trans" orthodoxy is not part of Ms. Sullivan's official duties as a teacher.

The District suggests that using students' preferred pronouns might be an official duty, without actually stating it is. (ECF 40 at 6.) But the District contradicts that idea by arguing the pronoun policy is not the school board's official policy. (ECF 40 at 5.) But this contradicts Ms.

9

Sullivan's well-pleaded Complaint, which states that she "had and has no valid official duty to participate in students' experimenting with divergent genders or "transitioning," or her allegation that "forced participation in students' experimenting with divergent genders, and "transitioning" is not a valid curricular requirement." (ECF 44 ¶¶ 274-75.) Here, the Complaint controls.

In just two sentences the District argues that a public official's free speech rights are not protected while performing "official duties," so "clearly" Ms. Sullivan's speech "during the performance of her duties as a teacher" are not protected. (ECF 40 at 6). Not surprisingly, the District's second sentence omits the word 'official' when referring to Ms. Sullivan's duties as a teacher. And the District does not explain how compelling speech to affirm or endorse its new "trans" orthodoxy and compelling teachers to lie to parents about their child's activity at school—both of which require Ms. Sullivan to violate her sincerely-held religious beliefs, her other personal beliefs, and centuries of English language usage rules—are "clearly" official duties. (ECF 40 at 6.) The District ignores that "the state's interest as an employer in regulating employees' speech does not differ significantly from interests connected with the regulation of speech outside of the employment context. *Miles v. Denver Pub. Schs.*, 944 F.2d 773, 777 (10th Cir. 1991) (citing *Pickering v. Board of Education*, 391 U.S. 563, at 570, 88 S.Ct. at 1735 (1968). Even if Ms. Sullivan's speech were not protected under the First Amendment—it is—that would not affect her retaliation claim under Title VII.

The District footnotes *Willey v. Sweetwater Cnty. Sch. Dist. No 1 Bd. of Trs.*, 680 F. Supp. 3d 1250, 1264 (D. Wyo. 2023), which involved parents seeking a preliminary injunction (a far different standard than for the District's motion to dismiss). Although of no precedential value (perhaps why the District omitted the court), even *Willey* acknowledged the "thorny Constitutional issues" around the school district's pronoun policy and held that "[b]eing compelled to call someone by a ... pronoun not in conformance with [their religious] belief is the exact type of 'coercion or compulsion' prohibited by the Free Exercise Clause." *Id*. at 1263 and 1283. It also found the school district's policy of hiding a student's preferred name and pronouns from his or her parents, like the Communication with Parents Policy in this action (*see* ECF 44 ¶¶ 33, 254,

10

266), to be "constitutionally problematic" *Willey*, 680 F. Supp. 3d at 1276.

### a. *Garcetti* does not apply to compelled speech.

By its plain language, *Garcetti* only applies where public employees "make statements." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). That is, "the employee must have spoken." *Geraghty v. Bd. of Educ.*, 5:22-cv-02237, 23, 2024 WL 3758499 *11 (N.D. Ohio Aug. 12, 2024) ("where "a public employer does not simply restrict potentially disruptive speech but commands that its employees mouth a message on its own behalf, the calculus is very different") (quoting *Janus*, 585 U.S. at 908; citing *Vlaming v. W. Point Sch. Bd.*, 895 S.E.2d 705, 741 (Va. 2023)).

### b. Not all speech in the course of Ms. Sullivan's role as a teacher is part of her official duties.

The District cannot legitimately claim all speech as part of a teacher's job is official duty. It cannot define away a teacher's right against compelled speech by unilaterally deeming speech a compulsory official duty. *See Vlaming*, 895 S.E.2d at 740 (rejecting identical argument from another school board as circular); *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2425 (2022); *see also Garcetti*, 547 U.S. at 420-21 ("it would not serve the goal of treating public employees like "any member of the general public … to hold that all speech within the office is automatically exposed to restriction") (citations omitted)); *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1032 (9th Cir. 1998) (schools may not "indoctrinate their young charges with racist concepts").

### c. Promoting the District's orthodoxy is not a valid official duty for teachers.

Ms. Sullivan has no legitimate "official duty" to personally affirm the state's new "trans" orthodoxy by using any pronoun the student requests because the District has no power to impose such a duty in the first place. *Garcetti* itself "reject[ed] ... the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions." 547 U.S. at 424. While an employer may instruct that an "employee deliver any lawful message," it "is not easy to imagine a situation in which a public employer has legitimate need to demand that its employees recite words with which they disagree." *Janus*, 138 S. Ct. at 2473 (citing *Garcetti* 547 U.S., at 421–422,

11

425–426, 126 S.Ct. 1951).  *Garcetti*, then, does not expand the realm of what the government may compel; it only relieves the government of the *Pickering* balancing when an employee speaks in the context of an otherwise valid official duty. Interestingly, the District does not mention *Pickering*. Obviously, there are many limits on what type of speech may be mandated for repetition by employees.

"Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding." *Sweezy v. New Hampshire*, 324 U.S. 234, 250 (1957). For the same reason that it is unconstitutional to use compulsive methods to "foster a homogeneous people with American ideals," *Meyer v. Nebraska*, 262 U.S. 390, 402 (1923), it "cannot be" that the government possesses "power to compel ideological conformity." *Meriwether v. Hartop*, 992 F.3d 492, 506 (6th Cir. 2021). Where the government uses compulsive means to produce a "society free of corresponding biases … it is a decidedly fatal objective." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., Inc.*, 515 U.S. 557, 579 (1995).

### d. Academic-freedom also prevents the District from requiring, as an 'official duty,' speech that goes against her training and longstanding rules of English usage.

Ms. Sullivan is contractually guaranteed academic-freedom. (ECF 44 ¶¶ 519, 525-26). Academic freedom implicates First Amendment freedom of speech rights. *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967) ("Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom. The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools") (internal citation and quotation marks excluded)); *see also Vanderhurst v. Co Mountain Coll. Dist.*, 208 F.3d 908, 913 (10th Cir. 2000) (approvingly citing *Keyishian*); *and see Meriwether*, 992 F.3d at 505 ("the academic-freedom exception to *Garcetti* covers all classroom speech related to matters of public concern, whether that speech is germane to the contents of the lecture or not.") (citations omitted)). On the issue of First Amendment academic freedom, the Tenth Circuit has held that, while high-school

12

teachers are not afforded "an unlimited liberty as to structure and content of the courses," they "[u]ndoubtedly … have some freedom in the techniques to be employed." *Adams v. Campbell Cnty.*, 511 F.2d 1242, 1247 (10th Cir. 1975). And the Supreme Court in *Kennedy* suggests academic freedom at the high-school level may involve additional First Amendment interests beyond those captured by the *Pickering-Garcetti* framework. *Kennedy*, 142 S. Ct. at 2424. But even if there were no academic freedom of speech protections under the First Amendment, the District cannot claim that changing the definition of pronouns is an "official duty" because the District guarantees Ms. Sullivan a right to academic freedom, which it defines as:

> Academic freedom is the right of the Professional Employee and the learner to explore, present and discuss divergent points of view in the quest for knowledge and truth. Since only those who are free to learn can learn to be free and because the freedom to learn is dependent upon the freedom to teach, academic freedom shall be guaranteed to Professional Employees. A classroom atmosphere shall be encouraged which permits students and Professional Employees to study questions dealing with critical issues, included within the scope and sequence of the subject matter, the grade placement, maturity and level of comprehension of the students involved. Such questions and issues shall be consistent with the defined and outlined curricular programs approved by the Board of Education.

(ECF 44; Ex. 12 at 49, Art. XII § H(1).)

