## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JENNIFER CAEDRAN SULLIVAN,

                    **Plaintiff,**

v.

UNIFIED SCHOOL DISTRICT NO. 512,
JOHNSON COUNTY, KANSAS, et al.,

                    **Defendants.**

Case No. 24-2491-DDC-BGS

## <u>MEMORANDUM AND ORDER</u>

Plaintiff Jennifer Caedran Sullivan, a teacher at Kansas Unified School District 512 (the District), wrote a letter opposing the District's mandatory diversity training. She alleges that, because of her opposition, defendants retaliated against her by drumming up complaints, conducting sham investigations, and forcing her—against her sincerely held religious beliefs—to use students' preferred names and pronouns. She published two articles recounting her ordeal, which invited more retaliation. Based on these events, plaintiff has brought a lot of claims against a lot of defendants—11 claims against 16 defendants, including 15 individuals sued in both their individual and official capacities. The many defendants have moved to dismiss the many claims under many theories. This Order rules all three pending Motions to Dismiss (Doc. 35; Doc. 37; Doc. 39) and tries to bring order to this sprawling dispute.

### I.      Background

The court recites the following background facts, taken from plaintiff's Second Amended Complaint (Complaint or SAC). The court accepts the SAC's facts as true, and views them in the light most favorable to plaintiff—the party opposing the Motion to Dismiss. *Doe v. Sch.*

*Dist. No. 1*, 970 F.3d 1300, 1304 (10th Cir. 2020) (explaining on a motion to dismiss the court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to" the party opposing the motion (citation and internal quotation marks omitted)).

Plaintiff teaches English at Shawnee Mission North High School.  Doc. 44 at 3 (SAC ¶ 9).  She is an excellent teacher with no prior discipline or negative filings in her permanent file. *Id.* at 67 (SAC ¶ 346).  As part of her sincerely held religious beliefs, plaintiff does not believe a person can transition from one gender or sex to another.  *Id.* at 23 (SAC ¶ 124).  Plaintiff's religion also counsels her that lying is wrong, and it's wrong to lie by affirming falsehoods.  *Id.* (SAC ¶ 127).  Plaintiff thus declines to affirm the idea that a person can disavow or change one's sex or gender.  *Id.* at 26 (SAC ¶ 145).

### *Plaintiff Opposes Diversity Training*

The District mandates that its teachers attend Diversity, Equity, Inclusion, and Belonging (DEI) training.  *Id.* at 54 (SAC ¶¶ 289, 293).  Plaintiff attended several DEI training sessions.  *Id.* at 17 (SAC ¶ 90).  Plaintiff took issue with the training, calling it "anti-white racist, anti-American, and politically[ ]divisive[.]"  *Id.*  She wrote a letter to the DEI coordinators telling them as much.  *Id.* at 17–18 (SAC ¶ 91); Doc. 44-4 (Ex. 4).  Plaintiff asked defendant David Ewers, the high school principal, if he would excuse her from attending future trainings—a request Ewers denied.  Doc. 44 at 18 (SAC ¶ 92).

Shortly after plaintiff sent her opposition letter, some administrators started ignoring her. *Id.* at 66 (SAC ¶ 339).  Ewers, for his part, kept tabs on plaintiff by coming to her classroom.  *Id.* at 67 (SAC ¶ 340).  And Ewers failed to support plaintiff when she struggled to enforce the cell phone policy in her classroom.  *Id.* (SAC ¶ 341).

### *First Investigation*

In January 2023, Ewers asked to meet with plaintiff via email. *Id.* at 26 (SAC ¶ 147). On January 23, Ewers met with plaintiff to discuss an allegation that plaintiff had referred to students by an incorrect name and had used the students' non-preferred pronouns. *Id.* at 27 (SAC ¶ 154). Plaintiff didn't recall doing such a thing. *Id.* at 28 (SAC ¶ 159). Ewers also falsely accused plaintiff of making incendiary comments, which plaintiff categorically denied. *Id.* at 27 (SAC ¶ 155).

At the time, defendants didn't have a policy about the names or pronouns a teacher should use when referring to students. *Id.* (SAC ¶ 157). Nonetheless, at this meeting, defendants told her they expect "that students who have indicated a preferred name and pronoun will be referred to by those preferences." *Id.* at 30 (SAC ¶ 172). Defendants didn't communicate this expectation to any other teachers. *Id.* (SAC ¶ 173).

Nothing came of this first investigation. *See id.* at 68 (SAC ¶ 348).

### Second Investigation

In February 2023, defendants again investigated plaintiff. *Id.* at 30 (SAC ¶ 175). The investigation arose from a student's formal complaint of gender-identity discrimination. *Id.* This complaint alleged plaintiff had used incorrect pronouns during the prior school year. *Id.* at 32 (SAC ¶ 184). Again, at this time, neither the school nor the District had a policy about pronoun use. *Id.* (SAC ¶ 183). Instead, the school board had a "Policy AC," and defendants alleged plaintiff had violated this policy. *Id.* at 38 (SAC ¶ 208).

Defendants either manufactured or solicited this complaint after the first investigation failed to find any cause for discipline. *Id.* at 31 (SAC ¶ 176). And no one ever produced the alleged complaint to plaintiff. *Id.* (SAC ¶ 177). Defendants cited the complainant's confidentiality as a reason for refusing to disclose the complaint and its contents but, during an inappropriate, unpleasant interrogation of plaintiff, defendants Rachel England and Jeremy

Higgins gave the complainant's name and read the claims aloud. *Id.* at 33, 34 (SAC ¶¶ 193, 197).

The investigation was a sham. *Id.* at 37 (SAC ¶ 206). It didn't uncover any discrimination by plaintiff. *Id.* at 43 (SAC ¶ 236). The investigator determined only that plaintiff inadvertently referred to the student's "legal name" and used incorrect pronouns on one or two occasions. *Id.* (SAC ¶ 239). Yet, despite assuring plaintiff that the investigation wouldn't result in discipline, *id.* (SAC ¶ 235), defendants disciplined plaintiff with a conference; a written reprimand in her permanent employment file; and a required training, *id.* at 44 (SAC ¶ 240). Plaintiff tried to appeal under the collective bargaining agreement, *id.* at 68 (SAC ¶ 350), but defendant England declined to process her appeal. Doc. 44-21 at 1 (Ex. 21).

Defendants used this second investigation and subsequent discipline to retaliate against plaintiff for opposing the mandatory DEI training. Doc. 44 at 37–38, 45 (SAC ¶¶ 206, 251). The complaint that sparked the second investigation does not exist, *id.* at 39 (SAC ¶ 213), or was created by defendants to retaliate against plaintiff, *id.* (SAC ¶ 215). If plaintiff incorrectly used pronouns, then defendants were retaliating against her for doing so. *Id.* at 41 (SAC ¶ 223).

During this second investigation, defendant Higgins, the Director of Secondary Human Resources, also disclosed to students that plaintiff allegedly had racist books and a racist flag in her classroom. *Id.* at 41–42 (SAC ¶ 226). Defendants never produced any evidence supporting these allegations. *Id.* at 42 (SAC ¶¶ 227–28).

### *Defendants Implement a New Policy & Practice*

During a professional-development session on April 10, 2023, defendants discussed a policy prohibiting teachers from disclosing certain information to parents of students. *Id.* at 46 (SAC ¶ 255). Specifically, teachers couldn't tell parents if students requested that teachers use different pronouns or a different name. *Id.* On April 12, defendants implemented new practices

4

that require teachers to use a student's preferred pronouns and name. *Id.* (SAC ¶ 257). Plaintiff believes these practices force her to endorse defendants' view that students can change their gender or sex. *Id.* at 46–47 (SAC ¶ 258). And the practices prohibit plaintiff from expressing her contrary view. *Id.* Plaintiff doesn't want to use pronouns that conflict with a student's sex—as assigned at birth—because doing so would violate her conscience and her sincerely held beliefs. *Id.* at 50 (SAC ¶ 272).

In April 2023, plaintiff published an opinion piece in *The Lion*. It opined that the District was indoctrinating students with an anti-white bias and "woke" political ideology. *Id.* at 52 (SAC ¶ 283). Plaintiff's piece also opined that the District had created a toxic environment and teacher shortage with its DEI training. *Id.* The piece mentioned the District's practice that teachers should refer to students by their preferred name and pronouns but not tell parents. Doc. 44-24 at 3 (Ex. 24). Plaintiff published a second opinion piece in *The Lion* in May 2023. Doc. 44 at 52 (SAC ¶ 285); Doc. 44-25 (Ex. 25). Plaintiff calls these pieces the "Exposé Articles."

After the Exposé Articles, students at plaintiff's school organized a walk-out protest. Doc. 44 at 69 (SAC ¶ 359). The students claimed plaintiff was racist and homophobic. *Id.* at 70 (SAC ¶ 361). Defendants didn't discipline the protesting students for skipping school. *Id.* at 70 (SAC ¶ 363). Defendants thus organized, promoted, or condoned this protest to retaliate against plaintiff and attempt to control her speech. *Id.* (SAC ¶¶ 363, 365). Around this time, defendants also began monitoring plaintiff at school. *Id.* (SAC ¶ 366). And, after the 2023–2024 school year, defendants took away plaintiff's AP classes—highly sought, rewarding classes consisting of advanced students—without cause. *Id.* at 71–72 (SAC ¶¶ 372–78).

## II.     Legal Standard

There are three pending Motions to Dismiss ready for the court to decide. Each motion vaguely cites Rule 12 as the grounds for dismissal. *See* Doc. 35; Doc. 37; Doc. 39. But because

the legal standard depends on the particular component of Rule 12 invoked, the court can't abide such vagueness.