It cannot be that the District could compel its English teachers, as part of the government's orthodoxy, to contradict teachers' training and adherence to the long-established rules of English usage by requiring them, for example, to teach that subjects and verbs need not agree or that contractions need not contain apostrophes because English grammar rules are "racist." Likewise, the government could not, in managing the classroom, compel "a pacifist to declare that war is just, a civil rights icon to condemn the Freedom Riders, a believer to deny the existence of God, or a Soviet émigré to address his students as 'comrades.'" *Meriwether*, 992 F.3d at 506. So the District's "New Trans Orthodoxy" (ECF 44 ¶ 258), requiring teachers to corrupt the English language by removing the long-standing rules for pronoun usage, exceeds the limits of valid official duties under *Garcetti*.

### 2. Ms. Sullivan's speech unquestionably deals with matters of public concern.

Next, this Court must assess whether Ms. Sullivan's speech may be "fairly characterized

as constituting speech on a matter of public concern" as opposed to speech upon matters of only personal interest. *Curtis v. Okla. City Pub. Schs. Bd. of Educ.*, 147 F.3d 1200, 1211 (10th Cir. 1998) (citing *Gardetto v. Mason*, 100 F.3d 803, 811 (10th Cir. 1996)). Matters of public concern are those matters of "political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983). The District cannot reasonably argue that Ms. Sullivan's speech on matters of DEI, race-based discrimination, concepts of gender "identification" or "assignment," gender dysphoria, gender incongruence, "preferred pronouns," whether one can actually "transition" from one sex or gender to the other, or to a multitude of other genders, and hiding so-called "transitions" from parents, all in the context of First Amendment rights regarding these matters, are not of public concern. (*See, e.g.*, ECF 44 ¶¶ 9-10, 14, 90-104, 7, 95-104, 15, 19, 27-32, 107-08). After all, "sexual orientation and gender identity" among others "are sensitive political topics, and they are undoubtedly matters of profound "value and concern to the public." *Janus,* 138 S. Ct. at 2476 (cleaned up). Thus, speech on those topics "occupies the highest rung of the hierarchy of First Amendment values" and merits "special protection". *Id.* (cleaned up); *Meriwether,* 992 F.3d at 508 ("[p]ronouns can and do convey a powerful message implicating a sensitive topic of public concern"); *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) ("it is always in the public interest to prevent the violation of a party's constitutional rights," the "public has a … profound and long-term interest in upholding an individual's constitutional rights."). Plus, speech disclosing illegal conduct by government officials is inherently a matter of public concern. *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1206 (10th Cir. 2007) (cleaned up). A public concern usually exists when the speech exposes racial discrimination, harassment, or corruption in a public workplace. *Rogers v. Riggs*, 71 F.4th 1256, 1260 (10th Cir. 2023) (citing *Connick*, 461 U.S. at 148 n.8)). These are the matters of unquestionable public concern addressed by the categories of Ms. Sullivan's speech at issue in this action, both past and compelled.

### 3. The District offers no valid interest served by its new "trans" orthodoxy sufficient to outweigh Ms. Sullivan's free speech rights.

The District's New Trans Orthodoxy (ECF 44 ¶ 258) is an attempt to impose a duty

requiring teachers, including Ms. Sullivan, to advocate government orthodoxy. The third prong of the *Pickering-Garcetti* analysis requires the District to offer a compelling interest for it to promote its government orthodoxy to outweigh Ms. Sullivan's fundamental free-speech and free-exercise rights.

### a. The District's motion offers no interest.

The District's motion does not offer any reason for requiring its teachers to endorse or affirm its new "trans" orthodoxy by participating in students who may have serious emotional disturbances experiments with divergent genders or so-called "transitioning," compelling the use of feminine pronouns for males and masculine pronouns for females whenever requested. To encroach on Ms. Sullivan's First Amendment rights, the District would need a compelling reason.

### b. The District would need to satisfy heightened scrutiny.

First Amendment rights are not absolute, but when the government seeks to impair one's free-speech speech rights in the public employee context, the government is subject to "exacting scrutiny or "strict scrutiny" to show a compelling or paramount state interest tailored in the least restrictive means. It is firmly established that a significant impairment of First Amendment rights must survive exacting scrutiny. "This type of scrutiny is necessary even if any deterrent effect on the exercise of First Amendment rights arises, not through direct government action, but indirectly as an unintended but inevitable result of the government's conduct[.]" *Elrod v. Burns*, 427 U.S. 347, 362 (1976) (cleaned up). Thus encroachment "cannot be justified upon a mere showing of a legitimate state interest." *Id*. The interest advanced must be paramount, one of vital importance, and the burden is on the government to show the existence of such an interest. *Id*. "[E]ven in public employment, "a significant impairment of First Amendment rights must survive exacting scrutiny." *Abood v. Detroit Bd. of Educ*, 431 U.S. 209, 259 (1977) (citing *Elrod*, 427 U.S. at 362); *see also Kennedy*, 142 S. Ct. at 2422 (finding First Amendment violation unless the government can satisfy "strict scrutiny"). For after the first prong of the *Pickering-Garcetti* analysis, "a second step remains where the government may seek to prove that its interests as employer outweigh even an employee's private speech on a matter of public concern." *Kennedy*, 142 S. Ct. at 2425.

"Whether one views the case through the lens of the Free Exercise or Free Speech Clause, at this point the burden shifts to the District. Under the Free Exercise Clause, a government entity normally must satisfy at least 'strict scrutiny,' showing that its restrictions on the plaintiff's protected rights serve a compelling interest and are narrowly tailored to that end." *Id.*

The District does not argue a compelling state interest and does not argue that it used the least restrictive means for the government's new policy that infringes on and burdens Ms. Sullivan's sincerely-held religious beliefs and other beliefs. Therefore, the District's new "trans" policy fails the third prong of the *Pickering-Garcetti* analysis and conveys neither a "lawful message" nor one that arises from a "legitimate" or a "compelling" need, and thus poses no valid apprehension of Ms. Sullivan's First Amendment rights under *Garcetti*. *See Janus*, 138 S. Ct. at 2473. Requiring teachers to refer to students by whatever pronoun they choose, whenever they choose (*see* ECF 44 ¶ 29), and requiring teachers to lie to parents (ECF 44 ¶ 31-33), are not compelling, or even legitimate, interests of the government.

### c. The District's desire for Ms. Sullivan to affirm its new "trans" orthodoxy does not outweigh her free-speech rights.

Even if the District did offer some reason for infringing on Ms. Sullivan's rights by compelling her to endorse the government's new "trans" orthodoxy by mouthing affirmation of a concept that violates her sincerely-held religious beliefs, the District does not offer any rationale for how that reason outweighs Ms. Sullivan's First Amendment rights. The Tenth Circuit has held: "Arguably, 'the only public employer interest that can outweigh a public employee's recognized speech rights is the interest in avoiding direct disruption, by the speech itself, of the public employer's internal operations and employment relationships.'" *Flanagan v. Munger*, 890 F.2d 1557, 1566 (10th Cir. 1989) (citing *Berger v. Battaglia*, 779 F.2d 992, 996, 1000 (4th Cir. 1985), *Connick v. Myers*, 461 U.S. 138, 151 (1983), *Givhan v. Western Line Consol. Sch. Dist*, 439 U.S. 410, 415 n.4 (1979), and *Pickering*, 391 U.S. at 570 (cleaned up)). The Tenth Circuit in *Munger* also held "public employers "cannot justify disciplinary action against plaintiffs simply because some members of the public find plaintiffs' speech offensive." *Munger*, 890 F.2d at 1566.