Defendants' dismissal arguments implicate the court's subject-matter jurisdiction, so the court must construe these arguments as ones under Rule 12(b)(1). "Federal courts are courts of limited jurisdiction and, as such, must have a statutory basis to exercise jurisdiction." *Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002). The party invoking federal jurisdiction bears the burden to prove it exists. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974).

Defendants' dismissal arguments also assert that plaintiff's claims fail to state a cognizable claim. The court construes these arguments as ones for dismissal under Rule 12(b)(6), which allows a party to move to dismiss an action for failing "to state a claim upon which relief can be granted[.]" For a complaint to survive a Rule 12(b)(6) motion, the pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "If, in the end, a plaintiff's 'well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct,' the complaint fails to state a claim." *Warnick v. Cooley*, 895 F.3d 746, 751 (10th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 679).

When considering a Rule 12(b)(6) motion to dismiss, the court must assume that the factual allegations in the complaint are true, but it is "'not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). And, while this pleading standard doesn't require "'detailed factual allegations,'" it demands more than a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" which, the Supreme Court has explained, "'will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

## III.     Analysis

The court begins its analysis with standing. Next, the court considers whether to dismiss the individual defendants sued in their official capacities. With those two preliminary matters resolved, the court moves to plaintiff's federal-law claims brought under Title VII and § 1983. It then evaluates plaintiff's state-law claims—her breach-of-contract claim, and her claims under the Kansas Constitution, the Kansas Preservation of Religious Freedom Act (KPRFA) and the Kansas Public Speech Protection Act (KPSPA). The court concludes with a brief discussion of plaintiff's remedies.

### A.     Standing

Defendants argue that plaintiff lacks standing to bring this suit. Doc. 38 at 4; Doc. 40 at 3–4. Because it's a jurisdictional issue, the court must start with standing.

Article III of our Constitution limits federal courts' jurisdiction to "cases" and "controversies." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). To present a case or controversy under Article III, a plaintiff must establish that she has standing to sue. *Id.* Article III's standing analysis requires three things:

(1) an "injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical[;]"

(2) "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court[;]" and

(3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (quotation cleaned up).

Here, defendants target the first element: an injury in fact. Doc. 38 at 4; Doc. 40 at 3–4. They argue that plaintiff hasn't identified a "legally protected interest" that defendants invaded. Doc. 38 at 4; Doc. 40 at 3. They insist that plaintiff has no legally protected interest not to attend required diversity training, nor to address students in a fashion that violates the District's instructions. Doc. 40 at 3–4. Defendants mischaracterize plaintiff's claims.

Plaintiff claims that she opposed diversity training in a letter—an exercise of her First Amendment rights. She isn't claiming she possesses a right to skip diversity training. And plaintiff claims that her sincerely held religious beliefs prevent her from using a student's preferred name or pronouns under certain conditions. "[I]t is axiomatic that a plaintiff has standing to assert his or her First Amendment rights have been violated." *Day v. Bond*, 500 F.3d 1127, 1137 (10th Cir. 2007). The court thus concludes that plaintiff has identified interests protected by the First Amendment and thus has identified a legally protected interest sufficient to confer her with standing.

## B.    Suit Against Individual Defendants in Their Official Capacities

Plaintiff has sued 15 individual defendants—the 2023 board-of-education members for the District, the 2024 board-of-education members, the District's superintendent, its deputy superintendent, its compliance coordinator, someone she identifies as "superintendent/associate superintendent," its human resources director, and her school's principal— in both their

individual and official capacities.  These 15 defendants have moved to dismiss the claims

asserted against them in their *official* capacities.  They argue that plaintiff's claims against them

"are duplicative of the claims asserted against Defendant USD 512 and should therefore be

dismissed."  Doc. 36 at 3.  The court agrees.

The Supreme Court has explained the difference between official-capacity and

individual-capacity, also called personal-capacity, claims.  "Personal-capacity suits seek to

impose personal liability upon a government official for actions he takes under color of state

law."  *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).  "Official-capacity suits, in contrast,

'generally represent only another way of pleading an action against an entity of which an officer

is an agent.'"  *Id.* at 165–66 (quoting *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690

n.55 (1978)).  Put simply, an official-capacity suit is "a suit against the entity"—not the official.

*Id.* at 166; *Unified Sch. Dist. No. 480 v. Epperson*, 583 F.2d 1118, 1121 (10th Cir. 1978) ("[A]

suit in a federal court against the members of a state board or agency acting in their official

capacities is a suit against the board or agency itself[.]").

So, there's no difference between suing, say, the District's superintendent of schools in

his official capacity, and suing the District.  Our court thus routinely dismisses "official capacity

claims against individuals who are sued in their official capacities" in "suits in which a

government entity is a party[.]"  *Rubio v. Turner Unified Sch. Dist. No. 202*, 453 F. Supp. 2d

1295, 1300 (D. Kan. 2006) (dismissing all claims against individual defendants—including a

school district's superintendent, individual school-board members, principal, and teacher—in

their official capacities because plaintiff also had sued school district); *Thouvenell v. City of

Pittsburg*, No. 18-CV-2113-JAR-KGG, 2018 WL 3068199, at *3–4 (D. Kan. June 21, 2018)

(dismissing official-capacity suits against city-official individual defendants where plaintiff also

sued city); *see also Epperson* at 1121–23 (collapsing defendant individual school-board members sued in their official capacity into defendant school board).

Striving to avoid this result, plaintiff makes a mishmash of arguments, none of which persuades. Doc. 50-2 at 8–13. Plaintiff vociferously asserts that her suit needs these defendants. But her strident arguments never bother to differentiate between individual-capacity and official-capacity lawsuits. And she never acknowledges the black letter law that an official-capacity suit against a government official is a suit against the entity. Plaintiff's stubborn arguments lead her to misunderstand why her claims against the individual defendants in their official capacities are redundant.

Plaintiff also asserts that she seeks different remedies from the different defendants— specifically, punitive damages against the individual defendants. *Id.* at 9. But our court already has "rejected the argument that official capacity claims should not be dismissed when the plaintiff seeks punitive damages." *Thouvenell*, 2018 WL 3068199, at *3. Plaintiff also insists that she needs to keep her official-capacity claims against the individual defendants because *Ex parte Young* allows her to seek injunctive relief from them, but not from the District. Doc. 50-2 at 9. Plaintiff misunderstands the basics of *Ex parte Young*. *Ex parte Young* is an exception to sovereign immunity. And sovereign immunity only applies to arms of the state. The state's immunity doesn't extend to local school districts. *Epperson*, 583 F.2d at 1122–23 (concluding Kansas local school districts do not enjoy Eleventh Amendment immunity). So plaintiff doesn't need *Ex parte Young* to maneuver around the state's sovereign immunity.

In sum, there's no difference between plaintiff's official-capacity suits against the 15 individual defendants and her suit against the District. The court thus dismisses the claims

asserted against the individual defendants in their official capacities. The court moves on to plaintiff's federal claims, below.

### C.    Title VII

The court begins its Title VII analysis by determining what claims, exactly, plaintiff brings. The Complaint brings a claim under Title VII titled "Retaliation for Opposition to Racist DEI Required Training." Doc. 44 at 90. But, in her briefing, plaintiff claims she's also brought a hostile-work-environment claim. Doc. 50-1 at 18 ("Ms. Sullivan pleads plausible Title VII retaliation and hostile environment claims."). Defendants didn't detect plaintiff's hostile-work-environment claim; they moved only to dismiss a retaliation claim. *See* Doc. 38 at 3; Doc. 40 at 3; Doc. 58 at 1–2.

The court laments plaintiff's imprecise pleading. Yet the Federal Rules of Civil Procedure that govern pleading require "an expansive construction of a complaint[.]" *Zokari v. Gates*, 561 F.3d 1076, 1085 (10th Cir. 2009). To determine how expansively to construe a complaint turns "on the fairness to the parties and the burdens on the court that would result from giving a pleading a possible, but improbable, reading." *Id.* "Early in litigation, justice is usually served by expansively construing complaints." *Id.* Our Circuit explicitly has suggested that, if a defendant moves to dismiss claims and plaintiff responds that those dismissal arguments don't apply to a certain claim, then district courts should construe the complaint to raise that certain claim. *Id.*

That's exactly what has happened here. Plaintiff's 106-page Complaint mentions hostile work environment in several places—though not in the place that identifies her claims. *See* Doc. 44 at 5, 10, 92, 102 (SAC ¶¶ 18, 42, 492, § VII.I.). When defendants moved to dismiss the retaliation claim, plaintiff nevertheless responded that, in so doing, defendants haven't moved to dismiss her hostile-work-environment claim. Doc. 50-1 at 22–23. At this early stage, the court

must construe plaintiff's Complaint to assert Title VII claims for retaliation and hostile work environment. But the court warns plaintiff. Future imprecision is unlikely to experience such luck.

Turning to the merits of plaintiff's Title VII claims, plaintiff alleges that the District's mandatory DEI training sessions are racist, Doc. 44 at 54 (SAC ¶ 295), and created a hostile work environment, Doc. 50-1 at 22. Plaintiff alleges that the letter she wrote opposing the DEI training qualified as protected activity under Title VII. Doc. 44 at 91 (SAC ¶ 483). And defendants retaliated against plaintiff for this opposition. Defendants have moved to dismiss plaintiff's Title VII claims. The court starts with the individual defendants' motion targeting this claim, then considers the District's motion.