Ms. Sullivan pleads there is no compelling or legitimate reason for the government to force Ms. Sullivan or other teachers to participate in students' experiments with divergent pronouns or genders or to force them to lie to parents by hiding from parents when their child is experimenting at school with different pronouns or genders. (ECF 44 ¶¶ 30, 33.) Because the District does not argue a compelling, or legitimate, or *any* interest in compelling Ms. Sullivan to affirm and endorse its new "trans" orthodoxy, or that the District's interests outweigh Ms. Sullivan's First Amendment rights, the third prong of the five-factor *Pickering-Garcetti* framework also supports Ms. Sullivan and militates denial of the District's motion, as uncontested. *See Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000) (inappropriate to  raise issues or arguments that could have been raised in prior briefing).

### 4. The District does not deny that Ms. Sullivan's free-speech was a motivating factor in the District's adverse employment actions.

The District apparently concedes that Ms. Sullivan pleads that her protected speech was a motivating factor in the District's actions. After all, the District does not contest that Ms. Sullivan's speech was a motivating factor in its actions. The District only agues that Ms. Sullivan fails the first two prongs of the five-part *Garcetti* analysis. (ECF 40 at 7.) *See Paraclete*, 204 F.3d at 1012. The District apparently concedes for good reason. Ms. Sullivan's Complaint is rife with facts plausibly pleading that Ms. Sullivan is a long-term, exceptional AP English teacher with an unblemished record (ECF 44 ¶¶ 9, 40-42) until she spoke up and opposed the race-based discriminatory indoctrination sessions that Defendants required under the guise of DEI. (ECF 44 ¶¶ 90-104.) Then they targeted her and began an ongoing pattern of retaliation. (*See, e.g.*, ECF 44 ¶¶ 14, 205, 215, 221, 338-349.) Ms. Sullivan's Complaint easily pleads her protected speech was the motivating factor in Defendants' retaliation against her.

### 5. The District does not argue it would have reached the same decisions in the absence of Ms. Sullivan's protected speech.

The District also apparently concedes that Ms. Sullivan pleads sufficient facts on the final element of the *Garcetti* analysis. Ms. Sullivan does plead ample evidence that the District's actions were (and are) motivated by Ms. Sullivan's free-exercise and free-speech as well as her opposition

to the District's race-based discriminatory DEI. The District does not suggest that it would have made the same decision in the absence of her speech. *See Paraclete*, 204 F.3d at 1012.

All five of the *Garcetti* factors support Ms. Sullivan's First Amendment retaliation claims.

### C. The District's motion should be denied because Ms. Sullivan plausibly pleads claims for other First Amendment violations.

In addition to pleading compelled speech and First Amendment retaliation claims, Ms. Sullivan also pleads claims for numerous other First Amendment violations. That is, she pleaded free exercise claims (ECF 44 ¶¶ 8, 10, 26, 27-29, 31, 34, 39), content and viewpoint discrimination claims (ECF 44 ¶¶ 490-501), and claims under the unconstitutional conditions doctrine (ECF 44 ¶¶ 502-509). The District does not seek to dismiss any of these claims, and thus, it waived any argument that she failed to plead these claims adequately. *Paraclete*, 204 F.3d at 1012.

### II.    The District's motion should be denied because Ms. Sullivan pleads plausible Title VII retaliation and hostile environment claims.

Ms. Sullivan plausibly states causes of action for retaliation and hostile work environment under Title VII in addition to causes of action under § 1983 for violation of her constitutional and federal civil rights. She also plausibly states causes of action for violations of her Kansas constitutional rights under the Kansas Preservation of Religious Freedom Act and the Kansas Public Speech Protection Act, plus her contractual rights under state law in her well-pleaded Second Amended Verified Complaint (ECF 44) (the "Complaint").

### A.  Ms. Sullivan pleads plausible Title VII retaliation claims.

In addition to Ms. Sullivan's Complaint plausibly stating claims for retaliation, content and viewpoint discrimination, and unconstitutional conditions under the First Amendment, her Complaint states claims under Title VII, which are analyzed under a completely different standard than constitutional claims.

Although a party need not state a *prima facie* case in the complaint,[2] those elements for

---

[2] *Rutila v. Buttigieg*, No. 23-6157, 4 (10th Cir. Dec. 18, 2024) ("A plaintiff need not establish a prima facie case in his complaint ... [t]o evaluate whether a complaint survives a motion to dismiss, we consider whether a plaintiff has 'set forth a plausible claim in light of the elements of [his] claim'") (citing *McNellis v. Douglas Cnty. Sch. Dist.*, 116 F.4th 1122, 1139 (10th Cir. 2024) (quoting *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1050 (10th Cir. 2020)); see also *Khalik,* at 1192 ("[w]hile the 12(b)(6) standard does not require that [a plaintiff] establish

Ms. Sullivan's Title VII retaliation claim are: "(1) that [s]he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged [retaliation] action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *See Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012)). The District argues only the first element is lacking, (ECF 40 at 3), thus conceding that Ms. Sullivan satisfactorily pleads the other two. *Paraclete*, 204 F.3d at 1012. But the District's argument is also wrong factually and legally.

### 1. Ms. Sullivan engaged in protected opposition to discrimination.

In its one-paragraph, perfunctory opposition to Ms. Sullivan's Title VII retaliation claim, the District insists that opposing race-based discrimination in the workplace is not protected. (ECF 40 at 3.) In so arguing, the District misstates Ms. Sullivan's claim. The District's motion, like the motions of its co-defendants, mischaracterizes Ms. Sullivan's claims. Defendants attempt to avoid the egregious facts in this action by repackaging Ms. Sullivan's claims. Even though Ms. Sullivan tries not to use pronouns for students, and disputes that she has, after Ms. Sullivan opposed the government's race-based discrimination, Defendants ginned-up two "investigations" without any specifics as to time, date, or context, without any allegation of different treatment or different outcomes, and without ever producing the alleged written complaint for "gender identity" discrimination that the District claimed was the basis for "formal investigation." The District disciplined and punished Ms. Sullivan (i) despite promising no discipline would result from the "investigation," (ii) despite the District's investigator finding no discrimination, (iii) despite the investigator finding Ms. Sullivan's alleged use of "wrong pronouns on one or a couple occasions during the school year" was "inadvertent and not purposeful," and (iv) despite there being no policy, rule, or expectation to use "preferred pronouns" at the time. The District's "investigations" after Ms. Sullivan was targeted were also tainted with numerous procedural issues and conflicts under the District's own policies and contract terms.

---

a prima facie case in [his or her] complaint, the elements of each alleged cause of action help to determine whether [the plaintiff] has set forth a plausible claim").

Ms. Sullivan made it clear that she does not oppose using preferred names because they do not communicate sex like pronouns do (ECF 44 ¶ 19), and Ms. Sullivan does not oppose diversity training, she actually proposed ways to make the DEI mandatory sessions non-discriminatory. (ECF 44 ¶¶ 91, 99-102, Ex. 4.) She opposes race-based discrimination—in the form of racial insults, stereotypes, and slurs. *Id*; (and see ECF 44 ¶¶ 289-337.) She also does not oppose being investigated, she opposed the bogus and sham "investigations" that were obviously targeting her and were improper under the District's own policies and contract. (ECF 44 ¶¶ 146-216.)

The retaliation worsened when Ms. Sullivan warned parents and taxpayers of the "woke" anti-white indoctrination and low teacher morale in the Shawnee Mission School District by penning op-eds in an online news publication. The District's retaliation increased when Ms. Sullivan availed herself of a right clearly afforded by the First Amendment.