### 1.    Individual Defendants

Individual defendants sued in their individual capacity have moved to dismiss plaintiff's Title VII claims for a few reasons, but the court need only address one. Doc. 38 at 3. A Title VII plaintiff must sue her employer. *Haynes v. Williams*, 88 F.3d 898, 901 (10th Cir. 1996) ("[T]he language and structure of amended Title VII continue to reflect the legislative judgment that statutory liability is appropriately borne by employers, not individual supervisors."). And so "personal capacity suits against individual supervisors are inappropriate under Title VII." *Id.*

Perhaps acknowledging that she can't sue any of the individually named defendants in their individual capacity under Title VII, plaintiff never responds to this dismissal argument. *See generally* Doc. 50-2. The court thus dismisses plaintiff's Title VII retaliation and hostile-work-environment claims against all defendants except for the District. *See Brown v. Nationwide Ins. Co.*, No. 21-4122, 2023 WL 4174064, at *9 (10th Cir. June 26, 2023) (affirming dismissal of claim where party "'effectively abandon[ed] the litigation by not responding to alleged deficiencies in a motion to dismiss'" (quoting *Lee v. Ne. Ill. Reg'l Commuter R.R. Corp.*, 912

F.3d 1049, 1053–54 (7th Cir. 2019))); *see also C1.G ex rel. C.G. v. Siegfried*, 38 F.4th 1270, 1282 (10th Cir. 2022) ("The district court correctly dismissed Plaintiff's facial challenge here because he abandoned it by not addressing it in his response to Defendants' motion to dismiss.").

### 2.    The District

The District, for its part, argues that plaintiff's Title VII retaliation claim fails because opposing diversity training doesn't qualify as "protected activity" under Title VII.  Doc. 40 at 3. The court disagrees.

As relevant here, Title VII makes it unlawful for an "employer to discriminate against any of his employees" because the employee has "opposed any practice made an unlawful employment practice by this subchapter[.]"  42 U.S.C. § 2000e-3(a).  And so, opposing unlawful discrimination qualifies as protected activity.  "To show she engaged in protected activity, [plaintiff] doesn't need to show that she reported an actual Title VII violation; rather, she must only show 'a reasonable good-faith belief that' she was opposing discrimination."  *Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 890 (10th Cir. 2018) (quoting *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015–16 (10th Cir. 2004)).

Here, plaintiff alleges she opposed the District's "anti-white racist, anti-American and politically-divisive DEI programming."  Doc. 44 at 17 (SAC ¶ 90).  This falls within Title VII's protections because Title VII "broadly prohibits . . . . employers from allowing work conditions to be permeated with hostile racial . . . animus."  *Young v. Colo. Dep't of Corr.*, 94 F.4th 1242, 1244–45 (10th Cir. 2024).  "To the extent diversity programs generate such animus, they are equally subject to the prohibitions of Title VII[.]"  *Id.* at 1245.  Plaintiff here alleges just that. She asserts the District mandated that she and other teachers attend—in her view—a racist training.  Doc. 44 at 4 (SAC ¶¶ 13–14).  Plaintiff thus has plausibly alleged a reasonable, good-faith belief that she opposed discrimination.  *See Fassbender*, 890 F.3d at 890.

13

In urging the opposite result, the District relies on *Vavra v. Honeywell International, Inc.*, 106 F.4th 702 (7th Cir. 2024). Doc. 40 at 3. In *Vavra*, plaintiff's employer launched a mandatory unconscious bias training that plaintiff refused to complete because he thought it was "a joke[.]" 106 F.4th at 704. (internal quotation marks omitted). Plaintiff's refusal led his employer to terminate his employment, and he sued for Title VII retaliation. *Id.* at 705. The Seventh Circuit affirmed summary judgment for the employer, concluding that plaintiff did not have an objectively reasonable belief that he was opposing unlawful behavior "because he never accessed the training or otherwise discovered what it entailed[.]" *Id.*

But that's not the situation here. Plaintiff alleges she attended many trainings and was well aware of what the trainings entailed. So, plaintiff has alleged a reasonable, good-faith belief that she opposed DEI training that generated—again, in her view—anti-white racial animus. Plaintiff's Title VII retaliation claim against the District thus survives. And plaintiff's hostile-work-environment claim against the District also survives because the District didn't move for dismissal.

The court addresses plaintiff's § 1983 claims, next.

**D.    § 1983**

The court must begin this analysis, again, by bringing order to plaintiff's dense Complaint to determine which § 1983 claims she brings and what, exactly, serves as the basis for those claims. Defendants argue that the § 1983 claims are duplicative, Doc. 40 at 4 n.15, but they are not, as explained below.

Plaintiff's first § 1983 claim—Count I—is a freedom-of-speech claim—specifically a compelled-speech claim. Doc. 44 at 75–78 (SAC ¶¶ 396–417). Count I's allegations allege that defendants compelled plaintiff to use a transgender student's preferred name and pronouns and this compulsion violates her First Amendment rights.

14

Plaintiff's second § 1983 claim—Count V—is a First Amendment retaliation claim.  Doc. 44 at 89–90 (SAC ¶¶ 473–78).  This claim is a bit confused.  It's labeled "Retaliation for Opposition to Government's Racist DEI Programming."  *Id.* at 89.  But it also alleges that defendants took actions against plaintiff motivated by plaintiff's DEI opposition letter, her "Exposé Articles," and "her refusal to affirm or endorse the government's New Trans Orthodoxy."  *Id.* at 90 (SAC ¶ 476).  So, though the claim's label suggests one type of retaliation, other parts of the claim suggest retaliation for three separate actions.  The court thus concludes that plaintiff alleges defendants retaliated against her based on all three actions.

Plaintiff's third § 1983 claim—Count VII—is a First Amendment freedom-of-speech claim claiming content and viewpoint discrimination.  *Id.* at 92–94 (SAC ¶¶ 490–501).  As pleaded in the Complaint, plaintiff bases this claim on plaintiff "expressing her views regarding gender identity."  *Id.* at 93 (SAC ¶ 495).  She asserts that the First Amendment protects expression of her views.  *Id.* (SAC ¶ 498).

Plaintiff's fourth § 1983 claim—Count VIII—is called "Violation of Plaintiff's Right to be Free from Unconstitutional Conditions."  *Id.* at 94.  In it, plaintiff alleges that defendants' "policies and their enforcement of those policies impose an unconstitutional condition upon teachers' rights to free speech and their receipt of state benefits[.]"  *Id.* at 94 (SAC ¶ 505).  According to plaintiff, these conditions violate plaintiff's "rights under the First Amendment (e.g., freedom of speech, freedom from retaliation, free exercise of religion), and the unconstitutional conditions doctrine."  *Id.* (SAC ¶ 503).

There's a fifth § 1983 claim lurking in plaintiff's Complaint.  Plaintiff's motion-to-dismiss response asserts that she "pleaded free exercise claims[.]"  Doc. 50-1 at 18.  Indeed—and though omitted from the portion of her Complaint dedicated to her actual causes of action—the

Complaint alleges defendants violated plaintiff's "constitutional rights to freedom of speech and the free exercise of her religion, practices prohibited by 42 U.S.C. § 1983[.]" Doc. 44 at 8 (SAC ¶ 34). The court is bound by Circuit precedent to construe this language as stating a fifth § 1983 claim based on free exercise. *Zokari*, 561 F.3d at 1085 ("Early in litigation, justice is usually served by expansively construing complaints."). Defendants haven't moved to dismiss this claim, so it survives.

With that overview out of the way, the court turns to defendants' dismissal arguments targeting the various § 1983 claims. The court begins with the individual defendants' argument that they did not personally participate in the alleged deprivation of plaintiff's rights. The court next evaluates the individual defendants' qualified-immunity defense. Piggybacking off the qualified-immunity analysis, the court then considers the District's argument that plaintiff has failed to state viable § 1983 claims. And finally, the court evaluates the District's argument that plaintiff has failed to allege a policy or custom sufficient to impose § 1983 liability.

### 1.    Personal Participation

The 15 individual defendants argue that plaintiff has failed to allege plausibly that they participated personally in violating her constitutional rights. Doc. 38 at 4–5. Eleven of the 15 are right.

"Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Iqbal*, 556 U.S. at 676. Because she can't rely on vicarious liability, a § 1983 "plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* In § 1983 lawsuits with multiple defendants, "'it is particularly important' that plaintiffs 'make clear exactly who is alleged to have done what to whom, as distinguished from collective allegations.'" *Pahls v. Thomas*, 718 F.3d 1210, 1225 (10th Cir. 2013) (quotation cleaned up)

(quoting *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011)).  And "to impose supervisor liability under § 1983, 'it is not enough for a plaintiff merely to show a defendant was in charge of other state actors who actually committed the violation.'"  *Beedle v. Wilson*, 422 F.3d 1059, 1074 (10th Cir. 2005) (quoting *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996)).  Instead, a § 1983 "'plaintiff must establish a deliberate, intentional act by the supervisor to violate constitutional rights.'"  *Id.* (quoting *Jenkins*, 81 F.3d at 994–95).  A plaintiff can satisfy this intentional-or-deliberate-act standard "'by showing the defendant-supervisor personally directed the violation or had actual knowledge of the violation and acquiesced in its continuance.'"  *Id.* (quoting *Jenkins*, 81 F.3d at 995).

Here, plaintiff has alleged that four defendants personally participated in the events at issue:  Higgins, England, Hubbard, and Ewers.  The court reviews the sufficient allegations against those four, below.  Then, the court explains why her allegations against the other 11 defendants fall short.