Ms. Sullivan did not merely "oppose[] diversity training" as the District claims. (ECF 40 at 3.) Ms. Sullivan's Complaint clearly details how she "dared speak up in opposition to the Shawnee Mission School District's mandatory, anti-white, anti-American, anti-Christian, politically-divisive DEI training sessions while also suggesting more balanced, non-racist viewpoints for the training." (ECF 44 ¶ 9.) "[A]fter Ms. Sullivan spoke up and then put in writing her opposition ... Defendants targeted Ms. Sullivan for retaliation." (ECF 44 ¶ 14.) More specifically, Ms. Sullivan's Complaint states: "After enduring numerous anti-white DEI training sessions she was required to attend, Ms. Sullivan opposed the government's anti-white racist, anti-American, and politically-divisive DEI programing." (ECF 44 ¶ 90.) "After the government's DEI programing became even more racist and one-sided, Ms. Sullivan wrote a letter to the DEI coordinators opposing the racist and divisive curriculum and suggesting more balanced training, which letter Ms. Sullivan provided to her principal, Defendant Ewers (the 'Opposition Letter')." (ECF 44 ¶ 91, Ex. 4.)

The District's motion misrepresents Ms. Sullivan's Complaint. The District also conveniently omits Ms. Sullivan's claims that "center on" not being compelled to lie to parents (e.g., ECF 44 ¶¶ 31-33) and not being retaliated against. (ECF 44 ¶¶ 104, 146, 338-49.) Plus her

claims for the District's breach of its employment contract. (ECF 44 ¶¶ 204, 350-58.) The Court, in accepting Ms. Sullivan's facts as she pleads, should deny the District's motion.

### 2. Opposing race-based workplace discrimination is a protected activity.

Title VII's anti-retaliation provision (the opposition clause) bars employers from discriminating against an individual who has opposed any practice the statute makes unlawful. 42 U.S.C. § 2000e-3(a); *Reznik v. inContact, Inc.*, 18 F.4th 1257, 1260–61 (10th Cir. 2021). Title VII "prohibits employers from allowing work conditions to be permeated with hostile racial [] animus." *Young v. Colo. Dep't of Corr.*, 94 F.4th 1242, 1245 (10th Cir. 2024). Opposing workplace race-based discrimination—whether perpetrated against one's self or against other employees, *see Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 279 n.3 (2009)—is undeniably a "protected activity" under Title VII's Opposition Clause. The opposition clause of Title VII has an "expansive definition." *Id.* at 276-80. "When an employee communicates to her employer a belief that the employer has engaged in ... a form of employment discrimination, that communication virtually always constitutes the employee's *opposition* to the activity." *Id.*

### 3. The District's motion also fails because its authority is unavailing.

To support its misplaced argument that opposing race-based discrimination is not protected activity, the District relies on a Seventh Circuit case (again without including the court in its citation). (ECF 40 at 3, n. 7.) In that case, the plaintiff refused to access online "unconscious bias training" and was fired. *Vavra v. Honeywell Int'l, Inc.*, 106 F.4th 702, 703 (7th Cir. 2024).[3] Vastly different from the facts here, the *Vavra* plaintiff "never accessed the training or otherwise discovered what it entailed, so his belief that it violated Title VII ... could not have been objectively reasonable." *Id.* But, as the Complaint here details, Ms. Sullivan endured and opposed numerous repeated instances of pervasive, disgraceful, race-based discrimination that she and others were

---

[3] The Seventh Circuit case Defendant relies on cites the old, pre-*Burlington Northern*, "adverse employment action" element for Title VII retaliation claims *See Argo v. Blue Cross and Blue Shield of Kansas*, 452 F.3d 1193, 1202 n.2 (10th Cir. 2006) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 54 (2006) (Supreme Court rejected former standard for retaliation under Title VII requiring an "adverse employment action," instead, establishing the standard to prevail on a Title VII retaliation claim a plaintiff need only show "that a reasonable employee would have found the challenged action materially adverse," meaning it may have dissuaded a reasonable worker from making or supporting a charge of discrimination)).

subjected to by the government (ECF 44 ¶¶ 295–324), causing her to oppose those practices. (ECF 44 ¶ 89–91.) Unlike Ms. Sullivan, the *Vavra* plaintiff only "assumed, based on [an] email, that the training would vilify white people and treat people differently based on their race." *Id.*

Here, Ms. Sullivan's Complaint painstakingly sets forth and meticulously supports direct evidence of numerous instances of the pervasive, blatant discrimination through race-based insults, stereotypes, and slurs that she and others were subjected to by the government. (ECF 44 ¶¶ 295-324.) For perspective on the kind of outrageous discrimination Ms. Sullivan opposed, the Court should consider what jurors of any race might reasonably find if the word 'white' were substituted with 'black' in the 30 or more severe and pervasive instances cited in Ms. Sullivan's Complaint. (*Id.*) These examples certainly establish circumstances that support an inference that the District is "one of those unusual employers who discriminates against the majority." *See Notari v. Denver Water Dep't*, 971 F.2d 585, 589 (10th Cir. 1992).

### 4. Abundant authority supports Ms. Sullivan's Title VII claims.

The Tenth Circuit has stated that race-based ideological messaging in DEI training "is troubling on many levels," that opposition to such programs is reasonable, and that "the rhetoric of these programs sets the stage for actionable misconduct by organizations that employ them." *Young*, 94 F.4th at 1245. And, unlike the plaintiff in *Young*, Ms. Sullivan pleads plenty of facts to state a claim not only for Title VII retaliation but also for hostile work environment. Despite the District's attempted misdirection, when Ms. Sullivan opposed the government's race-based workplace discrimination, occurring repeatedly through the mandatory DEI sessions, not just DEI in general, her opposition fell well within Title VII's protections.

### B. The District apparently concedes that Ms. Sullivan pleads a hostile environment.

A victim of a racially hostile work environment may bring a cause of action under Title VII. *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1138 (10th Cir. 2008) (citations omitted). The District's motion does not argue that Ms. Sullivan's hostile work environment claims under Title VII should be dismissed, ostensibly because the severe and pervasive race-based insults, stereotypes, and slurs (ECF 44 ¶¶ 289-337) are meticulously pleaded and the Defendants'

numerous adverse employment actions against Ms. Sullivan (ECF 44 ¶¶ 338-388) are also well-pleaded. Ms. Sullivan's Complaint clearly pleads her hostile work environment claim. (ECF 44 ¶¶ 18, 42, 283, 492, p. 102, ¶ I.) The District waives any argument that Ms. Sullivan does not state a claim for hostile work environment because it is not appropriate to advance arguments that could have been raised in prior briefing. *Paraclete*, 204 F.3d at 1012. Ms. Sullivan's Complaint plausibly states both her Title VII retaliation and her Title VII hostile work environment causes of action. The District cannot credibly argue either should be dismissed.

### III. The District's motion fails because Ms. Sullivan amply pleads injury-in-fact to establish standing and facts to support causation.

In challenging Ms. Sullivan's standing, the District: (A) insists that she provide *evidence* of her injury at this stage, (B) ignores Ms. Sullivan's First Amendment rights, (C) ignores all the facts in Ms. Sullivan's Complaint detailing her injuries (ECF 40 at 3), and (D) does not contest that Ms. Sullivan pleads causation. Therefore, the District's arguments fail.

#### A. Arguing the merits, without accepting well-pleaded facts, is inappropriate and ineffectual in a motion to dismiss.