Plaintiff alleges that defendant Higgins, the District's Director of Secondary Human Resources, and defendant England, its Compliance Coordinator, unfairly and inappropriately interrogated her during the second "sham" investigation.  Doc. 44 at 33 (SAC ¶¶ 192–94).  She also alleges that Higgins falsely accused her of racism during the second investigation, *id.* at 41–42 (SAC ¶¶ 224–28), and used those false accusations to threaten her, *id.* at 42 (SAC ¶ 231).  Plaintiff thus has alleged personal participation by defendants Higgins and England sufficiently.

Plaintiff also has sued defendant Hubbard, the District's superintendent.  *Id.* at 12 (SAC ¶ 55).  She alleges Hubbard authorized, executed, enforced, and implemented policies governing faculty—including the policies plaintiff challenges.  *Id.* at 13, 14 (SAC ¶¶ 58, 65).  And, she asserts, Hubbard directly oversaw defendants England, Higgins, and Ewers.  *Id.* (SAC ¶ 59).

17

Plaintiff also alleges Hubbard knew about the actions at issue here and didn't do anything "to change or alter either the policies or actions taken against [plaintiff] pursuant to those policies." *Id.* at 14 (SAC ¶ 63). These allegations suffice for defendant Hubbard. *See Beedle*, 422 F.3d at 1074 (explaining plaintiff may satisfy supervisor liability under § 1983 if she alleges a supervisor knew of the constitutional violation and acquiesced in it).

Defendant Ewers is the principal at plaintiff's school. Doc. 44 at 14 (SAC ¶ 67). Plaintiff alleges he has authority over the faculty and supervises her. *Id.* (SAC ¶¶ 68, 70). Ewers can investigate, recommend discipline, and impose discipline for policy violations. *Id.* at 15 (SAC ¶ 73). And Ewers, along with Hubbard, the superintendent, created and enforced the challenged policies against plaintiff. *Id.* (SAC ¶ 74). Ewers also participated in all the major incidents. Plaintiff sent the letter opposing diversity training—the step kicking off this whole saga—to Ewers. *Id.* at 17–18 (SAC ¶ 91). Ewers conducted the first investigation. *Id.* at 26–27 (SAC ¶¶ 147–55). And Ewers retaliated against plaintiff by monitoring her and failing to support her in the classroom after she sent her letter opposing DEI training. *Id.* at 67 (SAC ¶¶ 340, 341). Ewers also took away plaintiff's AP classes. *Id.* at 72 (SAC ¶ 376). That's plenty of fodder to assert personal participation.

The rest of the defendants, though, are a different story. The remaining 11 defendants are Schumacher, Gilhaus, and the nine board-of-education members.

Defendant Schumacher, the District's superintendent/associate superintendent, warranted just four mentions in the Complaint. *See generally* Doc. 44. Schumacher's only action directed at plaintiff: failing to process her grievance. *Id.* at 13 (SAC ¶ 60). Plaintiff's brief claims that she mentions defendant Schumacher in ¶ 146 of her Complaint. Doc. 50-2 at 13. But that's not so. That paragraph refers to defendants writ large; it says nothing about Schumacher

specifically.  Doc. 44 at 26 (SAC ¶ 146).  This dissonance is just one symptom of the disease that infects much of plaintiff's Complaint:  She often uses collective allegations to refer to defendants.  And under our Circuit's law, that just won't do.  *Pahls*, 718 F.3d at 1225.  So, the court dismisses the § 1983 claims asserted against defendant Schumacher in his individual capacity.

Defendant Gilhaus is the District's deputy superintendent.  Doc. 44 at 1.  Plaintiff's allegations against Gilhaus are thin.  The Complaint mentions him just four times in 106 pages. *See generally id.*  Plaintiff alleges he, along with Schumacher, England, and Higgins, failed to process the grievance she filed after the second investigation.  *Id.* at 13 (SAC ¶ 60).  That's it. Failure to process the grievance serves as the basis of one of plaintiff's state-law claims, but it doesn't form the basis of any of her § 1983 claims.  Put differently, Gilhaus's alleged failure to process plaintiff's grievance didn't deprive her of *constitutional* rights, just her alleged *contractual* rights.  So, Gilhaus (and defendant Schumacher, for that matter) didn't personally participate in the alleged constitutional violations and the court thus dismisses the § 1983 claims asserted against Gilhaus.

Plaintiff's allegations against the board members also fall short.  True, plaintiff alleges that the board adopts and authorizes policies that govern teachers and holds final policymaking authority.  *Id.* at 11, 12 (SAC ¶¶ 47, 48).  And plaintiff asserts that she needs discovery to "determine if responsibility for drafting or approving the First Amendment-violating new 'trans' policy lies with the school board Individual Defendants or if they delegated that authority to the superintendent or other employee Individual Defendants."  Doc. 50-2 at 13.  But plaintiff's own Complaint betrays this excuse.  Plaintiff concedes that the school board doesn't have a policy about trans students.  Doc. 44 at 48, 49 (SAC ¶¶ 264, 268).  So this case isn't like other cases

where the district's school board adopted a specific policy about names and pronouns for trans

students. *See Ricard v. USD 475 Geary Cnty. Sch. Bd.*, No. 22-cv-04015-HLT-GEB, 2022 WL

1471372, at \*2 (D. Kan. May 9, 2022).[1]

In sum, plaintiff has alleged that only defendants Higgins, England, Hubbard, and Ewers

had anything to do with the constitutional violations she claims. The rest of the individual

defendants didn't participate personally, so the court dismisses the § 1983 claims asserted against

defendants Schumacher, Gilhaus, Mary Sinclair, Jessica Hembree, Jamie Borgman, April Boyd-

Noronha, Sara Goodburn, Heather Ousley, Brad Stratton, Mario Garcia, David Westbrook. With

the universe of individual defendants narrowed, the court next considers their legislative-

immunity argument.

### 2.     Legislative Immunity

The individual defendants contend that absolute legislative immunity bars plaintiff's

§ 1983 claim. Doc. 38 at 5. Plaintiff argues that the individual defendants' argument on this

front is purely a perfunctory one. Doc. 50-2 at 6. Plaintiff's right.

The individual defendants' motion dedicates three sentences to reciting the law governing

legislative immunity but never bothers to apply that law. Doc. 38 at 5. The reply adds no clarity

to the argument. Doc. 57 at 2. The court thus considers this undeveloped argument perfunctory

and rejects it. *See United States v. Walker*, 918 F.3d 1134, 1151 (10th Cir. 2019) (explaining

that parties waive arguments when "they are advanced . . . only in a perfunctory manner"

(quotation cleaned up)).

---

[1]     The court does not suggest that the school-board members were proper defendants in *Ricard*. The
order there stems from a preliminary injunction sought early in the case before issues of who-can-sue-
who had emerged. *Ricard*, 2022 WL 1471372, at \*1 n.1 (acknowledging that plaintiff sued defendants,
including individual board members, in their individual and official capacities but, because the "parties
ma[de] no effort to analyze this nuance in briefing and in arguing the preliminary-injunction motion," and
"the very tight timelines in th[e] case," the court purposefully skipped over the issue).

In any event, the court already has dismissed the school-board-member defendants because plaintiff fails to allege that they participated personally in depriving plaintiff of her constitutional rights. So the court need not consider whether the school-board members are entitled to legislative immunity. The rest of the defendants are employees—not legislators—so it's not clear how non-legislators could invoke legislative immunity.

The court considers a different, and more complicated immunity, next.

### 3.    Qualified Immunity

The individual defendants next assert that qualified immunity shields them from plaintiff's § 1983 claims. Doc. 38 at 5–8. "[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ziglar v. Abbasi*, 582 U.S. 120, 152 (2017) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "When a defendant asserts qualified immunity at the motion to dismiss phase, the plaintiff 'must allege facts sufficient to show (assuming they are true) that the (1) defendant plausibly violated their constitutional rights, and that (2) those rights were clearly established at the time.'" *Brown v. City of Tulsa*, 124 F.4th 1251, 1265 (10th Cir. 2025) (quotation cleaned up) (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008)). Once a defendant has "asserted the defense of qualified immunity, the burden is on Plaintiffs to establish their right to proceed." *Matthews v. Bergdorf*, 889 F.3d 1136, 1143 (10th Cir. 2018). Note that this qualified-immunity analysis doesn't apply to the District. "Only individuals, not municipalities, are protected by qualified immunity." *Camuglia v. City of Albuquerque*, 448 F.3d 1214, 1223 (10th Cir. 2006).

The court's analysis starts with the first qualified-immunity prong: whether plaintiff plausibly has alleged that defendants violated her constitutional rights. This evaluation begins with whether the First Amendment's freedom-of-speech clause protects plaintiff's opposition to DEI training. The court then considers whether the Constitution's freedom-of-speech clause

encompasses plaintiff's refusal to use a student's preferred name pronouns in certain situations. Concluding that neither plaintiff's DEI opposition nor her refusal to use preferred names and pronouns falls within the First Amendment's freedom-of-speech protections, the court then considers the ramifications of these conclusions. With the universe of claims whittled down, the court concludes its qualified-immunity analysis with the second prong:  clearly established law.[2]

### a.    Freedom of Speech:  Opposition to DEI Training

Plaintiff alleges that defendants retaliated against her for writing the letter opposing DEI training, thereby violating her First Amendment freedom-of-speech rights.  Doc. 44 at 89–90 (SAC ¶¶ 473–78).  Public "employees do not surrender all their First Amendment rights by reason of their employment."  *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006).  The "First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern."  *Id.*

A five-element test—commonly called the *Pickering* framework—governs First Amendment retaliation claims brought by government employees.  *Eisenhour v. Weber County*, 744 F.3d 1220, 1227–28 (10th Cir. 2014).  The five elements ask:

> "(1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct."