The District first improperly argues the merits of this action at the pleading stage. (ECF 40 at 3.) In arguing that Ms. Sullivan "bears the burden of establishing these elements by the manner and degree of evidence required at each stage of the litigation" (ECF 40 at 3), the District cites to and misconstrues a Supreme Court *summary judgment* case in which the Eighth Circuit reversed the district court's dismissal on standing ground at the pleading stage, remanding to the district court until the record could be developed and ruled on at summary judgment. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992). (ECF 40 at 3 n.8-12.) *Lujan* does not state any "evidence" requirement at the pleading stage. In fact, *Lujan* holds: "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss, we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan,* 504 U.S. at 561 (internal quotation marks and citation omitted).

### B. The District ignores Ms. Sullivan's First Amendment rights and again misstates her claims.

The District next argues that Ms. Sullivan, "a teacher, has no legally protected interest in or right to address students in a manner different from the manner in which she is instructed to do so by Defendant [or] in not attending diversity or other training." (ECF 40 at 4.) The District fails to acknowledge Ms. Sullivan's First Amendment right to be free from compelled speech to advance the District's new "trans" orthodoxy that violates her sincerely-held religious and other beliefs. (ECF 44 ¶¶ 26-31, 104-144.) The District also overlooks that Ms. Sullivan does not oppose diversity training; she opposes race-based discrimination—in the form of blatant anti-white insults, stereotypes, and slurs—under the artifice of "DEI." (ECF 44 ¶¶ 89-90, 295-324.)

### C. Ms. Sullivan pleads numerous injuries that amply establish standing.

The District imagines that First Amendment injuries are inconsequential, though the law holds distinctly otherwise. When First Amendment interests are either threatened or being impaired, irreparable injury is shown. *Elrod*, 427 U.S. at 348; *see also Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir. 2003) (the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury) (cleaned up).

#### 1. Ms. Sullivan pleads six categories of constitutionally protected speech for which she sustained injury, satisfying Article III standing.

The six categories of speech for which Ms. Sullivan plausibly pleads corresponding injuries are: (1) her private speech in opposition to race-based discrimination and its effect on student outcomes and teachers leaving the District (ECF 44 ¶¶ 90-102);[4] (2) her speech involving the alleged use of a student's legal name and pronouns coinciding with the student's sex (ECF 44 ¶¶ 15, 176, 184, 193, 239, 249, 250, 273, 454-5, 557); (3) the government's new "trans" orthodoxy speech that the District is attempting to compel Ms. Sullivan to voice (ECF 44 ¶¶ 10, 65, 129-30, 249-50, 400-01); (4) her speech communicating with her students' parents, in which the District is compelling her to lie (ECF 44 ¶¶ 120, 400-01); (5) her speech critical of the District in a local

---

[4] *See Givhan v. Western Line Consol. Sch. Dist*, 439 U.S. 410, 415-16 (1979) ("The First Amendment forbids abridgment of the 'freedom of speech.' Neither the Amendment itself nor our decisions indicate that this freedom is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public. We decline to adopt such a view of the First Amendment").

24

newspaper (ECF 44 ¶¶ 37, 283, 285, 288, 359, 366, 368, 376, 379, 456, 457, 476); and (6) her speech in filing an EEOC charge of unlawful race discrimination and retaliation in a public school district (ECF 44 ¶¶ 86, 359, 376, 379, 381, 388, 459). The District's argument that Ms. Sullivan has no standing is perfunctory, at best.

### 2. Ms. Sullivan pleads numerous other injuries that satisfy Article III standing.

The District also ignores that Ms. Sullivan pleads the many additional injuries caused by the District and its co-defendants and fails to acknowledge that Ms. Sullivan pleads the escalating pattern of material adverse employment actions against her, attacking her reputation and resulting in her reassignment, demotion, and significant change in job responsibilities, plus ongoing adverse actions and threats of termination. The District retaliated against Ms. Sullivan subjecting her to various levels of injury when the District:

- subjected Ms. Sullivan to a bogus "investigation" in which Defendants (a) made blatantly false and shameful accusations that Ms. Sullivan used the N-word in class (among other unfounded allegations attacking her reputation), (b) refused to provide any substance to support any of Defendants' accusations, (c) made false statements regarding representation by counsel, and (d) imposed unique expectations not applied to other teachers (ECF 44 ¶¶ 145-173);

- subjected Ms. Sullivan to another sham "investigation" (a) claiming *she* was discriminating (based on gender identity), (b) again refused to provide any dates, times, classes, names of witnesses, context, or other substance to support the allegation of discrimination, (c) breached the teachers' contract and violated the School Board's own policies regarding alleged complaints, and (d) provided specious and spurious excuses for refusing to provide the requested basis for the "investigation," (e) through a process tainted by conflict of interest and fundamental unfairness (ECF 44 ¶¶174-215);

- made reprehensible, unsupported allegations of a "racist book" and a "racist flag" in Ms. Sullivan's classroom, spreading that blatantly false, unfounded rumor *among the student body*, again attacking her reputation (ECF 44 ¶¶ 225-231);

- subjected Ms. Sullivan to discipline and punishment for allegedly using the legal name and feminine pronouns for a female student "on one or a couple of occasions during the school year," even though (a) the District's own investigator determined there was no discrimination, (b) the alleged conduct was inadvertent and unintentional, as also determined by the District' own investigator, (c) there was no violation of a policy or expectation against using accurate pronouns that match a student's sex at the time when the "incorrect" pronoun use was alleged to have occurred, and (d) the District promised no discipline would occur as a result of or in connection with the "investigation" but disciplined Ms. Sullivan anyway (ECF 44 ¶¶ 234-253, Ex. 13);

- targeted and shunned Ms. Sullivan and stopped supporting her in disciplining behavior-problem students (ECF 44 ¶¶ 338-341);

- required Ms. Sullivan to use inconsistent sex pronouns that violate her beliefs while other teachers were not similarly compelled (until later) (ECF 44 ¶¶ 337-387);

25

- refused to participate in Ms. Sullivan's appeal, grievance, or arbitration process, in violation the District's own teacher contract (ECF 44 );

- promoted or allowed a walk-out protest against Ms. Sullivan during class-time, that the District' false rumors likely caused (ECF 44 );

- closely monitored and continues to monitor Ms. Sullivan *with District personnel* in invasive ways, unlike the oversight of any other teachers, ever (ECF 44 );

- demoted and reassigned Ms. Sullivan with significantly different job responsibilities; and

- refused to provide relevant documents requested by the EEOC in the EEOC's investigation (ECF 44 ).

While some of the District's above-referenced retaliatory actions are more significant injuries than others, all are injuries, nonetheless. To make out a Title VII discrimination claim, a plaintiff must show some harm respecting an identifiable term or condition of employment, not a "significant" or even "economic or tangible" harm. *Muldrow v. City of St. Louis*, 601 U.S. 346, 144 S.Ct. 967 (2024) (Title VII prevents injury to individuals based on protected status without distinguishing between significant and less significant harms); *see also Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1219 (10th Cir. 2013) ("the Tenth Circuit construes the term 'adverse action' liberally"). In any event, for her Title VII retaliation claim, Ms. Sullivan need only show "that a reasonable employee would have found the challenged action materially adverse." *Argo*, at 1202.