*Id.* (quoting *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1301–02 (10th Cir. 2009)); *McNellis v. Douglas Cnty. Sch. Dist.*, 116 F.4th 1122, 1132 (10th Cir. 2024) ("These five factors are essential elements of a First Amendment retaliation claim brought by public employees under

---

[2]    Recall that defendants didn't move to dismiss plaintiff's free-exercise claims, so the following qualified-immunity analysis doesn't extend to those claims.

§ 1983." (quotation cleaned up)).  The first three elements are questions of law.  *McNellis*, 116 F.4th at 1132; *Pryor v. Sch. Dist. No. 1*, 99 F.4th 1243, 1250 (10th Cir. 2024).  "'To prevail, a plaintiff must show all five elements.'"  *McNellis*, 116 F.4th at 1132 (quoting *Duda v. Elder*, 7 F.4th 899, 911 (10th Cir. 2021)).

Plaintiff's freedom-of-speech retaliation claim fails on the very first element of the *Pickering* framework.  She has not alleged plausibly that she sent the DEI opposition letter as a private citizen—rather than pursuant to her official duties as a District employee.

"Generally, a governmental employer may control speech within the scope of an employee's official duties."  *Pryor*, 99 F.4th at 1251.  Our Circuit "'take[s] a broad view of the meaning of speech that is pursuant to an employee's official duties.'"  *McNellis*, 116 F.4th at 1133 (quotation cleaned up) (quoting *Thomas v. City of Blanchard*, 548 F.3d 1317, 1324 (10th Cir. 2008)).  No bright-line rules exist "'to determine when an employee speaks pursuant to her official duties[.]'"  *Id.* (quoting *Rohrbough v. Univ. of Colo. Hosp. Auth.*, 596 F.3d 741, 746 (10th Cir. 2010)).  Instead, our Circuit instructs district courts to "use 'a case-by-case approach, looking both to the content of the speech, as well as the employee's chosen audience, to determine whether the speech is made pursuant to an employee's official duties.'"  *Id.* (quoting *Rohrbough*, 596 F.3d at 746).

Speech "'is made pursuant to official duties if it is generally consistent with the type of activities the employee was paid to do.'"  *Id.* (quotation cleaned up) (quoting *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1203 (10th Cir. 2007)).  "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen."  *Garcetti*, 547 U.S. at 421–22.

This inquiry can prove difficult, *id.* at 418, so an example helps.  In *McNellis*, the plaintiff, a high school athletic director and assistant principal, served as a member of the school's administrative team, a team tasked with discussing issues about extracurricular activities.  116 F.4th at 1127–28.  When the theatre teacher sent a school-wide email about an upcoming performance of *The Laramie Project*—a play about a murder likely motivated by the victim's sexuality—plaintiff responded with his reservations.  *Id.* at 1128.  He explained that, as a dad and an employee, he disagreed with the production and wanted to offer a Christian perspective.  *Id.* at 1129.  Plaintiff was investigated for his religious comments and fired.  *Id.* at 1129–30.  As relevant here, the *McNellis* plaintiff asserted a § 1983 First Amendment retaliation claim.  The district court dismissed that claim.

The Circuit affirmed this dismissal, concluding the *McNellis* plaintiff has made his comments pursuant to his official duties.  *Id.* at 1133–34.  As a member of the administrative team, plaintiff's official duties included discussing any issues arising from extracurricular activities.  *Id.*  And, in plaintiff's response to the theatre teacher's email, he explicitly identified an interest both as a parent and *as an employee*.  *Id.* at 1134.  So, the *McNellis* plaintiff, "pursuant to his official duties, raised concerns about an extracurricular activity at the school— precisely the sort of thing he was paid to do."  *Id.* (emphasis omitted).  The Circuit noted the audience for plaintiff's email—school staff only—also suggested that the plaintiff spoke pursuant to his official duties.  *Id.*

*McNellis* compels the same reasoning and result here.  Plaintiff did not speak as a private citizen, as demonstrated by the context where her opposition letter arose, the letter's content, and the letter's audience.  The District's DEI training was mandatory for plaintiff.  Doc. 44 at 3 (SAC ¶ 8).  And so, plaintiff's opposition to the training rests within her official duties because the

24

opposition letter "owes its existence to [her] professional responsibilities[.]"  *Garcetti*, 547 U.S. at 421.  The content of plaintiff's opposition letter confirms as much.  Plaintiff's letter reads, "*As a staff member myself*, and having worked in the building for years, it is irresponsible and unreasonable to continue to carry on [DEI] meetings while preventing or limiting differing or opposing views from discussion."  Doc. 44-4 at 2 (Ex. 4) (emphasis added).  So, like the *McNellis* plaintiff, the speech at issue explicitly claims an interest as an employee.  What's more, like the *McNellis* plaintiff, plaintiff directed her speech to school staff only—*i.e.*, the DEI coordinators and the principal.  Doc. 44 at 17–18 (SAC ¶ 91).  Plaintiff thus wrote her opposition letter pursuant to her official duties and not as a private citizen.  These conclusions doom her First Amendment retaliation claim based on the opposition letter.

### b.    Freedom of Speech:  Preferred Names and Pronouns

Plaintiff also asserts that defendants have violated her First Amendment right to freedom of speech by compelling her to use students' pronouns and names in a manner that violates her religious beliefs.  Doc. 44 at 76 (SAC ¶ 400).  The individual defendants argue that plaintiff's actions occur "in her official role as a public school teacher in the classroom and, as such, are not protected under the First Amendment."  Doc. 38 at 7.  The court agrees with defendants.

At the outset, the court notes that plaintiff's claim here is one for compelled speech. Indeed, it is a "fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message."  *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995).  Because this is a compelled-speech claim, plaintiff argues that *Garcetti*'s rule—*i.e.* "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes"— does not apply.  Doc. 50-1 at 11 (quoting *Garcetti*, 547 U.S. at 421).  This argument relies on the Supreme Court's suggestion that—perhaps—a different test should apply in compelled-speech

cases. *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps.*, 585 U.S. 878, 908 (2018) (declining to answer whether "*Pickering* applies at all to compelled speech" and suggesting that the test "would certainly require adjustment in that context"). But the Supreme Court never has so held. And other courts have continued to apply the *Pickering* framework post-*Janus*. *See, e.g.*, *Meriwether v. Hartop*, 992 F.3d 492, 508–09 (6th Cir. 2021); *Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trs.*, 680 F. Supp. 3d 1250, 1286–87 (D. Wyo. 2023) (compiling cases) ("While *Janus* certainly left open the possibility that *Pickering* may not apply to cases where the government compelled the speech of its employees, the clear majority of courts to address the issue have concluded *Pickering* still applies to such claims."). The court thus applies the *Pickering* framework here—the same five-element framework already articulated. *See above* § III.D.3.a.

The court begins—and ends—with the first element: whether the policy requiring plaintiff to use a transgender student's preferred name and pronouns compels her speech during performance of her official duties or as a private citizen. And the court reaches the same conclusion it reached for her first theory—plaintiff's speech is pursuant to her official duties.

A district court within our Circuit already has answered this question in a similar case, where a teacher challenged a district's policy requiring her to use a student's preferred name and pronouns. *Willey*, 680 F. Supp. 3d at 1263–64. And that court had "little trouble concluding that [the teacher plaintiff] was being asked—indeed compelled—to speak pursuant to her official duties as a teacher, and not as a citizen on a matter of public concern." *Id.* at 1287. At least one Circuit agrees with this view. In *Wood v. Florida Department of Education*, the Eleventh Circuit held that when "a public-school teacher addresses her students within the four walls of a classroom—whether orally or in writing—she is unquestionably acting pursuant to her official

duties." 142 F.4th 1286, 1290 (11th Cir. 2025) (quotation cleaned up). The court finds the analysis in these cases highly persuasive.

To be sure, the Sixth Circuit reached a different conclusion. *Meriwether*, 992 F.3d 492. But that case involved a university professor. *Id.* at 498. And the Sixth Circuit's analysis started from the premise that "'universities occupy a special niche in our constitutional tradition.'" *Id.* at 504 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003)). The court thus concludes that when plaintiff addresses her students, she does so pursuant to her official duties. And so, she does not speak as a private citizen.

Plaintiff offers several counterarguments on this front, but all fall short. Plaintiff argues that because the school board never adopted an official policy on pronouns, her pronoun usage can't fall within her official duties. Doc. 50-1 at 9–10. Plaintiff cites no authority for this notion. Plaintiff also argues that her Complaint alleges that she "has no valid official duty to participate in students' experimenting with divergent genders or 'transitioning'" and that factual allegation should control the analysis. *Id.* at 10. But that's just not right. Whether a public employee spoke pursuant to her official duties is a question of law. *McNellis*, 116 F.4th at 1132. And the court is "'not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

Sensing her argument's weaknesses, plaintiff clutches at academic freedom. She argues that her employer guarantees her academic freedom, so "requiring teachers to corrupt the English language by removing the long-standing rules for pronouns usage[] exceeds the limits of valid official duties[.]" Doc. 50-1 at 13. Rhetoric makes a poor substitute for legal authority. The "First Amendment 'does not entitle primary and secondary teachers, when conducting the education of captive audiences, to cover topics, or advocate viewpoints, that depart from the

27

curriculum adopted by the school system.'" *Wood*, 142 F.4th at 1291 (quoting *Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 480 (7th Cir. 2007)).  Requiring plaintiff to use a transgender student's preferred name and pronouns doesn't violate her freedom-of-speech rights under this official-duty analysis.