For her First Amendment injuries, the Tenth Circuit in *Schuler v. City of Boulder*, 189 F.3d 1304, 1309-10 (10th Cir. 1999), makes it clear that "deprivations less harsh than dismissal ... violated a public employee's rights under the First Amendment, citing such injuries as (1) removing job duties and (2) giving a written reprimand. In the present action, Defendants perpetrated both such harms without cause. (ECF 44 ¶¶ 38, 239, 247, 250, 371-378, 504.) Defendants further threatened Ms. Sullivan with more discipline, including termination, if she fails to promote the government's new "trans" orthodoxy by mouthing affirmation that boys can become girls and girls can become boys by so choosing. (ECF 44 ¶¶ 248, 249.) Because Ms. Sullivan pleads reputational damage (ECF 44 ¶¶ 234, 273, 274) , that injury, itself, provides Article III standing. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2200 (2021) (citing *Spokeo, Inc. v. Robins*, 578 U. S. 330, 340–341 (2016)). And some of the more than 11 material adverse employment actions pleaded by Ms. Sullivan involve denial of access to the alleged (phantom)

26

complaint the government used against her but never produced, and denial of access to information requested by the EEOC in the investigation of Ms. Sullivan's charge (ECF 44 ¶¶ 194, 195, 383), which are also, in and of themselves, sufficient injuries to provide Article III standing. *See Pub. Citizen v. Dep't of Justice*, 491 U.S. 440, 440 (1989) (refusal to permit scrutiny constitutes a sufficiently distinct injury to provide standing) (citations omitted); *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 12 (1998) (inability to obtain information plaintiffs claim is required meets the genuine "injury in fact" requirement that helps assure that the court will adjudicate "[a] concrete, living contest between adversaries"); *see also Couch v. Brd. of Trustees*, 587 F.3d 1223, 1237 (10th Cir. 2009) (noting the Supreme Court's holding "deprivations less harsh than dismissal that nevertheless press state employees and applicants to conform their beliefs and associations to some state-selected orthodoxy" are adverse employment actions) (quoting *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75, 110 S.Ct. 2729, 111 (1990)).

### 3. The District misconstrues Ms. Sullivan's requested relief.

Not only does the District ignore the multitude of Ms. Sullivan's injuries from Defendants compelling her speech and their retaliatory adverse employment actions, the District also misunderstands Ms. Sullivan's Complaint because she does not seek relief from attending DEI training; she seeks relief from the government compelling speech that violates her rights, relief from being compelled to lie to parents, relief from Defendants' retaliation, and relief from being subjected to race-based discrimination, among other relief. (ECF 44 at 98-101 ¶¶ A-F.) Ms. Sullivan's Complaint plausibly states facts supporting her concrete and particularized injuries. *See TransUnion LLC*, 141 S. Ct. at 2200.

### 4. Ms. Sullivan established standing because she pleads both constitutionally-protected activity and the District's actions that would chill the speech of a person of ordinary firmness.

The District argues Ms. Sullivan's § 1983 claims should be dismissed because her speech at school was not protected conduct (ECF 40 at 7). However, as shown in Part I.B and in Part III.C.1, the District's argument does not withstand scrutiny.

The District then makes an argument (ECF 40 at 7) that is difficult to distinguish but is

believed to be summarized as mischaracterizing all of Ms. Sullivan's pleaded injuries (ECF 44 ¶¶ 234, 247, 338-349, 358-379) as one injury—the sham "investigation" (as pleaded in ECF ¶¶ 175-216)—and the District's unsupported claim that it wasn't retaliatory.[5]

While the District merely states the standard and does not address how its actions would not chill a person of ordinary firmness, Ms. Sullivan, nevertheless, pleads facts more than sufficient to plausibly state an injury through Defendants' multitude of retaliatory adverse employment actions that a reasonable person would find chilling to her speech (*see, e.g.,* ECF 44 ¶¶ 228, 229, 251–53, 378, 492). *See also supra* Part III.C.

### D. The District waives any causation argument but its motion should be denied because Ms. Sullivan nevertheless amply pleads but-for causation.

The District does not argue a lack of causation for any of Ms. Sullivan's specific claims, so any such arguments are waived. *Paraclete*, 204 F.3d at 1012. But because the District mentions causation in passing in its Title VII standing section (ECF 40 at 3), Ms. Sullivan responds.

### 1. Ms. Sullivan pleads direct evidence of but-for causation.

Ms. Sullivan pleads direct evidence of the required but-for causation[6] through: (1) the pervasive race-based animus in the anti-white insults, stereotypes, and slurs that the government not only allowed but promoted (ECF 44 ¶¶ 295–324), (2) disparate treatment of Ms. Sullivan after her activity protected under the First Amendment, the Kansas Constitution, and Title VII (ECF 44 ¶¶ 21, 172, 453, 455, 458, 365–70), and (3) the ongoing pattern of escalating retaliation in the form of unwarranted punishments, disciplinary actions, a demotion with reassignment and significantly different responsibilities, plus threats of termination (ECF 44 ¶¶ 338-88) after Ms. Sullivan's opposition to the racial discrimination occurring in the mandatory DEI sessions. *See Ortiz v.*

---

[5] The District's actual one-sentence argument reads:

Plaintiff further fails the second prong as, evident by the fact that the alleged retaliatory act - when USD 512 officials to include certain Individual Capacity Defendants investigated a student complaint pursuant to USD 512 Policy AC concerning Plaintiff that resulted in a determination that, while Plaintiff had not violated Policy AC or treated the student differently or negatively based on gender or the fact that the student was transgender, Plaintiff had "inadvertent[ly] and not purposeful[ly]" [sic] referred to the student by a nonpreferred name and pronouns on one or more occasions during the school year and a recommendation that some corrective action steps be taken to ensure that Plaintiff understood the importance of positive teacher-student relationships -- is not considered an adverse action under applicable law. (ECF 40 at 7.)

[6] *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 339 (2013) (Title VII retaliation claims must be proved by "but-for causation").

28

*Norton*, 254 F.3d 889, 896 (10th Cir. 2001) (evidence of race-based animus could support inference that decision-makers harbored racial bias which might have affected the decisions adverse to plaintiff).

### 2. Ms. Sullivan also pleads indirect evidence of but-for causation.

In addition, Ms. Sullivan can prove but-for causation through Defendants' pretext as set forth in Ms. Sullivan's well-pleaded Complaint. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1219 (10th Cir. 2013) (without direct evidence of retaliation, the familiar *McDonnell Douglas* burden-shifting framework applies) (citing *Stover v. Martinez*, 382 F.3d 1064, 1070 (10th Cir. 2004)). Thus, "weaknesses, implausibilities, inconsistencies, incoherencies, [and] contradiction" in Defendants' purported excuses for the adverse actions against Ms. Sullivan serve as proof of intent and, in this case, but-for causation. *Parker Excavating, Inc. v. Lafarge W., Inc.*, 863 F.3d 1213, 1220 (10th Cir. 2017); *See Stroup v. United Airlines, Inc.*, 26 F.4th 1147, 1159 (10th Cir. 2022) ("the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose") (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) and *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000)).

Here, the Defendants instituted a sham "investigation" under false pretenses without giving Ms. Sullivan a fair opportunity to respond because the government would not and never did produce the alleged "written complaint" (ECF 44 ¶ 176) nor did it provide dates, times, or context of the alleged conduct for Ms. Sullivan to give her version (ECF 44 ¶¶ 199), and Defendants did not allege any different outcomes or treatment to support their allegation of "discrimination." (ECF 44 ¶ 189.) *See Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1314 (10th Cir. 2017) ("A failure to conduct what appeared to be a fair investigation of the violation that purportedly prompted adverse action may support an inference of pretext") (citations omitted)). Ms. Sullivan disputed the alleged conduct (ECF 44 ¶ 19) that, even if they were true, would not constitute "gender-identity discrimination" (ECF 44 ¶ 211), and would not constitute a violation of any policy, rule, or expectation at the time (ECF 44 ¶¶ 184, 245). And the so-called "investigation," through which Defendants made blatantly false statements (ECF 44 ¶¶ 195–96) was substantively unfair (ECF 44

¶¶ 191, 192, 199, 211), even promising no discipline would occur as a result (ECF 44 ¶¶ 234, 511), and then disciplining Ms. Sullivan anyway (ECF 44 ¶¶ 239, 240, 241) but claiming it was not discipline (ECF 44 ¶ 242) and then claiming it was discipline (ECF 44 ¶ 243). Where Ms. Sullivan plausibly pleads the entire basis for the "investigation" that was Defendants' excuse for her discipline was a sham, she pleads facts to support causation. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 506 (2002) (employment discrimination complaint need not contain specific facts establishing a *prima facie* case under the *McDonnell Douglas* framework because "[i]t seems incongruous to require a plaintiff, in order to survive a motion to dismiss, to plead more facts than he may ultimately need to prove to succeed on the merits if direct evidence of discrimination is discovered").