### c.    Constitutional Violation Analysis Ramifications

The court has concluded that the First Amendment's freedom-of-speech protections don't protect her letter opposing DEI.  And compelling plaintiff to use certain pronouns and names in a certain way doesn't violate her free-speech rights, either.  These decisions have ramifications for plaintiff's § 1983 claims, and the court stops here to sort through them.

Plaintiff's first § 1983 claim—Count I—is a freedom-of-speech claim.  Doc. 44 at 75 (SAC ¶¶ 396–417).  And it's based entirely on compelled speech—*i.e.*, requiring plaintiff to use certain pronouns and names.  As just explained, the First Amendment does not apply to this conduct in the context alleged by the SAC.  So, plaintiff's Count I doesn't state a plausible constitutional violation, and the claim fails the first prong of qualified immunity.

Plaintiff's second § 1983 claim—Count V—is a free-speech-retaliation claim.  Doc. 44 at 89–90 (SAC ¶¶ 473–78).  Recall that the court construed this as a claim that defendants had retaliated against plaintiff for three distinct exercises of her First Amendment rights:  (1) her DEI opposition letter, (2) her refusal to use certain pronouns and names, and (3) her "Exposé Articles."  *Id.* at 90 (SAC ¶ 476).  The court has concluded, however, that the First Amendment doesn't protect plaintiff's speech in the opposition letter, nor her compelled speech in the form of certain pronouns and names.  So plaintiff hasn't alleged a viable free-speech-retaliation claim on either of those grounds and the individual defendants are qualifiedly immune.  These conclusions leave just one more prong of this § 1983 claim:  the retaliation based on Exposé Articles.  The

court has construed the Complaint to state a First Amendment retaliation claim based on this speech, and defendants have not moved to dismiss it. This claim survives.

Plaintiff's third § 1983 claim—Count VII—is a First Amendment freedom-of-speech claim for content and viewpoint discrimination. *Id.* at 92–94 (SAC ¶¶ 490–501). As pleaded in the Complaint, plaintiff bases this claim on plaintiff "expressing her views regarding gender identity." *Id.* at 93 (SAC ¶ 495). This is a different form of a freedom-of-speech claim. And, as just mentioned, the First Amendment's right to freedom of speech does not apply to plaintiff's use of pronouns and names in the classroom. So, this claim doesn't state a constitutional violation. The individual defendants thus deserve qualified immunity on Count VII.

Plaintiff calls her fourth § 1983 claim—Count VIII—a claim for "Violation of Plaintiff's Right to be Free from Unconstitutional Conditions." *Id.* at 94. The court construes this claim to allege that conditioning plaintiff's employment on using a transgender student's preferred name and pronouns creates unconstitutional conditions because compliance violates plaintiff's freedom-of- speech and free-exercise-of-religion rights. *See id.* at 94 (SAC ¶ 506). Because the court has found no freedom-of-speech constitutional violation, the only part of this claim that possibly could state a plausible constitutional violation is the free-exercise-of-religion ground. That's the part defendants didn't move to dismiss. So that prong of Count VIII remains in the case.

In sum, defendants have not challenged the following constitutional violations, and so these claims survive qualified immunity:

- First Amendment retaliation for the Exposé Articles;

- Unconstitutional conditions based on free exercise of religion; and

- Free exercise of religion.

29

The rest of plaintiff's § 1983 claims don't allege a plausible constitutional violation and thus falter at the first prong of qualified immunity. The court dismisses all these § 1983 claims asserted against the individual defendants in their individual capacities. This ruling concludes the court's analysis of the first qualified-immunity prong. It now moves to the second: whether plaintiff's rights were clearly established at the time defendants allegedly violated them.

### d.    Clearly Established Law

A right is clearly established when, at the time of the challenged conduct, "the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014). A plaintiff can demonstrate that a right is clearly established by proffering "a 'materially similar' published case from the Supreme Court or Tenth Circuit" because that case "may give an official fair notice that their specific conduct would violate a constitutional right." *Brown*, 124 F.4th at 1265 (quoting *Apodaca v. Raemisch*, 864 F.3d 1071, 1076 (10th Cir. 2017)). The Supreme Court has warned courts not to define clearly established law "'at a high level of generality.'" *White v. Pauly*, 580 U.S. 73, 79 (2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). That is, "the clearly established law must be 'particularized' to the facts of the case." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The individual defendants train their focus on three rights that, they argue, are not clearly established.

The individual defendants first argue that plaintiff's right to refuse to use personal pronouns in school is not clearly established. Doc. 38 at 7. They're correct. Neither the Supreme Court nor the Tenth Circuit has addressed whether a teacher's use of certain pronouns for students qualifies as protected speech. And other courts who have decided the issue have reached mixed results. *Compare Willey*, 680 F. Supp. 3d at 1287 (concluding teacher plaintiff's compelled-speech claim over district's pronoun-and-name policy for transgender students failed

to state a claim), *and Kluge v. Brownsburg Cmty. Sch. Corp.*, 432 F. Supp. 3d 823, 838–39 (S.D. Ind. 2020) (concluding plaintiff had failed to state a claim because First Amendment didn't protect teacher's refusal to call transgender students by their preferred names and pronouns), *with Geraghty v. Jackson Local Sch. Dist. Bd. of Educ.*, No. 22-cv-02237, 2024 WL 3758499, at *11–16 (N.D. Ohio Aug. 12, 2024) (denying summary judgment against substitute teacher's compelled-speech, freedom-of-speech claim based on compliance with district's preferred-name-and-pronoun policy because speech compelled was not speech made pursuant to official job duties and fact issues remained on balancing of *Pickering* elements).

The second prong of qualified immunity thus also shields the individual defendants from some of plaintiff's claims because—even assuming defendants violated plaintiff's freedom-of-speech rights by requiring her to use the preferred names and pronouns of transgender students—that right is not clearly established by the case law. The individual defendants' second and third arguments do not fare so well, however.

The individual defendants next argue that no clearly established law "would support an employee's claim that her rights were violated by a requirement that she attend diversity training." Doc. 38 at 7–8. Defendants' argument misconstrues plaintiff's claim, based on DEI training. Plaintiff is claiming a First Amendment right to speak out about DEI training, both in her opposition letter and in her Exposé Articles. Requiring plaintiff to attend diversity training is not at issue, so this part of defendants' argument misses the mark. The court need not address it.

Last, defendants argue that no precedent clearly establishes that an investigation can serve as the basis for a First Amendment retaliation claim. *Id.* at 8. That's not quite right. Recall that one of the *Pickering* elements is "'whether the protected speech was a motivating factor in the adverse employment action[.]'" *Eisenhour*, 744 F.3d at 1227–28 (quoting *Dixon*,

553 F.3d at 1301–02). Our Circuit has held that an adverse employment action is one that "would deter a reasonable person from exercising his First Amendment rights." *Couch v. Bd. of Trs. of Mem'l Hosp. of Carbon Cnty.*, 587 F.3d 1223, 1238 (10th Cir. 2009) (quotation cleaned up). This inquiry is "'ordinarily [one] for the trier of fact.'" *McNellis*, 116 F.4th at 1132 (quoting *Brammer-Hoelter*, 492 F.3d at 1203). And so this *factual* inquiry—whether sham investigations like the ones alleged here would deter a reasonable person from speaking—won't readily lend itself to the clearly established *law* inquiry. This is another argument that misapprehends the clearly-established-law analysis.

In sum, the individual defendants are qualifiedly immune from plaintiff's § 1983 claims based on her freedom-of-speech right to refuse to use the preferred names and pronouns of transgender students. These claims fail both prongs of the qualified-immunity analysis—no constitutional violation and no clearly established law.[3]

These conclusions end the court's qualified-immunity analysis of plaintiff's § 1983 claims. The court next considers the District's argument that plaintiff's § 1983 claims fail to state a claim.

### 4.    Failure to State a Claim

The District argues that plaintiff's § 1983 claims fail to state a claim. Doc. 40 at 5. The District's argument overlaps with the constitutional-violation analysis the court just performed as part of its qualified-immunity discussion.

---

[3]    This clearly-established-law analysis is an additional ground to dismiss some of plaintiff's § 1983 claims. That is, the court concluded that requiring plaintiff to use a student's preferred names and pronouns doesn't violate her constitutional rights and, even if it did, her right to refuse to use a student's preferred names and pronouns isn't clearly established. This clearly-established-law analysis doesn't change which of plaintiff's claims survive defendants' Motions to Dismiss, listed in the above ramifications section. *See above* § III.D.3.c.

Defendants argue that the First Amendment's freedom-of-speech protections do not extend to plaintiff's perceived right to refuse to address students by their preferred name or pronouns. *Id.* at 6. As recited in the constitutional-violation section of the above qualified-immunity analysis, the court agrees with them. *See above* § III.D.2.b. Defendants also argue that freedom of speech does not protect plaintiff's DEI opposition, Doc. 40 at 6, nor any actions performed pursuant to the employee's official duties, Doc. 58 at 3. As already stated, the court agrees there as well. *See above* § III.D.2.a. And so the court dismisses plaintiff's § 1983 claims against the District based on these two theories. But the court does not dismiss the § 1983 claims that the District hasn't asked it to dismiss: (1) First Amendment retaliation for the Exposé Articles; (2) unconstitutional conditions based on free exercise of religion; and (3) free exercise of religion.

### 5.    *Monell* Liability

The District next argues that the court should dismiss plaintiff's § 1983 claims because she has failed to allege that a District policy or custom caused her injury. Doc. 40 at 4. This argument attempts to evade *Monell* liability, so the court begins with the basics of *Monell*.