### 3. Ms. Sullivan amply pleads causation for her First Amendment retaliation claim.

Because Ms. Sullivan easily meets the standard for pleading "but-for" causation for Title VII retaliation, *Rodriguez v. Arapahoe Cnty. Sheriff*, No. 21-1124, 29 (10th Cir. Aug. 18, 2022) (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013)). she clearly meets the lower "motivating factor" causation standard for First Amendment retaliation. *Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274, 287 (1977).

## IV. The District's motion should be denied because Ms. Sullivan pleads plausible claims under Kansas law.

### A. Ms. Sullivan need not provide the District notice of her claims but did anyway.

The District argues that Ms. Sullivan not providing and pleading notice under the Kansas Tort Claims Act ("KTCA") insulates Defendants from liability and denies the Court of its jurisdiction. (ECF 40 at 8.) The KTCA notice statute requires notice only for claims "brought under" the KTCA. *See* K.S.A. 12–105b(d)(2) ("any person having a claim against a municipality or against an employee of a municipality which could give rise to an action *brought under the Kansas tort claims* act shall file a written notice as provided in this subsection." (*emphasis* added)).

### 1. Kansas state law requiring notice for Kansas claims waiving sovereign immunity under the KTCA does not apply to claims under federal law.

30

To the extent the District seeks dismissal of Ms. Sullivan's claims brought under federal law (First, Fifth, Sixth, Seventh, and Eighth Causes of Action), it is "well-established that federal civil rights claims are not subject to the Kansas Tort Claims Act," *Miller v. Brungardt*, 904 F. Supp. 1215, 1217 (D. Kan. 1995) (*citing Scheideman v. Shawnee Cnty.*, 895 F. Supp. 279, 281 (D. Kan. 1995). So those claims have no notice or administrative remedy exhaustion, other than the EEOC administrative remedy exhaustion for Ms. Sullivan's Title VII claims. The federal statutory scheme imposing liability on municipalities, including school districts, for violation of federal civil rights violations under the First Amendment, cannot be and is not foreclosed by state law requiring notice of common law tort claims when waiving its sovereign immunity for such claims.[7]

**2. The KTCA notice is not required for claims brought under other Kansas statutory schemes establishing liability for state actors.**

The KTCA notice requirement does not apply to claims that are not brought under the KTCA, such as claims under other Kansas statutory schemes creating Kansas constitutional-based causes of action waiving immunity brought against state or municipal actors. *See, e.g.*, the Kansas Preservation of Religious Freedom Act (K.S.A. 60-5302, *et seq.*) (the "KPRFA"), and the Kansas Public Speech Protection Act (K.S.A. 60–5320, *et seq.*) (the "KPSPA"). These statutory schemes establish causes of action for violations of the Kansas Constitution without notice or exhaustion requirements under their own statutes, or under the KTCA. The District even argues, "liability under the KTCA does not extend to liability for violations of the Kansas constitution." (ECF 40 at 8.) If the legislature would have intended a notice requirement or an exhaustion requirement under either the KPRFA or the KPSPA, it could have included them.

Ms. Sullivan's Kansas constitutional-based claims (in her Second, Third, and Fourth Causes of Action) are encompassed in the KPRFA and the KPSPA, which give "persons" a cause of action for violations of the Kansas Constitution. *Id*. Those claims do not require notice because

---

[7] *See Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 659 (1978) (*Monroe v. Pape* is overruled insofar as it holds that local governments, expressly including school boards, are immune from suit under § 1983) (citation omitted); *see also Owen v. City of Independence*, 445 U.S. 622, 623 (1980) ("municipalities, unlike States, do not enjoy a constitutionally protected immunity from suit . . . a local school board such as petitioner is more like a county or city than it is like an arm of the State . . . it was not entitled to assert any Eleventh Amendment immunity from suit in the federal courts.") (citing *Jinks v. Richland Cnty.*, 538 U.S. 456, 466 (2003); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280–81 (1977)).

they are not common law claims brought under the KTCA's waiver of immunity.

### 3. The District nevertheless had substantive notice of Ms. Sullivan's claims.

Even so, Defendants nevertheless had substantial notice under K.S.A. 12–105b of Ms. Sullivan's claims through her EEOC charge that the District received and responded to (ECF 44, Exs. 2, 30). *See* K.S.A. 12–105b(d)(1)(C) ("Substantial compliance with the provisions and requirements of this subsection shall constitute valid filing of a claim."); *see also* K.S.A. 12–105b(a) ("A claim may be the usual statement of account of the vendor or party rendering a service *or other written statement* showing the required information") (*emphasis* added).[8]

### 4. The District has actual notice of Ms. Sullivan's claims.

Furthermore, Ms. Sullivan supplied notice under K.S.A. 12–105b on January 6, 2025 with the clerk of the governing body of the District. In the event the Court determines notice is required under the KTCA for any of Ms. Sullivan's claims, Ms. Sullivan, respectfully moves the Court for leave to amend or supplement her Complaint when the District administratively denies her claims. *See* R. 15(a)(2) ("The court should freely give leave when justice so requires"); *and see Steed v. McPherson Area Solid Waste Utility*, 43 Kan. App. 2d 75, 76 Syl. ¶ 11 (2010) ("Where a cause of action has been commenced prematurely, the defect may be cured by filing an amended or supplemental petition after the cause of action has accrued, unless the amended petition changes the cause of action"); *Johnson v. Bd. of Pratt Cnty. Comm'rs*, 259 Kan. 305, 306-07 (1996) (KTCA notice case holding: "If the underlying facts or circumstances identify a proper subject of relief, the plaintiff ought to be afforded an opportunity to test the claim on the merits. In the absence of any apparent or declared reason, such as undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of the amendment, leave to amend should be freely given").

---

[8] Defendant had notice of (A) The name and address of the claimant and the name and address of the claimant's attorney; (B) a concise statement of the factual basis of the claim, including the date, time, place and circumstances of the act, omission or event complained of; (C) the name of any public officer or employee involved, if known; and (D) a concise statement of the nature and the extent of the injury claimed to have been suffered. *See* K.S.A. 12–105b(d)(1).

32

The U.S. District Court for the District of Kansas has very recently done likewise by granting a plaintiff's motion permitting her to file an amended complaint after she complied with the KTCA statutory notice requirement post-filing. *See Richardson v. Wangerin*, 2024 WL 5245252 (D. Kan. Dec. 30, 2024).

### 5. The Kansas Tort Claims Act notice also does not apply to contract claims.

That leaves the District's KTCA "notice" argument for only one of Ms. Sullivan's claims (Ninth Cause of Action), consisting of contract claims. Contract claims also do not require notice under the Kansas Tort Claims Act. *Bd. of Pratt Cnty. Comm'rs*, 259 Kan. at 306 ("persons with contract claims are not required to give notice to a municipality before filing suit"). The District's KTCA notice argument is of no avail in this action.