A "local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell*, 436 U.S. at 694. That is, "a municipality"—like the District— "cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691. Instead, to hold the local government liable, a § 1983 plaintiff must allege that "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury[.]" *Id.* at 694. A policy or custom can take any of the following forms:

> "(1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage

33

with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused."

*Waller v. City and County of Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019) (quoting *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010)).[4]

The District argues for dismissal of plaintiff's § 1983 claims based on plaintiff's own allegation that the school board—the final policymaker for the District—has not adopted formally the policies about which plaintiff complains. Doc. 58 at 2. Assuming that's so, a formal policy is but one of the five *Monell* options. Plaintiff also can pursue *Monell* liability by plausibly alleging a widespread practice. And she's done that.

Plaintiff alleges that, during the first investigation in January 2023, principal Ewers handed plaintiff a paper stating "an expectation that students who have indicated a preferred name and pronouns will be referred to by those preferences[.]" Doc. 44 at 30 (SAC ¶ 172); Doc. 44-7 at 2 (Ex. 7). She also alleges that "defendants," during a mandatory professional development session in April 2023, stated a policy prohibiting teachers from disclosing a student's "divergent" pronouns to parents. Doc. 44 at 46 (SAC ¶ 255). What's more, plaintiff has attached to her Complaint a document labelled "Transgender Practices & FAQ" circulated by the "Shawnee Mission School District." Doc. 44-22 at 2 (Ex. 22). This document acknowledges that the school board hasn't adopted a policy specific to transgender students. *Id.* But it adopts

---

[4]     In a brief attempt to keep the individual school-board members in the case as defendants (located in her opposition to the District's Motion to Dismiss), plaintiff insists that the board members were deliberately indifferent to the other defendants violating her constitutional rights. Doc. 50-1 at 8. Deliberate indifference alone isn't enough. Deliberate indifference only matters when a plaintiff has alleged a failure to train or supervise adequately. *Waller*, 932 F.3d at 1283. And nowhere does plaintiff allege that the board members failed to train or supervise anyone. *See generally* Doc. 44; Doc. 50-1.

the very position of which plaintiff's claim complains. It provides, "All students have the right to be addressed by the name and pronouns that correspond to the gender identity they assert at school. School staff and peers are expected to respect a student's name and pronouns once they have been made aware" of them. *Id.* at 3.

Plaintiff thus has plausibly alleged that the District itself had "'an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law[.]'" *Waller*, 932 F.3d at 1283 (quoting *Bryson*, 627 F.3d at 788). And so, the District plausibly is liable for plaintiff's surviving § 1983 claims: (1) First Amendment retaliation for the Exposé Articles; (2) unconstitutional conditions based on free exercise of religion; and (3) free exercise of religion.

These rulings conclude the court's analysis of plaintiff's many federal claims. It turns to plaintiff's state-law claims, next.

### E.    Kansas Constitution

Plaintiff's Complaint brings a variety of claims under the Kansas Constitution. Doc. 44 at 79, 85, 87. Defendants assert that she can't do that. Doc. 38 at 8; Doc. 40 at 7. In apparent agreement with defendants, plaintiff clarified that she "brings her Kansas Constitution-based claims under" two other state laws: the Kansas Preservation of Religious Freedom Act (KPRFA) and the Kansas Public Speech Protection Act (KPSPA). Doc. 50-1 at 33. So, to the extent plaintiff's Complaint asserts claims under the Kansas Constitution, plaintiff has abandoned those claims and the court thus dismisses them.

### F.    KPRFA

Plaintiff's Complaint brings a variety of claims under the KPRFA:

- Count II:  "Violation of Plaintiff's Kansas Constitutional Rights to Religious Liberty and Liberty of Press and Speech;"

- Count III:  "Retaliation for Exercising Religious Liberty, Rights of Conscience, and Liberty of Speech;" and

- Count IV:  "Violation of the Kansas Preservation of Religious Freedom Act[.]"

Doc. 44 at 79, 85, 87.  The individual defendants assert that they are not proper parties to this claim because the KPRFA allows plaintiff to sue only the government.  Doc. 38 at 9 (citing Kan. Stat. Ann. § 60-5303 ("*Government* shall not substantially burden a person's civil right to exercise of religion[.]")).  But defendants' argument on this front consists of just one sentence and one citation.  There's no analysis.  What's more, the court recently reached the opposite conclusion.  *Polk v. Bunting*, No. 23-2415-DDC-ADM, 2025 WL 1837276, at *10 (D. Kan. July 2, 2025).  The individual defendants (in their individual capacities) thus remain on the hook for now based on plaintiff's KPRFA claims.

The District, for its part, argues that plaintiff can't bring claims under the KPRFA because she has failed to file a notice of her claims, as required by Kan. Stat. Ann. § 12-105b. Doc. 40 at 8.  This statute requires that "any person having a claim against a municipality or against an employee of a municipality which could give rise to an action brought under the Kansas tort claims act [KTCA] shall file a written notice as provided in this subsection before commencing such action."  Kan. Stat. Ann. § 12-105b(d)(1).  Plaintiff responds, asserting that this notice provision doesn't apply because her KPRFA claim doesn't fall under the KTCA. Doc. 50-1 at 31.

As best the court can tell, Kansas courts have not yet determined whether KPRFA claims fall under the KTCA.  Given this authority gap, the court must predict how the Kansas Supreme Court would decide this issue.  *See Pehle v. Farm Bureau Life Ins. Co.*, 397 F.3d 897, 901 (10th

Cir. 2005) ("Because [Kansas] has not directly addressed this issue, this court must make an Erie-guess as to how the [Kansas] Supreme Court would rule.").

The KTCA provides that government entities are liable for damages caused by government employees' negligent or wrongful acts or omissions "under circumstances where the governmental entity, if a private person, would be liable under the laws of this state." Kan. Stat. Ann. § 75-6103(a). But the KPRFA doesn't apply to private persons. The KPRFA creates a cause of action against "government." Kan. Stat. Ann. § 60-5303(a) ("*Government* shall not substantially burden a person's civil right to exercise of religion[.]" (emphasis added)). And so KPRFA claims don't fall within the ambit of the KTCA. That means plaintiff didn't have to serve any notice under Kan. Stat. Ann. § 12-105b, because the notice applies only to claims "which could give rise to an action brought under the" KTCA. Kan. Stat. Ann. § 12-105b(d)(1).

As a last resort, the District argues that plaintiff hasn't alleged sufficient facts for a KPRFA violation. Doc. 40 at 8–9. This argument is no more than cursory. The District doesn't provide, much less apply, the substantive standards for a KPRFA violation. Doc. 40 at 8–9; *see also Polk*, 2025 WL 1837276, at *10 (D. Kan. July 2, 2025) (explaining that KPRFA claims have same substantive standards as federal Religious Land Use and Institutionalized Persons Act of 2000, which uses substantial-burden test). The court thus declines to consider this perfunctory argument. *See Walker*, 918 F.3d at 1151.

Plaintiff's KPRFA claims thus survive.

### G.    KPSPA

Plaintiff brings three claims—Count II, Count III, and Count IV—under the Kansas Public Speech Protection Act (KPSPA). Doc. 44 at 79, 85, 87. Defendants argue that plaintiff

can't bring her claims under the KPSPA because that law doesn't provide a cause of action. Doc. 38 at 10; Doc. 40 at 9.  Defendants are right.

The KPSPA is an anti-SLAPP (Strategic Lawsuits Against Public Participation) statute. *Zickel v. City of Overland Park*, No. 24-CV-2506-EFM-ADM, 2025 WL 2623209, at *10 (D. Kan. Sept. 11, 2025).  "'An anti-SLAPP statute is a specialized version of the tort of abuse of process, designed to reduce defense costs by creating an absolute or qualified immunity, and (in several states) by requiring early disposition of a motion to dismiss.'"  *CST Indus., Inc. v. Tank Connection, L.L.C.*, No. 23-2339-JAR-RES, 2024 WL 3360420, at *3 (D. Kan. July 9, 2024) (quoting *Orchestrate HR, Inc. v. Blue Cross Blue Shield Kan.*, No. 19-CV-04007-HLT-TJJ, 2019 WL 6327591, at *1 (D. Kan. Nov. 26, 2019)).  "The purpose of the KPSPA is to protect the constitutional rights of a person to petition, speak, and associate freely about 'a public issue or issue of public interest,' while also 'protecting the rights of a person to file meritorious lawsuits for demonstrable injury.'"  *Zickel*, 2025 WL 2623209, at *10 (quoting Kan. Stat. Ann. § 60-5320(b)).

To that end, the KPSPA provides that a "party may bring a motion to strike the claim if a claim is based on, relates to or is in response to a party's exercise of the right of free speech, right to petition or right of association." Kan. Stat. Ann. § 60-5320(d).  And so the KPSPA provides a procedural mechanism to raise a defense—but not a cause of action.  *See Neuman v. Anesthesia Assocs. of Kan. City, P.A.*, No. 127,030, 2025 WL 2177353, at *4 (Kan. Ct. App. Aug. 1, 2025) (published) ("In support of its purpose to prevent frivolous lawsuits, the KPSPA permits litigants to move to strike claims that impede a party's public participation through free expression and thus protect a party's First Amendment rights").

The court thus dismisses plaintiff's claims asserted under the KPSPA.