### A.  Ms. Sullivan pleads plausible claims under the Kansas Constitution.

The District argues that Ms. Sullivan cannot pursue claims for damages directly under the Kansas Constitution and "[n]or is there any § 1983 analogue in Kansas." (ECF 40 at 7.) However, Ms. Sullivan brings her Kansas Constitution-based claims under the KPRFA" and the KPSPA (ECF 44 ¶¶ 418-472), which do provide causes of action for denial of Ms. Sullivan's rights under the Kansas Constitution.

K.S.A. 60–5302 provides a cause of action for one whose "[e]xercise of religion" has been "burdened" by "any government action that directly or indirectly constrains, inhibits, curtails or denies the exercise of religion by any person or compels any action contrary to a person's exercise of religion," meaning the practice or observance of religion under section 7 of the bill of rights of the Kansas constitution. K.S.A. 60–5302(c). The KPRFA provides for relief in the form of: (1) Injunctive relief; (2) protective order; (3) writ of mandamus or prohibition; (4) declaratory relief; (5) actual damages; and (6) costs and attorney fees determined by the court. K.S.A. 60–5303.

Likewise, the KPSPA provides a cause of action to "safeguard the constitutional rights of a person to petition, and speak freely and associate freely, in connection with a public issue or issue of public interest to the maximum extent permitted by law while, at the same time, protecting the rights of a person to file meritorious lawsuits for demonstrable injury." K.S.A. 60–5320. Ms.

Sullivan's Complaint makes clear that her Kansas constitutional claims are brought through these statutory schemes. (ECF 44 ¶¶ 418–52.) But even if Ms. Sullivan could not bring her constitutional claims for damages through the KPRFA and the KPSPA that would not preclude her from declaratory or injunctive relief.

The District argues only the Free Speech Act "does not provide for a cause of action under Kansas law and, instead, only provides a statutory defense to certain types of claims." (ECF 40 at 9.) The District again misstates the law and cites to caselaw that does not support its premise. *Doe v. Kan. State Univ. & Heather Reed*, 499 P.3d 1136, 1143 (Kan. Ct. App. 2021); *Kan. Govern. Ethics Comm'n v. Shepard*, 65 Kan.App.2d 1, 4–6 (2024) cited by the District, discuss the anti-SLAPP provisions of the KPSPA as relating to their cases below but do not hold that the Act does not provide a means for persons to petition and file lawsuits under Kansas law. The third case cited by the District is unpublished, *T & T Fin. of K.C., LLC v. Taylor*, No. 117,624, 2017 WL 6546634, at *3 (Kan. App. 2017) (unpublished opinion). Interestingly, in both *Reed* and *Shepard*, the Kansas Court of Appeals discusses the part of the KPSPA that does provide persons authority to bring lawsuits: "while, at the same time, protecting the rights of a person to file meritorious lawsuits for demonstrable injury. K.S.A. 2020 Supp. 60-5320(b).

The Legislature mandated the Act's provisions 'shall be applied and construed liberally to effectuate its general purposes.' K.S.A. 2020 Supp. 60-5320(k)." *Reed*, 499 P.3d at 1143; *Shephard*, 556 P.3d at 894. Those general purposes of the Act are "to encourage and safeguard the constitutional rights of a person to *petition*, and speak freely and associate freely, in connection with a public issue or issue of public interest to the maximum extent permitted by law." *Id*. (*emphasis* added). The KPSPA provides a cause of action on its face.

### B.  Ms. Sullivan pleads plausible contract claims.

The District again argues the merits at the pleading stage and again repackages Ms. Sullivan's claims. (ECF 40 at 9.) The terms of the teachers' contract state in relevant part: "The parties agree that complaints are likely to arise from time to time with reference to Professional Employees and, in order to resolve such complaints, the following criteria shall apply:" (1) "*After*

34

*appropriate investigation*, the administrator shall decide whether the complaint merits further attention," (2) "*the complaint will be presented to the Professional Employee for resolution*," (3) "Professional *Employee shall have an opportunity to answer the complaint*," (4) "*No complaint and/or related documents will be placed in the Professional Employee's file unless the complaint has led to an investigation*," and (5) "the Professional Employee and the administrator shall do their best to keep the other informed of progress toward resolution." (ECF 44 ¶¶ 177 (*emphasis* added).) The District ignores the fact that Ms. Sullivan's breach of contract claims allege that the "investigation" was not "appropriate" in numerous respects and all five of the above terms were breached by the District (ECF 44 ¶¶ 178–204), resulting in wrongful placement of complaint and/or related documents in Ms. Sullivan's permanent file. (ECF 44 ¶ 239.)

The District argues "The plain and clear language of the contract which is attached indicate [sic] that this is not the case and warrants dismissal of her breach of contract claim." (ECF 40 at 9.) The District's conclusory argument and interpretation, without explanation, are unsupported, flawed, and contested. The facts as developed in discovery will better demonstrate the District's breaches. But, until then, Ms. Sullivan's facts as pled are to be taken as true and require denial of the District's motion to dismiss. *Lujan,* 504 U.S. at 561; *Lucas,* at 1136.

The District also ignores Ms. Sullivan's other breach of contract claims for the District's refusal of Ms. Sullivan's academic freedom (ECF 44 ¶ 519, 525), for the District's subjecting Ms. Sullivan to disciplinary action under the District policies for expression that is protected by the First Amendment (ECF 44 ¶ 520), for the District discriminating against Ms. Sullivan based on her political affiliation (ECF 44 ¶ 522), for the District discriminating against Ms. Sullivan because she is not a member of the teacher's union (ECF 44 ¶ 523).

**V.     The District's motion should be denied because Ms. Sullivan seeks punitive damages against the individual co-defendants and not against USD 512.**

As noted in Ms. Sullivan's prayer for relief, she seeks punitive damages against the individual defendants but not against the District. (ECF 44 at 102 ¶¶ I, J.)

Punitive damages are available under 42 U.S.C. § 1983 and are warranted in this action

where the individual co-defendants' "conduct involves reckless or callous indifference to the plaintiff's federally protected rights, as well as when it is motivated by evil motive or intent." *Smith v. Wade*, 461 U.S. 30, (1983) (actual malice not required for punitive damages).

**VI.     The District's request for attorney's fees should be denied.**

The District argues, without authority, "Defendant USD 512 should be awarded its costs, including reasonable attorneys' fees, and any additional relief this Court deems appropriate." (ECF 40 at 10.) Costs and attorney's fees are not available except under the Court's authority to award them for bad-faith or frivolous claims, which are not appropriate here (on either side). *Poindexter v. Morse Chevrolet, Inc.*, 282 F. Supp.2d 1232, 1235 (D. Kan. 2003) (exception to American Rule when a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons") (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991)).

**CONCLUSION**

WHEREFORE, the District's motion to dismiss should be denied because Ms. Sullivan's Second Amended Verified Complaint states claims for which relief can be granted.

In the event the Court considers matters outside the pleadings and treats the District's motion as a summary judgment motion under Rule 12(d) Ms. Sullivan respectfully moves for time to conduct discovery under Rule 56(d)(2).

Respectfully submitted,

**EDMUNDS LAW OFFICE, LLC**

*/s/ Fritz Edmunds*
FRITZ EDMUNDS (KS Bar # 16829)
11715 W. 101st Street
Overland Park, Kansas 66214
(913) 669-3000
fritz@edmundslaw.com
ATTORNEY FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of February, 2025, the above was served by email on counsel for Defendants:

Greg P. Goheen
McANANY, VAN CLEAVE & PHILLIPS, P.A.

10 E. Cambridge Circle Drive, 300
Kansas City, Kansas 66103
ggoheen@mvplaw.com

/s/ Fritz Edmunds
FRITZ EDMUNDS (KS Bar # 16829)

37