### H.    Breach of Contract

Plaintiff's final claim is one for breach of contract, premised on several breaches of the labor agreement (the Agreement) between National Education Association Shawnee Mission and the District.  Plaintiff alleges six different breaches:

(1) promising "no discipline as a result of the 'investigation' and then subjecting [plaintiff] to discipline[,]" Doc. 44 at 96 (SAC ¶ 516);

(2) refusing "to participate in the grievance process under the contract, including without limitation binding arbitration[,]" *id.* (SAC ¶ 517);

(3) refusing plaintiff academic freedom, *id.* (SAC ¶ 519);

(4) subjecting plaintiff "to disciplinary action under the District policies for expression that is protected by the First Amendment[,]" *id.* (SAC ¶ 520);

(5) discriminating against plaintiff because of her political affiliation, *id.* at 97 (SAC ¶ 522); and

(6) discriminating "against [plaintiff] because she is not a member of the teacher's union[,]" *id.* (SAC ¶ 523).

The individual defendants argue that the court should dismiss this claim as asserted against them because they're not parties to the Agreement.  Doc. 38 at 10.  Plaintiff doesn't respond to this argument, *see generally* Doc. 50-2, so the court considers the breach-of-contract claim against the individual defendants abandoned.  It's dismissed.

The District, for its part, seeks dismissal of plaintiff's breach-of-contract claim based on the second alleged breach:  refusal to participate in the grievance process.  Doc. 40 at 9.  The District asserts that plaintiff couldn't appeal the findings of the second investigation under the Agreement's grievance policy.  *Id.*  And plaintiff couldn't appeal because the second investigation didn't produce discipline, as defined in the Agreement.  Doc. 58 at 4.  The District insists that these conclusions are supported by the "plain and clear language of the agreement[.]" Doc. 40 at 9.  And it cites the relevant portions of the Agreement.  *Id.*  But that's all there is.

Plaintiff calls the District's argument on this front conclusory and unexplained.  Doc. 50-1 at 35.  It is.  The District doesn't cite a single principle of contract interpretation.  Doc. 40 at 9–10; Doc. 58 at 4–5.  Nor does the District bother to apply the relevant provisions of the contract.[5]  The District thus has waived this argument.  *See Miller v. Astrue*, No. 09-1354-JWL, 2010 WL 4810231, at *5 (D. Kan. Nov. 19, 2010) (concluding party had waived argument where party cited no legal authority and provided no explanation).

That decision concludes the court's analysis of plaintiff's state-law claims.  The court considers defendants' two arguments attacking the remedies plaintiff requests.  This analysis starts with plaintiff's requested equitable relief.

## I.    Equitable Relief

The individual defendants argue that they can't implement the equitable relief that plaintiff seeks.  Doc. 38 at 11.  Plaintiff doesn't respond directly to this argument, but in arguing that her claims do not duplicate each other, she responds that the court "may order different injunctive relief to be effectuated by the Individual Defendants in their different capacities."  Doc. 50-2 at 9.

The SAC seeks the following injunctive relief:

- prohibit defendants from requiring plaintiff to hide certain information about children from their parents, Doc. 44 at 101 (SAC ¶ VII.C.);

- prohibit defendants from compelling plaintiff to use a transgender student's preferred names and pronouns, *id.* (SAC ¶ VII.D.);

---

[5]    For example, it's not evident whether the actions taken against plaintiff after the second investigation qualify as discipline.  The Agreement doesn't seem to define "discipline" explicitly.  The Agreement does provide, though, that "Disciplinary action may include:  a. A verbal reprimand; b. A written reprimand; c. Suspension with pay; d. Suspension without pay; e. Non-renewal or termination."  Doc. 44-12 at 13 (Ex. 12).  Is this an exhaustive list of disciplinary actions or a non-exhaustive list?  What effect does the permissive "may" have on the list?  No one party addresses these important questions—and the court views them as important ones.

- prohibit defendants from compelling plaintiff to engage in speech that conflicts with her religious beliefs, *id.* (SAC ¶ VII.E.);

- identify and produce the allegedly racist materials in plaintiff's classroom, *id.* (SAC ¶ VII.F.);

- produce plaintiff's permanent file, halt all suggestions that plaintiff had racist materials in her classroom, and include a finding in plaintiff's permanent file that she didn't have racist materials or behave in a racist manner, *id.* at 102 (SAC ¶ VII.G.); and

- retract and purge plaintiff's personnel file of any reference to disciplining plaintiff for her views on gender identity, *id.* (SAC ¶ VII.H.).

Only four individual defendants, sued in their individual capacities, remain. And it's plausible that all four could grant the above relief. Defendant Higgins is the District's Director of Secondary Human Resources, Doc. 44 at 1, so he plausibly has access to plaintiff's files. Thus, there's a basis for a reasonable inference that he possesses power to effectuate some of this relief. The same goes for defendant England, the Compliance Coordinator. *Id.* Higgins also is the defendant who accused plaintiff of having racist materials, so he plausibly could produce those materials. Defendant Hubbard is the District's superintendent, with a variety of powers to create and enforce policies against faculty. *Id.* at 12, 13, 14 (SAC ¶¶ 55, 58, 65). Defendant Ewers is the principal of the school where plaintiff teaches and also has the power to enforce the challenged policies and practices against plaintiff. *Id.* at 15 (SAC ¶ 74). An injunction against defendants Hubbard and Ewers thus could achieve some of the policy-based relief plaintiff seeks. The court thus declines to dismiss the equitable relief sought from these defendants.

## J.    Punitive Damages

The District argues that plaintiff can't recover punitive damages against a governmental entity, so the court should dismiss that request. Doc. 40 at 10. This is another helping of imprecision. The District did not need to make this argument because plaintiff's Complaint

explicitly provides that she is not seeking punitive damages against the District.  Doc. 44 at 102 (SAC ¶¶ VII.I–J.).  The court thus denies this part of the District's motion.

## IV.        Conclusion

The court grants the individual defendants' Motion to Dismiss (Doc. 35).  It grants in part and denies in part the individual defendants' other Motion to Dismiss (Doc. 37).  And it grants in part and denies in part the District's Motion to Dismiss (Doc. 39).

The court dismisses plaintiff's claims asserted against the individual defendants in their official capacities because plaintiff has sued the relevant government entity.  So, she doesn't need to sue the individual defendants in their official capacities as well.

The court dismisses plaintiff's Title VII claims against the 15 individual defendants because she only can sue her employer:  the District.  But the court declines to dismiss plaintiff's Title VII claims against the District.

On plaintiff's federal constitutional claims, the court dismisses 11 of the individual defendants sued in their individual capacities because, put simply, those 11 defendants[6] didn't do anything.  It then rejects the individual defendants' request for legislative immunity as perfunctory.  The individual defendants also have raised a qualified-immunity defense.  This defense succeeds against plaintiff's freedom-of-speech claims because plaintiff has failed to state a constitutional violation.  And her freedom-of-speech right to refuse to refer to transgender students by their preferred name and pronouns isn't clearly established.

Without a constitutional violation, the court dismisses these federal constitutional claims against the District, too.  But defendants didn't move to dismiss plaintiff's First Amendment retaliation claim based on her published articles; the unconstitutional conditions claim based on

---

[6]        The 11 defendants encompassed within this ruling are Schumacher, Gilhaus, Sinclair, Hembree, Borgman, Boyd-Noronha, Goodburn, Ousley, Stratton, Garcia, Westbrook.

free exercise of religion; nor plaintiff's free-exercise-of-religion claim.  Plaintiff also has alleged plausibly that the pronoun-and-name practice—though not a formal policy adopted by the board of education—came from the District, so the District remains on the hook for these three surviving § 1983 claims.

Plaintiff has come to realize that she can't sue directly under the Kansas Constitution, so the court dismisses those claims.  But Plaintiff's KPRFA claims against the individual defendants survive.  And her KPRFA claims against the District survive because the District's argument that the KTCA required plaintiff to give notice of her KPRFA claims before filing her suit fails to persuade the court.  KPRFA claims don't fall under the KTCA.  In contrast, plaintiff's KPSPA claims don't survive because that statute (Kansas's anti-SLAPP statute) doesn't provide her with a cause of action.  For the breach-of-contract claim, no contract exists between plaintiff and the individual defendants, so that claim is dead on arrival.  It's dismissed as it applies to those individual defendants.  Plaintiff's breach-of-contract claim against the District survives, however, because the District's undeveloped argument on this front is insufficient to merit relief.

The individual defendants argue that they can't implement plaintiff's sought equitable relief but, for the four remaining individual defendants, that's not so.  Consequently, injunctive relief—a remedy, not a claim—remains viable against individual defendants Higgins, England, Hubbard, and Ewers.  And the District argues that plaintiff can't recover punitive damages from it—a wholly unnecessary argument because plaintiff doesn't seek punitive damages from the District.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants Mario Garcia, David Westbrook, Michelle Hubbard, Joe Gilhaus, Rachel England, Michael Schumacher,

Jeremy Higgins, David Ewers, Mary Sinclair, Jessica Hembree, Jamie Borgman, April Boyd-Noronha, Sara Goodburn, Heather Ousley, and Brad Stratton's Motion to Dismiss (Doc. 35) is granted. The court dismisses all claims asserted against these defendants in their official capacities.

**IT IS FURTHER ORDERED THAT** defendants Mario Garcia, David Westbrook, Michelle Hubbard, Joe Gilhaus, Rachel England, Michael Schumacher, Jeremy Higgins, David Ewers, Mary Sinclair, Jessica Hembree, Jamie Borgman, April Boyd-Noronha, Sara Goodburn, Heather Ousley, and Brad Stratton's Motion to Dismiss (Doc. 37) is granted in part and denied in part, all as fully explained in this Order.

**IT IS FURTHER ORDERED THAT** defendant USD 512 Shawnee Mission's Motion to Dismiss (Doc. 39) is granted in part and denied in part, as explained here.

**IT IS SO ORDERED.**

**Dated this 25th day of September, 2025, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
